**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| IN RE: CREDIT DEFAULT SWAPS AUCTIONS LITIGATION | Case No. 1:21-cv-00606-KG-JHR<br><br><br>**DEALER DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 3

    A.    Credit Default Swaps ............................................................................. 3

    B.    Early Settlement Of CDS Contracts ...................................................... 4

    C.    The Auction Mechanism ........................................................................ 6

    D.    Plaintiff's Allegations ........................................................................... 7

ARGUMENT ......................................................................................................... 10

    I.    PLAINTIFF FAILS TO PLEAD A PLAUSIBLE ANTITRUST
        CONSPIRACY. ................................................................................... 10

        A.    Plaintiff's Improper Group Pleading Fails To Connect A Single
            Dealer Defendant To The Alleged Conspiracy. ..................................... 10

        B.    Plaintiff Fails To Plead The Existence Of The Alleged Conspiracy. ....... 13

            1.    Plaintiff Fails To Plead Direct Evidence Of A Conspiracy. ......... 14

            2.    Plaintiff Fails To Plead Circumstantial Evidence Of
                Conspiracy:  No Parallel Conduct. ................................................. 15

            3.    Plaintiff Fails To Plead Circumstantial Evidence Of
                Conspiracy: No "Plus Factors." ...................................................... 20

        C.    Plaintiff's Attacks On The CDS Auction Process Fail To State A
            Sherman Act Claim. .............................................................................. 23

            1.    Plaintiff Fails To Adequately Allege Any Agreement To
                Restrain Trade Related To The CDS Auction Process. ................. 24

            2.    Plaintiff Fails To Plead That Any Agreement Related To
                The CDS Auction Process Would Be A Per Se Violation. ........... 27

            3.    Plaintiff Fails To Plead The Elements Of A Rule-Of-
                Reason Claim Regarding The CDS Auction Process. ................... 29

    II.    PLAINTIFF LACKS ANTITRUST STANDING. ................................. 31

        A.    Plaintiff Has Not Plausibly Alleged That It Suffered Injury From
            The Alleged Anticompetitive Conduct. ................................................ 31

        B.    Plaintiff Is Not An Efficient Enforcer Of The Antitrust Laws With
            Respect To Transactions With Non-Defendants. ................................... 34

    III.    PLAINTIFF FAILS TO PLEAD FACTS SUPPORTING A PLAUSIBLE
         CLAIM OF MANIPULATION UNDER THE CEA. ........................... 36

A.      Plaintiff Fails To Adequately Plead The Elements Of A
        Manipulation Claim. ........................................................... 37

B.      Plaintiff Fails To Adequately Plead Actual Damages As Required
        By The CEA ........................................................................ 39

IV.     PLAINTIFF'S UNJUST ENRICHMENT CLAIM SHOULD BE
        DISMISSED. ....................................................................... 41

V.      PLAINTIFF'S CLAIMS AND DAMAGES ARE LIMITED BY THE
        STATUTE OF LIMITATIONS. ............................................ 43

A.      Plaintiff Had Notice Of Its Claims ..................................... 44

B.      Plaintiff Does Not Plead Fraudulent Concealment. ............ 47

VI.     PLAINTIFF FAILS TO ESTABLISH PERSONAL JURISDICTION
        OVER THE FOREIGN DEFENDANTS. ............................. 49

A.      The Foreign Defendants Are Not Subject To General Jurisdiction. ......... 50

B.      The Foreign Defendants Are Not Subject To Specific Jurisdiction. ........ 51

CONCLUSION .................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
   2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ........................................................13

*Abraham v. Intermountain Health Care Inc.*,
   461 F.3d 1249 (10th Cir. 2006) ...........................................................................17

*Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*,
   64 F. Supp. 2d 1097 (D. Kan. 1999) ...................................................................30

*Alaska Dep't of Revenue v. Manku*,
   2021 WL 3027170 (2d Cir. July 19, 2021) ....................................................12, 15

*Am. Fidelity Assurance Co.* v. *Bank of N.Y. Mellon*,
   810 F.3d 1234 (10th Cir. 2016) .......................................................................50, 51

*In re Amaranth Nat. Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008) *aff'd*, 730 F.3d 170 (2d Cir. 2013) ............39

*Anderson Living Tr. v. ConocoPhillips Co., LLC*,
   952 F. Supp. 2d 979 (D.N.M. 2013) .....................................................................43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................10, 18

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999)...................................................................................21

*New Mexico ex rel. Balderas v. Google, LLC*,
   489 F. Supp. 3d 1254 (D.N.M. 2020) ...................................................................37

*Ballen v. Prudential Bache Sec., Inc.*,
   23 F.3d 335 (10th Cir. 1994) ................................................................................47

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................... *passim*

*Benton v. Cameco Corp.*,
   375 F.3d 1070 (10th Cir. 2004) ............................................................................54

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
   691 F. App'x 389 (9th Cir. 2017) .........................................................................20

*Braman v. The CME Grp., Inc.*,
  149 F. Supp. 3d 874 (N.D. Ill. 2015) .................................................................40

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*,
  137 S.Ct. 1773 (2017) ..........................................................................52, 54

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*,
  691 F. App'x 515 (10th Cir. 2017) .................................................11, 13, 14, 17

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ..............................................................................30

*Bryson v. Gonzales*,
  534 F.3d 1282 (10th Cir. 2008) .................................................................11

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
  846 F.3d 1297 (10th Cir. 2017) .................................................................27

*Buffalo Broad. Co. v. ASCAP*,
  744 F.2d 917 (2d Cir. 1984)......................................................................27

*Butala v. Agashiwala*,
  916 F. Supp. 314 (S.D.N.Y. 1996) ..............................................................48

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) .................................................................29

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993).....................................................................23

*In re Cattle Antitrust Litig.*,
  2020 WL 5884676 (D. Minn. Sept. 29, 2020) ..................................................37

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)..................................................................53, 55

*In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
  435 F. Supp. 3d 845 (N.D. Ill. 2020) ................................................... *passim*

*Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*,
  763 F. Supp. 2d 759 (W.D.N.C. 2011) ..........................................................15

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
  328 F. Supp. 3d 217 (S.D.N.Y. 2018)...............................................16, 18, 22

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
  2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013), *aff'd*, 560 F. App'x 84 (2d Cir.
  2014) ..............................................................................................17

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)..................................................................23

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)..............................................................................31

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)........................................................................................50

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    801 F.3d 758 (7th Cir. 2015) ........................................................................36

*Dental Dynamics, LLC v. Jolly Dental Grp., LLC*,
    946 F.3d 1223 (10th Cir. 2020) ..............................................................49, 54

*In re DiPlacido*,
    2008 WL 4831204 (C.F.T.C. Nov. 5, 2008)..................................................38

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)............................................................................23

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*,
    407 F.3d 1091 (10th Cir. 2005) ....................................................................43

*Fabara v. GoFit, LLC*,
    308 F.R.D. 380 (D.N.M. 2015)....................................................................51

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019)..........................................................55

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S.Ct. 1017 (2021)....................................................................................52

*New Mexico ex rel. Foy v. Vanderbilt Cap. Advisors, LLC*,
    2009 WL 3672921 (D.N.M. Apr. 13, 2009) ................................................11

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d. 2016)............................................................................25, 35

*In re German Auto. Mfrs. Antitrust Litig.*,
    2020 WL 1542373 (N.D. Cal. Mar. 31, 2020)..............................................28

*GF Gaming Corp. v. Black Hawk Casino Owners Ass'n*,
    326 F. Supp. 2d 1177 (D. Colo. 2004)..........................................................32

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
    547 F.3d 266 (5th Cir. 2008) ........................................................................26

v

*In re GSE Bonds Antitrust Litig.*,
  396 F. Supp. 3d 354 (S.D.N.Y. 2019) .................................................................12

*Harry v. Total Gas & Power N. Am., Inc.*,
  244 F. Supp. 3d 402 (S.D.N.Y. 2017)..............................................................33, 38

*Harry v. Total Gas & Power N. Am., Inc.*,
  889 F.3d 104 (2d Cir. 2018)........................................................... 33-34, 40

*Heimann v. Kinder-Morgan CO2 Co., L.P.*,
  144 P.3d 111 (N.M. Ct. App. 2006) ....................................................................42

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  708 F. Supp. 2d 348 (S.D.N.Y. 2010)..................................................................18

*In re ICE LIBOR Antitrust Litig.*,
  2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ......................................................12

*Indus. Constructors Corp. v. U.S. Bureau of Reclamation*,
  15 F.3d 963 (10th Cir. 1994) .......................................................................44, 47

*Infant Swimming Rsch., Inc. v. Faegre & Benson, LLP*,
  335 F. App'x 707 (10th Cir. 2009) .......................................................................32

*In re Int. Rate Swaps Antitrust Litig.*,
  2018 WL 2332069 (S.D.N.Y. May 23, 2018) ......................................................30

*In re Int. Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)..............................................21, 23, 29, 42

*Int'l Healthcare Mgmt. v. Haw. Coalition for Health*,
  332 F.3d 600 (9th Cir. 2003) ...............................................................................26

*JM through Foley v. N.M. Dep't of Health*,
  2009 WL 10698495 (D.N.M. Mar. 5, 2009)........................................................49

*Kan. Penn. Gaming, LLC v. Collins*,
  656 F.3d 1210 (10th Cir. 2011) ...........................................................................11

*Kaw Valley Elec. Coop. Co. v. Kan. Elec. Power Coop., Inc.*,
  872 F.2d 931 (10th Cir. 1989) .............................................................................43

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)......................................................................................49, 53

*King v. Est. of Gilbreath*,
  2016 WL 7468071 (D.N.M. Mar. 30, 2016)....................................................45, 46

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
    910 F.3d 927 (7th Cir. 2018) ................................................22

*Koch v. Koch Indus.*, *Inc.*,
    203 F.3d 1202 (10th Cir. 2000) ...................................................37, 47

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ...............................................21

*Leder v. Am. Traffic Sols, Inc.*,
    81 F. Supp. 3d 211 (E.D.N.Y. 2015) *aff'd*, 630 F. App'x 61 (2d Cir. 2015)..........41

*Leegin Creative Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..........................................................28

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)..................................................44

*Levy v. BASF Metals Ltd.*,
    917 F.3d 106 (2d Cir.), *cert. denied*, 140 S. Ct. 536 (2019) ......................44, 45, 46

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ......................................34

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014)..........................................40-41

*Litovich. v. Bank of Am. Corp.*,
    2021 WL 4952034 (S.D.N.Y. Oct. 25, 2021) ..................................... *passim*

*Llacua v. W. Range Ass'n*,
    930 F.3d 1161 (10th Cir. 2019) ................................................ *passim*

*Lucero v. Olivas*,
    2016 WL 10242917 (D.N.M. Sept. 13, 2016) ....................................3-4

*Maple Flooring Mfrs.' Ass'n* v. *United States*,
    268 U.S. 563 (1925)........................................................26, 27

*Martin v. Comcast Cablevision Corp. of Cal., LLC*,
    338 P.3d 107 (N.M. Ct. App. 2014) ............................................43

*Martinez v. N. Arizona Univ.*,
    2021 WL 3488268 (D.N.M. Aug. 9, 2021) .......................................52

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................33

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)....................................................................... 14-15

*In re Mexican Gov't Bonds Antitrust Litig.*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019)....................................................12, 13, 42

*Mitchell v. Bank of N.Y. Mellon*,
    835 F. App'x 318 (10th Cir. 2020) ....................................................................32

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................... 13-14, 21, 22, 25

*MVT Servs., LLC v. Terminal Exch. Servs., Inc.*,
    2020 WL 6384293 (D.N.M. May 5, 2020).........................................................50

*N. Am. Soccer League, LLC v. U. S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018)...............................................................................29

*In re N. Sea Brent Crude Oil Futures Litig.*,
    256 F. Supp. 3d 298 (S.D.N.Y. 2017)...............................................................17

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*,
    2011 WL 13253436 (C.D. Cal. Dec. 19, 2011) ............................................ 19-20

*Nguyen v. FXCM Inc.*,
    364 F. Supp. 3d 227 (S.D.N.Y. 2019)................................................................40

*In re Novartis & Par Antitrust Litig.*,
    2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019).....................................................41

*Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985)..................................................................................... 27-28

*Old Republic Ins. Co. v. Cont'l Motors, Inc.*,
    877 F.3d 895 (10th Cir. 2017) ...................................................................51, 55

*Ontiveros Insulation Co., Inc. v. Sanchez*,
    3 P.3d 695 (N.M. Ct. App. 2000)......................................................................42

*Orgill v. Norstan Commc'ns, Inc.*,
    2002 WL 35649498 (D.N.M. Dec. 5, 2002) ......................................................43

*Ortiz v. N.M. Dep't of Cultural Affs.*,
    2017 WL 6375618 (D.N.M. Dec. 13, 2017), *report and recommendation
    adopted*, 2018 WL 637394 (D.N.M. Jan. 31, 2018)..........................................48

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) ...........................................................................37

*Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*,
 801 F. Supp. 2d 1163 (D.N.M. 2011) ...................................................................35

*In re Platinum & Palladium Antitrust Litig.*,
 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .......................................................34

*In re Platinum & Palladium Commodities Litig.*,
 828 F. Supp. 2d 588 (S.D.N.Y. 2011).....................................................................37

*In re Pork Antitrust Litig.*,
 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ..........................................................16

*Pueblo of Sandia v. United States*,
 50 F.3d 856 (10th Cir. 1995) ....................................................................................3

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
 587 F. Supp. 2d 27 (D.D.C. 2008)..........................................................................26

*Ramos v. Foam Am., Inc.*,
 2018 WL 987243 (D.N.M. Feb. 20, 2018) ........................................................51, 52

*Res. Assocs. Grant Writing & Evaluation Servs., Inc.* v. Southampton Union Free
 Sch. Dist.,
 193 F. Supp. 3d 1200 (D.N.M. 2016) ......................................................................51

*Robbins v. Oklahoma*,
 519 F.3d 1242 (10th Cir. 2008) .........................................................................11, 42

*Rosner v. Bank of China*,
 528 F. Supp. 2d 419 (S.D.N.Y. 2007).....................................................................33

*In re Rough Rice Commodity Litig.*,
 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ....................................................36, 38, 39

*Santa Fe Techs., Inc. v. Argus Networks, Inc.*,
 131 N.M. 772 (Ct. App. 2001).................................................................................54

*SD3, LLC* v. *Black & Decker (U.S.) Inc.*,
 801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ..........................26

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
 277 F. Supp. 3d 521 (S.D.N.Y. 2017)................................................................34, 35

*In re Soybean Futures Litig.*,
 892 F. Supp. 1025 (N.D. Ill. 1995) .........................................................................39

*In re SSA Bonds Antitrust Litig.*
 2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018).....................................................33, 34

ix

*Sharp v. United Airlines, Inc.*,
    967 F.2d 404, 406-07 (10th Cir. 1992) ................................................................35

*Sugar v. Tackett*,
    2020 WL 6508859 (D.N.M. Nov. 5, 2020) ...........................................................53

*Sugar Inst. v. United States*,
    297 U.S. 553 (1936)...............................................................................................26

*Sullivan v. Barclays PLC*,
    2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)....................................................34, 35

*Sw. Re, Inc. v. G.B. Invs. Reinsurance Co.*,
    2011 WL 13114921 (D.N.M. June 17, 2011) ........................................................41

*Sweesy v. Sun Life Assurance Co. of Canada (USA)*,
    643 F. App'x 785 (10th Cir. 2016) ..................................................................44, 45

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) .........................................................13, 31, 33, 34

*Tatum v. Legg Mason Wood Walker, Inc.*,
    83 F.3d 121 (5th Cir. 1996) ...................................................................................36

*Texaco Inc.* v. *Dagher*,
    547 U.S. 1 (2006)...................................................................................................27

*In re Treasury Sec. Auction Antitrust Litig.*,
    2021 WL 1226670 (S.D.N.Y. Mar. 31, 2021) ......................................2, 12, 13, 20

*Two Old Hippies, LLC v. Catch the Bus, LLC*,
    784 F. Supp. 2d 1200 (D.N.M. 2011) ...................................................................11

*In re Urethane Antitrust Litig.*,
    409 F. Supp. 2d 1275 (D. Kan. 2006) ...................................................................49

*Walden v. Fiore*,
    571 U.S. 277 (2014).................................................................................49, 52, 55

*Walker v. Emergency Staffing Sols., Inc.*,
    2017 WL 3206641 (D.N.M. Feb. 2, 2017) ...........................................................43

*Warren v. MBI Energy Servs., Inc.*,
    2020 WL 937420 (D. Colo. Feb. 25, 2020), *report and recommendation*
    *adopted in part*, 2020 WL 5640617 (D. Colo. Sept. 22, 2020) ..............................54

*Wenz v. Memery Crystal*,
    55 F.3d 1503 (10th Cir. 1995) ........................................................................49, 52

**Statutes**

7 U.S.C. § 1a(47)(B)(x) .................................................................................2, 36

7 U.S.C. § 9 ..................................................................................................38

7 U.S.C. § 13 ................................................................................................36

7 U.S.C. § 25(a)(1) .......................................................................................39

7 U.S.C. § 25(c) ...........................................................................................44

15 U.S.C. § 15b ............................................................................................43

28 U.S.C. § 1367(c) ......................................................................................41

N.M. Stat. Ann. § 37-1-4 .............................................................................44

N.M. Stat. Ann. § 38-1-16(A)(1) ..................................................................53

**Other Authorities**

17 C.F.R. §180.1 ..........................................................................................38

17 C.F.R. § 240.3a67-2(a) ........................................................................2, 36

2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2013-2020) ...................15, 22

Credit Event Auction, CreditFixings.com, https://creditfixings.com/
    CreditEventAuctions/disclaimerHist.jsp ..............................................36

Creditex Group Inc. and Markit Group Limited, *Credit Event Fixings*,
    https://www.creditfixings.com/CreditEventAuctions/fixings.jsp .............................7

DOJ Antitrust Division, Business Review Letter from Asst. Att'y Gen. Makan
    Delrahim to Abram J. Ellis of Simpson Thacher & Bartlett LLP (Oct. 1,
    2020), https://www.justice.gov/atr/page/file/ 1323171/download..........................28

Erica Paulos, Bruno Sultanum, & Elliot Tobin, "CDS Auctions: An Overview,"
    *Federal Reserve Bank of Richmond: Economic Quarterly* (2Q 2019) ..............................29, 48

Federal Reserve Bank of New York, *Fourth Industry Meeting Hosted by the
    Federal Reserve Bank of New York* (June 9, 2008),
    https://www.newyorkfed.org/newsevents/news/markets/2008/ma080609.html .................. 4-5

Federal Reserve Bank of New York, *New York Fed Welcomes CDS Auction
    Hardwiring* (Mar. 12, 2009),
    https://www.newyorkfed.org/newsevents/news/markets/2009/ma090312.........................5, 28

Letter to Timothy Geithner, President Federal Reserve Bank of New York
    (Mar. 27, 2008),
    https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/
    2008/an080327.pdf ................................................................................................5

Mikhail Chernov, Alexander S Gorbenko, & Igor Makaraov, "CDS Auctions,"
    *Review of Financial Studies* (Mar. 2013) ...................................................48

*Repository Reporting OTC Data*, Depository Tr. & Clearing Corp.,
    https://www.dtcc.com/repository-otc-data.............................................................23

Senior Supervisors Grp., Observations on Management of Recent Credit Default
    Swap Credit Events (Mar. 9, 2009), https://www.newyorkfed.org/
    medialibrary/media/newsevents/news/markets/2009/SSG_030909.pdf................................48

Sudip Gupta & Rangarajan Sundaram, "CDS Auctions and Informative Biases in
    CDS Recovery Rates," Working Paper (Aug. 2012)................................................48

U.S. Treasury Dep't, et al., *Policy Statement on Financial Market Developments*
    (Mar. 2008), https://www.treasury.gov/resource-center/fin-
    mkts/Documents/pwgpolicystatemktturmoil_03122008.pdf.....................................4

Virginie Coudert & Mathieu Gex, "The Credit Default Swap Market and the
    Settlement of Large Defaults," *International Economics* (Mar. 2010) ...................................48

The Dealer Defendants[1] respectfully submit this memorandum in support of their motion to dismiss Plaintiff's Complaint in its entirety.

## PRELIMINARY STATEMENT

Plaintiff alleges that ten groups of the Dealer Defendants comprised of thirty-two distinct corporate entities conspired over sixteen years to manipulate final auction prices for credit default swaps ("CDS"). (Compl. ¶¶ 1, 22.) Yet Plaintiff fails to plead any facts about any individual Dealer Defendant's participation in or submissions to any particular CDS auction. Instead, Plaintiff asserts that the Dealer Defendants had the opportunity to manipulate the final auction prices and speculates that the Dealer Defendants have shared competitively sensitive information and coordinated their submissions in CDS auctions. (*Id.* ¶¶ 263-264, 271.) Lacking any factual allegations about any individual Dealer Defendant's auction participation or submissions, Plaintiff purports to support its conspiracy claim with aggregated statistical analyses, none of which are sufficient to withstand this motion to dismiss. (*Id.* ¶¶ 25, 194.) Dismissal is warranted for at least six reasons.

*First*, Plaintiff fails to plead a plausible antitrust conspiracy to manipulate CDS auction prices. The Complaint contains no direct evidence of a conspiracy or any circumstantial evidence from which the Court could draw a plausible inference of a conspiracy. Plaintiff's reliance on

---

[1] Bank of America Corporation, Bank of America, N.A., BofA Securities, Inc., Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., BNP Paribas S.A., BNP Paribas Securities Corp., Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc., Citigroup Global Markets Limited, Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse Capital LLC, Credit Suisse International, Deutsche Bank AG, Deutsche Bank Securities Inc., The Goldman Sachs Group, Inc., Goldman Sachs & Co. LLC, Goldman Sachs International, JPMorgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, Morgan Stanley, Morgan Stanley & Co. LLC, Morgan Stanley & Co. International plc, Morgan Stanley Capital Services LLC, NatWest Group Plc (f/k/a The Royal Bank of Scotland Group plc), NatWest Markets Plc (f/k/a The Royal Bank of Scotland plc), and NatWest Markets Securities Inc. (f/k/a RBS Securities Inc.) (together, "Dealer Defendants").

aggregated statistics to try to fill that gap is inadequate because aggregated statistics say nothing about the participation or submission of any individual Dealer Defendant and whether submissions to any individual auction were "coordinated."  Numerous federal courts "confronted with statistical analyses similar to those proffered here have emphasized that analyses in which defendants are grouped together are no substitute for well-pleaded allegations" that could support a plausible conspiracy.  *In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *15 (S.D.N.Y. Mar. 31, 2021) ("*Treasuries*") (dismissing auction rigging conspiracy claims among similar defendants based on statistical analyses).  Plaintiff's allegations about purported information sharing among CDS dealers that trade with one another daily in the interdealer marketplace, and about the development of the rules governing CDS auctions—rules that were openly and publicly adopted more than twelve years ago at the urging of federal regulators—do not provide a basis to infer an auction manipulation conspiracy.

*Second*, Plaintiff fails to plead that it was injured by the alleged conspiracy.  Plaintiff identifies only one auction that allegedly affected it, but according to Plaintiff's own allegations, and facts on which the Court may take judicial notice, this particular auction was not subject to the alleged manipulation.  Indeed, seemingly in recognition of that fact, Plaintiff *excluded* that auction from its statistical analyses.  Having failed to plead facts showing that it was injured, Plaintiff lacks antitrust standing, and its Complaint should be dismissed.

*Third*, Plaintiff's claims under the Commodities Exchange Act ("CEA") are fatally flawed and must be dismissed.  Single-name CDS, the financial product at issue in this case, are outside the scope of the CEA.  *See* 7 U.S.C. § 1a(47)(B)(x); 17 C.F.R. § 240.3a67-2(a).  In addition, Plaintiff's CEA manipulation claim does not satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Plaintiff's CEA claim relies on the same allegations as its antitrust

claim, and thus similarly fails.  In particular, the Complaint fails to plead any facts detailing manipulation of any specific auction, describing any actual net loss from an allegedly manipulated CDS transaction, or establishing the other required elements of a CEA claim.

*Fourth*, the Court should decline to exercise supplemental jurisdiction over Plaintiff's unjust enrichment claim after dismissing Plaintiff's federal claims.  Alternatively, the Court should dismiss Plaintiff's unjust enrichment claim because it is duplicative of Plaintiff's flawed antitrust claim, among other reasons.

*Fifth*, the applicable statutes of limitations bar Plaintiff's claims to the extent those claims accrued before June 30, 2017 (in the case of the antitrust and unjust enrichment claims) or June 30, 2019 (in the case of the CEA claims).

*Finally*, Plaintiff's Complaint fails to plead facts establishing personal jurisdiction over any of the Foreign Defendants.[2]

## BACKGROUND[3]

### A.    Credit Default Swaps

A CDS is a contract that provides protection against the risk that a bond or other financial instrument will lose value as a result of a "credit event," such as bankruptcy or default.  (Compl.

---

[2] The "Foreign Defendants" are those defendants who have their principal place of business and place of incorporation outside the United States.  They are Barclays PLC, Barclays Bank PLC, BNP Paribas S.A., Citigroup Global Markets Limited, Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Deutsche Bank AG, Goldman Sachs International, Morgan Stanley & Co. International plc, NatWest Group Plc, and NatWest Markets Plc.  (Compl. ¶¶ 62-63, 66, 72, 74-75, 78, 80, 85, 93, 96-97.)

[3] The following is based on the allegations in the Complaint, the materials referenced and relied upon in the Complaint, and matters of public record, all of which may be considered in ruling on a motion to dismiss.  *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (courts may take "notice of the full contents of the published articles" quoted in complaint); *Pueblo of Sandia v. United States*, 50 F.3d 856, 861 n.6 (10th Cir. 1995) (courts may take judicial notice of government publications); *Lucero v. Olivas*, 2016 WL 10242917, at *6 (D.N.M. Sept. 13, 2016)

¶¶ 115-116.) CDS contracts require the party that agrees to provide protection against credit events (the "protection seller") to make a cash payment or purchase the distressed instrument at face value if a qualifying credit event takes place. (*Id.*) In exchange, the party purchasing protection (the "protection buyer") pays periodic fees to the protection seller. (*Id.*)

### B. Early Settlement Of CDS Contracts

Before the financial crisis in 2008, there was no widely accepted mechanism for settling CDS contracts following a credit event, i.e., for determining payment obligations under the contracts. (Compl. ¶¶ 7, 122.) CDS contracts were sometimes settled "physically," which meant that the protection seller would buy the distressed loans or bonds from the protection buyer at full face value. (*Id.* ¶ 123.) At other times, CDS contracts "cash" settled, meaning the protection seller would make a payment to the protection buyer equal to the estimated reduction in value of the bond or loan at issue. (*Id.* ¶ 124.) Determining the value of the bonds for cash settlement was done in different ways (*id.* ¶¶ 125, 130), with the most widely used mechanism being a "dealer poll" that involved "soliciting bids from multiple dealers" and "us[ing] the resulting bids" to value bonds. (*Id.* ¶ 125.) Beginning in 2005, parties also began to use an auction process as an alternative means of determining settlement values. (*Id.* ¶¶ 131-132.)

The financial crisis prompted federal regulators to urge industry participants to adopt a standardized approach to CDS settlement that could be used across the market.[4] Market

---

(courts may take judicial notice of "matters of public record," including "government documents available from reliable sources on the Internet").

[4] *See* U.S. Treasury Dep't, *et al.*, *Policy Statement on Financial Market Developments* (Mar. 2008), https://www.treasury.gov/resource-center/fin-mkts/Documents/pwgpolicystatemkt turmoil_03122008.pdf ("Supervisors should urge the industry to promptly amend standard credit derivative trade documentation to provide for cash settlement of obligations stemming from a credit event, in accordance with the terms of the cash settlement protocol that has been developed but not yet incorporated into standard documentation."); Federal Reserve Bank of New York, *Fourth Industry Meeting Hosted by the Federal Reserve Bank of New York* (June 9, 2008),

participants—dealers, customers, and industry groups, including the International Swaps and

Derivatives Association, Inc. ("ISDA")—responded by committing to develop a standardized

auction settlement mechanism.[5]  In March 2009, these efforts culminated in the incorporation of

an auction settlement mechanism into the standard form contract for CDS trading published by

ISDA.  (*Id.* ¶¶ 131, 184.)  Federal regulators endorsed these efforts:

> The New York Fed, along with other supervisors involved in OTC
> [over-the-counter] market improvement efforts **support the**
> **permanent incorporation of the auction-based mechanism in**
> **order to increase the certainty, transparency and orderliness of**
> **settling CDS transactions following a credit event**.[6]

The auction settlement process adopted in 2009 is now widely used, and parties often

transact in CDS using the standardized contracts published by ISDA, which provide an efficient

means to transact in CDS without undertaking burdensome individualized negotiations that

increase transaction costs.  (*See* Compl. ¶ 137.)  Nevertheless, parties continue to transact in CDS

pursuant to bilaterally negotiated bespoke contracts that do not incorporate the auction protocol

developed by ISDA and instead call for settlement through other means (e.g., physical settlement).

(*Id.* ¶¶ 14, 101.)

---

https://www.newyorkfed.org/newsevents/news/markets/2008/ma080609.html              ("Market
participants and regulators agreed [to] promot[e] greater certainty in credit event management by
incorporating an auction based settlement mechanism into standard credit derivatives
documentation.").

[5] Letter to Timothy Geithner, President, Federal Reserve Bank of New York (Mar. 27, 2008),
https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2008/an080327.pdf.

[6] Federal Reserve Bank of New York, *New York Fed Welcomes CDS Auction Hardwiring*
(Mar. 12,      2009),      https://www.newyorkfed.org/newsevents/news/markets/2009/ma090312
(emphasis added).

C.     **The Auction Mechanism**

The auction process begins when a determinations committee is convened to determine whether a credit event has occurred.  (Compl. ¶ 138.)  There are five determinations committees covering different regions of the world (North America, EMEA, Japan, Asia ex-Japan, and Australia/New Zealand),[7] and each consists of ten dealer and five non-dealer voting members.  (*Id.* ¶ 140.)  If a determinations committee finds that a credit event has occurred, it schedules a publicly announced auction to determine the value of the affected bond or loan.  (*Id.* ¶ 138.)

The auction proceeds in two phases.  In Phase I, both defendant and non-defendant dealers may submit "initial market submissions," which are the prices at which each dealer is willing to buy or sell the CDS.  (*Id.* ¶¶ 143, 188.)  In addition, in Phase I, dealers as well as their clients (through dealers (*id.* ¶ 189)) submit physical settlement requests, which reflect the quantity of physical bonds or loans that dealers and clients wish to buy or sell.  (*Id.* ¶ 146.)   All physical settlement requests are then aggregated to determine the "net open interest," meaning the total quantity of bonds or loans to be bought or sold.  (*Id.*)

In Phase II of the auction, dealers and clients make bids and offers ("limit orders") for the instruments to be bought or sold.  (*Id.* ¶ 13.)  These bids are arranged from highest to lowest and matched off against the net open interest at the auction.  (*Id.* ¶ 148.)  The final auction price is the last limit order used to match against the net open interest, and that price "is then used as the settlement value for all outstanding CDS."  (*Id.* ¶¶ 148-149.)  Approximately 180 CDS auctions

---

[7] *See* Credit Derivatives Determinations Committees, *About Determinations Committees*, https://www.cdsdeterminationscommittees.org/about-dc-committees/.

have occurred to date, and all the submissions and results from both phases of those auctions are publicly available.[8]

### D.    Plaintiff's Allegations

Plaintiff alleges that ten groups of the Dealer Defendants (together with certain of their affiliated corporate entities) and three non-dealers have conspired to manipulate CDS final auction prices by sharing competitively sensitive information and coordinating their auction submissions. (Compl. ¶¶ 1, 22, 168.)  Despite alleging a sweeping conspiracy, Plaintiff has not identified a single instance in which any Dealer Defendant coordinated its auction submission with another Dealer Defendant.  Rather, Plaintiff simply complains that the nature of the auction structure, which was developed and adopted more than twelve years ago, provides dealers with an opportunity to manipulate final auction prices.  Plaintiff then speculates that the Dealer Defendants share confidential information about their auction bids to manipulate prices in a way that helps the dealer with the biggest physical settlement request in any given auction.  (*Id.* ¶¶ 263-264, 271.)

Plaintiff's complaints about the nature of the auction structure do not support an inference of any conspiracy to manipulate final auction prices.  Plaintiff asserts that a group of dealers agreed to every aspect of the auction settlement process to "reap anti-competitive trading profits" by excluding "non-dealers" and then "force[d] the market to adopt" that process.  (*Id.* ¶¶ 18-21, 289.) Plaintiff suggests that the rules governing CDS settlement auctions facilitated the alleged conspiracy by guaranteeing the Dealer Defendants a central "gatekeeping" role in the process. (*See, e.g.*, *id.* ¶¶ 8-21, 130-136, 175-191, 296.)  Plaintiff concedes that the auction structure was developed by many industry participants, including non-dealer clients, like Plaintiff, with the

---

[8]  *See* Creditex Group Inc. and Markit Group Limited, *Credit Event Fixings*, https://www.creditfixings.com/CreditEventAuctions/fixings.jsp.

encouragement of federal regulators and that the auction process serves a valuable market function by ensuring that CDS contracts can be efficiently cash settled by reference to a common benchmark.  (*Id.* ¶¶ 15, 130, 182-184.)  So nothing about the development of the auction structure more than twelve years ago supports an inference of a conspiracy to manipulate CDS final auction prices.

Moreover, none of Plaintiff's allegations about possible information sharing identifies a single instance in which the Dealer Defendants agreed to coordinate their auction submissions. Plaintiff alleges, for example, that the Dealer Defendants have access to bond pricing by other dealers through Bloomberg terminals, WhatsApp chats, and text messages, which are tools Plaintiff alleges are often used in the interdealer marketplace.  (*Id.* ¶¶ 28-29, 255, 259, 274-275, 287.)  Plaintiff also alleges that the Dealer Defendants learn their clients' order flow when those clients place orders with them.  (*Id.* ¶¶ 31, 260.)  Plaintiff further speculates that the Dealer Defendants have had the opportunity to share sensitive information when they meet with other dealers and non-dealer clients at determinations committee meetings (*id.* ¶¶ 32, 266), and because they sometimes socialize with one another in informal private conversations.  (*Id.* ¶¶ 274, 287(c).) Plaintiff does not, however, plead that the Dealer Defendants actually used any of those opportunities to share confidential information.  None of Plaintiff's non-conclusory allegations plead facts that, if true, would establish that the Dealer Defendants conspired to manipulate CDS final auction prices.

Lacking any non-conclusory factual allegations specific to any of the Dealer Defendants, Plaintiff instead relies on aggregated statistics.  (*Id.* ¶¶ 192-254.)  Plaintiff alleges that these statistics show that, on average, the auction submission of the dealer that made the largest physical settlement request at a given auction (the so-called "dominant dealer") "correlates" with the

auction submissions of other dealers over the course of dozens of auctions.  (*Id.* ¶¶ 205-238).

Plaintiff concedes that its datasets do not include all CDS auctions or all submissions at those

auctions.  Rather, Plaintiff acknowledges its dataset excludes (1) auctions where a non-defendant

dealer was the dominant dealer and (2) any non-defendant dealer's limit orders.  (*Id.* ¶¶ 219, 232.)

Although Plaintiff claims to find correlations between these submissions in the aggregate, it pleads

no factual allegations about the bidding behavior of any individual Dealer Defendant.  Nor does

Plaintiff plead that the purported correlation in any particular auction is different for dealers versus

non-dealers or defendants versus non-defendants.  To the contrary, the Complaint effectively

acknowledges that the same alleged correlation that is the linchpin of the Complaint is also present

in the bids of non-dealers and non-defendants.  (*Id.* ¶¶ 233-234.)

Plaintiff nevertheless claims to have been injured by the alleged conspiracy when it

participated in a single CDS auction involving CDS on Argentine bonds in June 2020 (the

"Argentine Auction").  (Compl. ¶ 318.)   Specifically, Plaintiff claims that "Defendants'

misconduct caused the [Argentine] auction's final price to fall," and that Plaintiff, "as a protection

seller," "had to make credit protection payments to its counterparty that were artificially inflated

as a result of Defendants' conspiracy." (*Id.*)  From the publicly available results of the Argentine

Auction, however, it is clear that non-defendant HSBC was the "dominant Dealer" of the

Argentine Auction.  (*See* Ex. A, Argentine Rep. Auction Results; Compl. ¶ 199.)[9]  Consequently,

under Plaintiff's own theory, the Argentine Auction was not affected by the alleged conspiracy.

---

[9] Because Plaintiff included allegations of the Argentine Auction and its authenticity is not in question, the Court may take judicial notice of the publicly available bids and offers in the auction outside the four corners of the complaint.  *See supra* note 3.

Indeed, Plaintiff did not even include the final price of the Argentine Auction in its putative statistical analyses.  (*See* Compl. ¶¶ 219, 232.)

## ARGUMENT

### I.   PLAINTIFF FAILS TO PLEAD A PLAUSIBLE ANTITRUST CONSPIRACY.

Plaintiff accuses the Dealer Defendants of engaging in a sixteen-year conspiracy to manipulate the final prices determined in as many as 180 different CDS auctions.  (Compl. ¶¶ 1, 22.)  To plead such a conspiracy, the Complaint must contain "enough factual matter (taken as true) to suggest that an *agreement* was made."  *Twombly*, 550 U.S. at 556 (emphasis added); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)[10] (complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.").  Allegations that the Dealer Defendants engaged in *unilateral* attempts to manipulate auction prices are insufficient: an antitrust conspiracy cannot "'survive a motion to dismiss . . . absent some factual context suggesting *agreement*, as distinct from identical, independent action.'"  *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177 (10th Cir. 2019) (emphasis added) (quoting *Twombly*, 550 U.S. at 548-549).

Plaintiff fails to plead a conspiratorial agreement for two independent reasons.  First, the Complaint relies almost entirely on improper group-pleading allegations that fail to connect any individual Dealer Defendant to the alleged conspiracy.  Second, the Complaint fails to allege facts that sustain a plausible inference that there was any conspiracy at all.

### A.   Plaintiff's Improper Group Pleading Fails To Connect A Single Dealer Defendant To The Alleged Conspiracy.

To connect each individual Dealer Defendant to the alleged conspiracy, Plaintiff must plead facts showing that each of the Dealer Defendants, "in their individual capacities, consciously

---

[10] All internal quotation marks and citations are omitted except where otherwise stated.

committed themselves to a common scheme designed to achieve an unlawful objective." *Llacua*, 930 F.3d at 1179.  To satisfy that standard, "it is 'particularly important' to 'make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations.'" *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 519 (10th Cir. 2017) (emphases added) (quoting *Kan. Penn. Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)).  "The Tenth Circuit has admonished all plaintiffs that, if a complaint uses 'either the collective term "Defendants" or a list of the defendants named individually but with no distinction as to what acts are attributable to whom,' the Court will not speculate as to what acts a particular defendant is alleged to have committed."  *New Mexico ex rel. Foy v. Vanderbilt Cap. Advisors, LLC*, 2009 WL 3672921, at *4 (D.N.M. Apr. 13, 2009) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)).  Accordingly, collective allegations that fail to "specify[] which Individual Defendants engaged in which alleged action" are insufficient to survive a motion to dismiss.  *Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1200, 1218-19 (D.N.M. 2011).  The lack of any individualized allegations as to any Dealer Defendant compels the dismissal of Plaintiff's claims.

Although Plaintiff attempts to plead a massive conspiracy to manipulate CDS auctions over a sixteen-year period, the Complaint is devoid of any facts tying *any* individual Dealer Defendant to the alleged conspiracy.  For example, the Complaint fails to identify a single collusive auction submission or a single collusive communication by any Dealer Defendant.  Instead, Plaintiff relies throughout its Complaint on conclusory allegations directed at "Dealers" as an undifferentiated group.  (Compl. ¶¶ 18-27, 168-277.)  Plaintiff's failure to link a single Dealer Defendant to the alleged conspiracy is sufficient, on its own, to dismiss the Complaint.  *See Bryson v. Gonzales*,

534 F.3d 1282, 1290 (10th Cir. 2008) (holding that "conclusory allegations that simply name the 'Defendants' generically" are insufficient); *Alaska Dep't of Revenue v. Manku*, 2021 WL 3027170, at \*4 (2d Cir. July 19, 2021) (dismissing antitrust conspiracy claims against dealers that did not "link each of the defendants individually to specific acts of anticompetitive conduct"); *Litovich. v. Bank of Am. Corp.*, 2021 WL 4952034, at \*26 (S.D.N.Y. Oct. 25, 2021) ("*Corporate Bonds*") ("Absent allegations that would support a claim against an individual defendant, there is no basis for the Court to sustain the complaint against any defendant."); *Treasuries*, 2021 WL 1226670, at \*11 ("Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the specific defendants named in the complaint fails to state a claim."); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) ("*MGB*") ("An antitrust complaint that fails to connect each or any individual entity to the overarching conspiracy . . . cannot ordinarily survive a motion to dismiss.").

Plaintiff's statistical allegations do not alter this analysis.  They "are simply group pleading in another form" because they consist of aggregated averages of auction submissions "that obscure any given [Dealer] Defendant's contribution" to those averages.  *MGB*, 412 F. Supp. 3d at 389. Numerous courts "confronted with statistical analyses similar to those proffered here have emphasized that analyses in which defendants are grouped together are no substitute for well-pleaded allegations demonstrating that *each named defendant* engaged in anti-competitive conduct."  *Treasuries*, 2021 WL 1226670, at \*15 (emphasis added); *see also In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at \*5-6 (S.D.N.Y. Mar. 26, 2020) (holding that "[i]t is inappropriate for [p]laintiffs to rely upon aggregate data," and dismissing antitrust conspiracy claim regarding alleged fixing of ICE LIBOR where plaintiffs relied on "statistical analyses"); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019) (statistical analyses do

not "suggest that the particular defendants named in this suit were part of that conspiracy" because "any given defendant's trading activity and pricing choices might well be swallowed in plaintiffs' aggregated statistics"); *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539, at *12 (S.D.N.Y. Mar. 31, 2015) ("econometric evidence" is "not sufficient to meet the plausibility test" because it only "flags the possibility of a conspiracy").

Two recent decisions are directly on point. In *Treasuries*, the plaintiffs relied on "statistical analyses" to try to plead a conspiracy among U.S. Treasuries dealers to manipulate Treasuries auctions. *See* 2021 WL 1226670, at *4-5. The statistical analyses purported to show that auction prices were artificially inflated and that the defendants outperformed non-defendants at auctions during the alleged conspiracy. *Id.* at *5-6. The court dismissed the complaint in its entirety, reasoning that the "core deficiency in [p]laintiffs' statistical analyses and other allegations . . . is that they are not aimed at any particular Auction Defendant." *Id.* at *16. Similarly, in *MGB*, the plaintiffs relied on statistical analyses of auction bids and reports of a government investigation to try to plead a conspiracy to manipulate auctions for Mexican government bonds. 412 F. Supp. 3d at 384-86. The court dismissed the complaint because the statistical analyses "failed to articulate a link between their allegations and the specific defendants named in the complaint." *Id.* at 389.

Likewise here, Plaintiff's aggregated statistics fail to tie any individual Dealer Defendant to an alleged conspiracy to manipulate CDS auctions. The Complaint should be dismissed.

## B.      Plaintiff Fails To Plead The Existence Of The Alleged Conspiracy.

"Bare bones accusations of a conspiracy without any supporting facts are insufficient to state an antitrust claim." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006). A complaint that neglects to identify the "specific time, place, or person involved in the alleged conspiracies" should be dismissed. *Bristow*, 691 F. App'x at 519. A plaintiff must plead "evidentiary facts" that support a plausible inference of a conspiratorial agreement, including "who, did what, to whom (or with

13

whom), where, and when." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) ("*Musical Instruments*"); *see also Twombly*, 550 U.S. at 555 ("[L]egal conclusion[s] couched as . . . factual allegation[s]" are not entitled to a presumption of truth.)

There are two ways to satisfy these pleading requirements.  First, a plaintiff may plead "direct evidence" of conspiracy, i.e., "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Llacua*, 930 F.3d at 1177.  Second, a plaintiff may plead "circumstantial" evidence of conspiracy by alleging that the defendants engaged in parallel conduct that "raises a suggestion of a preceding agreement." *Id.* at 1179 & n.29.  The Supreme Court, however, "has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial." *Id.* at 1179.  Accordingly, "parallel conduct, absent some additional type of contextual evidence, is generally not sufficient to nudge an antitrust conspiracy allegation beyond the line from possible to plausible." *Id.* at 1178.  Thus, allegations of parallel conduct must be accompanied by additional circumstances, known as "plus factors," that "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 553, 557; *see also Llacua*, 930 F.3d at 1179 (parallel conduct must be accompanied by additional circumstances that "tend to exclude the possibility of independent action"); *Bristow*, 691 F. App'x at 519 ("A complaint is insufficient if the alleged behavior was as likely to have been the result of legal, unilateral action as the product of illicit collusion.").

Plaintiff's Complaint fails to plead a conspiracy under either standard.

   1.   *Plaintiff Fails To Plead Direct Evidence Of A Conspiracy.*

Plaintiff has not even *attempted* to plead any direct evidence of a conspiracy to manipulate CDS auctions.  Direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor & City Council of Balt., Md. v.*

*Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Here, there are no allegations suggesting any agreement to manipulate a single CDS auction, much less a massive conspiracy of ten groups of the Dealer Defendants comprised of thirty-two distinct corporate entities to manipulate CDS auctions over the last sixteen years.

The total absence of any allegations of direct evidence of conspiracy is telling.  Tens of thousands of communications—involving at least dozens, if not hundreds, of past and present employees of the defendants—would have been necessary to carry out a sixteen-year conspiracy among thirty-two distinct corporate entities to "synchroniz[e] . . . auction submissions" and "shar[e] competitively sensitive information."  (Compl. ¶¶ 168, 342.)  Yet Plaintiff has not identified a single collusive communication between even *one pair* of the Dealer Defendants, let alone collusive communications among all of them.  In the absence of such allegations, "the sheer breadth and scope of the conspiracy alleged . . . renders Plaintiff's claims facially implausible" because sustaining such a conspiracy would require a degree of "organization and cooperation [that is] practically impossible." *Chubirko v. Better Bus. Bureau of S. Piedmont, Inc*., 763 F. Supp. 2d 759, 765 (W.D.N.C. 2011) (dismissing complaint under *Twombly*); *see also Manku*, 2021 WL 3027170, at *4 (dismissing "broad" conspiracy against SSA bond dealers because a single conspiracy "tainting every one of their trades for some seven years" is "simply not plausible").

### 2.   *Plaintiff Fails To Plead Circumstantial Evidence Of Conspiracy: No Parallel Conduct.*

Plaintiff also fails to plead parallel conduct or other circumstantial conduct that raises a plausible inference of conspiracy.  In general, parallel conduct alone raises no inference of conspiracy because "the mere fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel fashion." 2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 307(d)(3) (5th ed. 2013-2020).  Accordingly, "when [an] antitrust

claim relies solely on circumstantial facts of parallel behavior, the conspiracy is not plausible if in light of common economic experience, the alleged conduct is equally likely to result from independent action." *Llacua*, 930 F.3d at 1175.

Plaintiff fails to plead any *facts* that, if proven, would establish parallel conduct among the Dealer Defendants with respect to any auction. Although Plaintiff purports to plead certain statistical correlations among the Dealer Defendants' CDS auction submissions (Compl. ¶¶ 192-238), those allegations are insufficient for at least three reasons.

*First*, Plaintiff's statistics fail to establish any parallel auction behavior. Plaintiff's aggregate statistics, one of which covers only 34% of the 180 auctions that have occurred since 2005, consist of averages that mask all variation and divergence in each Dealer Defendant's auction submissions. These statistics allegedly show that the Dealer Defendants' submissions, on average, in the aggregate are correlated with the submissions of the dealer that makes the largest physical settlement request. (*Id.* ¶¶ 201-38.) But Plaintiff's statistics do not identify whether the bids placed by individual Dealer Defendants were even "parallel." As courts have recognized, aggregate statistics, like the ones alleged by Plaintiff, are not a substitute for well-pled allegations of parallel behavior. *See Corporate Bonds*, 2021 WL 4952034, at *20 (finding no conspiracy where "it is impossible to know from [p]laintiffs' statistics whether the average . . . is driven by one particular dealer . . . or a small group of dealers"); *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *9 (D. Minn. Aug. 8, 2019) ("Plaintiffs give no individualized examples of any one [d]efendant increasing its rate of export, but simply provide the Court with the industry-wide data. As discussed above, this does not suffice to plausibly plead parallel conduct."); *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 226-27 (S.D.N.Y. 2018) ("*Gold II*") (refusing to credit "statistical analysis [that] draws only a weak connection between

[each defendant]"); *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 2013 WL 1100770, at *4-5, n.4 (S.D.N.Y. Mar. 18, 2013) (rejecting "statistical analyses [that] reflect generalized fluctuations" and "do not include allegations that are sufficiently factual"), *aff'd*, 560 F. App'x 84 (2d Cir. 2014).

*Second*, even if Plaintiff's statistics could be construed to allege parallel behavior, they still fall short of pleading the type of parallel behavior that raises a plausible inference of conspiracy. Plaintiff's allegations of a correlation between the Dealer Defendants' submissions and the submissions of the dealer that makes the largest physical settlement request come nowhere close to showing a causal relationship that could be evidence of an agreement to coordinate bids.  It is axiomatic that "[c]orrelation is not the same as causation."  *In re N. Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 313 (S.D.N.Y. 2017) (an alleged correlation between two benchmarks and allegedly manipulated commodity prices did not show a causal relationship between them). The correlation here is even weaker because the fact that the Dealer Defendants' auction submissions differ from the prior day's trading prices is "only natural."  *Twombly*, 550 U.S. at 566. According to Plaintiff, the Dealer Defendants are the most successful CDS dealers in the world. (Compl. ¶ 126.)  It therefore is unsurprising that there may be similarities in their views about the value of securities being auctioned.  Similar submissions should be expected and are anticipated— bidders are *penalized* if their bids are "off-market."  (*Id.* ¶ 144.)  The alleged correlations among the Dealer Defendants' auction submissions lend no support to Plaintiff's claim.  *See Llacua*, 930 F.3d at 1180 (parallel conduct that "is just as consistent with unilateral action as with concerted action . . . does not, standing alone, support an inference of antitrust conspiracy"); *Bristow*, 691 F. App'x at 519 ("A complaint is insufficient if the alleged behavior was as likely to have been the result of legal, unilateral action as the product of illicit collusion."); *Abraham v. Intermountain*

*Health Care Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006) ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.").

*Third*, each of the three sets of statistics suffers from additional fatal flaws.

a.   <u>Initial Market Submission Statistics</u>.   Plaintiff's first set of statistics purports to show that the difference between the dominant dealer's initial market submission and the previous day's average bond price is correlated with, or predictive of, the non-dominant dealers' initial market submissions.  (Compl. ¶¶ 205-215.)  But this is precisely the pattern one would expect in the absence of any conspiracy.  As Plaintiff recognizes, initial market submissions are governed by a maximum allowable bid-ask spread.  (*Id.* ¶ 143.)  For example, if the maximum spread for a given auction is set at 2%, and the average price of the relevant bond on the prior trading day is $100, then all else being equal, one would expect the participants' initial market submissions to cluster around a *bid* of approximately $99 (1% lower than $100) and an *offer* of approximately $101 (1% higher than $100).  In other words, the alleged correlation is unsurprising because one would expect most *bids* to be slightly *lower* than the previous day's trading price and most *offers* to be slightly *higher* than that trading price.  Any alleged correlation, therefore, is "not only compatible with, but indeed . . . more likely explained by, lawful, unchoreographed free-market behavior" than by an antitrust conspiracy.  *Iqbal*, 556 U.S. at 680; *see also Gold II*, 328 F. Supp. 3d at 227 (finding statistical analysis to be of limited, if any, value since "[t]he charts . . . are as consistent with parallel, market-following behavior . . . as they are with participation in a price-fixing scheme"); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 361 (S.D.N.Y. 2010) (statistical analysis of municipal bond auctions was "insufficient to state a plausible § 1 claim" because bid differentials did not suggest collusion).

b.      Limit Order Statistics.  Plaintiff's second set of statistics purports to show "that the dominant Dealer's inside market submission . . . is . . . able to predict *the other Dealers'* limit order submissions."  (Compl. ¶ 220 (emphasis in original.))   Again, this is entirely consistent with expected market outcomes: one would expect the "dominant" dealer's submissions to be correlated, on average, with the limit orders submitted by auction participants in general, since all participants place their limit orders after the publication of the Phase I auction results.  (*Id.* ¶ 148.) Consistent with that expectation, Plaintiff acknowledges that the same correlations appear in the limit orders submitted by the Dealer Defendants and non-defendants alike.  As the Complaint recognizes, dealers sometimes submit limit orders "on behalf of non-dealer clients."  (*Id.* ¶ 233.) When Plaintiff takes various steps to remove "non-dealer" submissions from its statistical analyses, "the result of Plaintiff's model is the same," i.e., the model finds the same statistical correlations regardless of whether non-dealer submissions are included or excluded.  (*Id.* ¶ 234-235.)  That is to say, there are no statistically significant differences between dealer and non-dealer auction submissions.  (*See id.*)  No inference of conspiracy may be drawn from this statistical analysis because it "shows nothing distinctive about [Dealer] Defendants and nothing other than what one would expect from the natural operation of market forces."  *Corporate Bonds*, 2021 WL 4952034, at *19.

c.      Summary Statistics.  Plaintiff's "third" analysis is no more than a restyled presentation of the first two statistical analyses, using charts and diagrams.  (Compl. ¶¶ 239-254.) Plaintiff adds a vague and conclusory assertion that this analysis somehow "filter[s] out" the alleged effects of the conspiracy, but fails to state how.  (*Id.* ¶ 244.)   Accepting these "indeterminate statistics" as sufficient to sustain a conspiracy claim "would be to effectively ignore

*Twombly's* requirement of factual allegations supporting conspiracy." *Nat'l Credit Union Admin.*

*Bd. v. RBS Sec., Inc.,* 2011 WL 13253436, at *5 (C.D. Cal. Dec. 19, 2011).

> 3.     *Plaintiff Fails To Plead Circumstantial Evidence Of Conspiracy: No "Plus Factors."*

Plaintiff's failure to plead parallel conduct suggestive of conspiracy is reason alone to

dismiss the antitrust claim.  *See Bona Fide Conglomerate, Inc. v. SourceAmerica,* 691 F. App'x

389, 391 (9th Cir. 2017) ("'Plus factors' are relevant only if the complaint adequately alleges

parallel conduct among the defendants."); *Treasuries,* 2021 WL 1226670, at *16 ("[P]lus factors

alone are not sufficient; a plaintiff must also adequately allege parallel conduct.").  But even if

Plaintiff had adequately alleged parallel conduct, it still would need to plead "plus factors" that

"'tend[] to exclude the possibility' of independent action."  *Llacua,* 930 F.3d at 1178-79.  No such

factors have been pled here because there are none.

a.     <u>Common Motive</u>.  Plaintiff alleges that "some" unspecified Dealer Defendants had

a common motive to conspire because "sometimes" dealers are "aligned in their net CDS

positions."  (Compl. ¶ 285.)  But Plaintiff concedes later that the Dealer Defendants, in fact, often

"had diametrically opposed economic incentives in the auction." (*Id.* ¶ 288(a).)  Moreover,

Plaintiff fails to allege why a non-dominant dealer or a smaller Dealer Defendant that would rarely

if ever be the "dominant dealer" would share a "common motive" to slant its auction prices in

favor of the dominant dealer, when doing so would consistently be to its own detriment.  Further,

even if Plaintiff had adequately alleged that the Dealer Defendants' interests were fully aligned

with respect to CDS auctions, that allegation would undermine any inference of conspiracy

because there would be no reason to *conspire* to place bids that each Dealer Defendant already had

a *unilateral* interest in placing.  *See Twombly*, 550 U.S. at 566 (finding "no reason to infer that the

companies had agreed among themselves to do what was only natural anyway").  Finally, to the

extent Plaintiff alleges that the Dealer Defendants had a motive to submit auction bids that would maximize their trading profits, such an allegation is insufficient to plead a plus factor because "common motive for increased profits *always* exists." *Musical Instruments*, 798 F.3d at 1194 n.8 (emphasis added). Indeed, "if 'a motive to achieve higher prices' were sufficient, every company in every industry could be accused of conspiracy because they all 'would have such a motive.'" *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999)).

b.    <u>Auction Rules</u>.  Plaintiff also attempts to characterize the CDS auction rules as a "plus factor," arguing that "the dealers share a common motive to protect their status as the exclusive auction gatekeepers." (Compl. ¶ 286.) That allegation fails to establish a viable plus factor because Plaintiff never alleges that the Dealer Defendants faced any apparent threat to their so-called "gatekeeper" role or had any need to conspire to preserve it. *See In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 471 (S.D.N.Y. 2017) ("*IRS I*") (declining to find a plus factor where there was "little urgency to conspire"). Plaintiff's auction rule allegations are also defective for the additional reasons set forth in Section I-C, below.

c.    <u>Conduct Against Self-Interest</u>.  Citing its statistical allegations, Plaintiff asserts that "some" unidentified Dealer Defendants acted against their self-interest because they sometimes made auction submissions that did not benefit their CDS trading positions. (Compl. ¶ 288(a).) But Plaintiff's statistics purport to show just the opposite—Plaintiff claims they show that dealers "will act to some degree in [their] self-interest by skewing [their] initial market submission" to benefit their CDS positions. (*Id.* ¶ 217.) Moreover, even if dealers sometimes made auction submissions that were unhelpful to their CDS positions—an allegation not supported by the Complaint—that would be unsurprising because dealers "are subject to financial penalties" if their auction

submissions are deemed "off-market." (*Id.* ¶ 144.)  Plaintiff thus fails to identify any conduct contrary to the individual interests of each Dealer Defendant, i.e., conduct "that is so irrational that no firm would have engaged in it except on the understanding that others were in agreement." 2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1414 (5th ed. 2013-2020); *see also Musical Instruments*, 798 F.3d at 1195 (conduct inconsistent with self-interest occurs "where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement").

d.  <u>Inter-Firm Communications</u>.  Although Plaintiff alleges in a wholly conclusory fashion that there was "a high degree of interdealer communication" (Compl. ¶ 287), the Complaint does not identify a *single* communication among the Dealer Defendants relating to CDS auction submissions, even though *tens of thousands* of communications would have been necessary to coordinate ten Dealer Defendants' auction submissions since 2005.  Plaintiff's generic assertions that (1) the Dealer Defendants created the CDS auction process and were represented on ISDA committees, and (2) CDS traders "know each other, speak with each other often, and socialize with each other" (*id.*) carry no weight.  They have no connection to the challenged conduct, and the Dealer Defendants often trade with each other and thus have legitimate reasons to communicate.  *See Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927, 938-39 (7th Cir. 2018) (declining to infer a conspiracy where there was "no evidence indicating that the [participants in the inter-firm communications] discussed illicit price-fixing" and refusing to "put much stock in the frequency of contacts, given the amount of trading that was taking place among the firms"); *Gold II,* 328 F. Supp. 3d at 228 ("[T]he probative value of [inter-defendant communications] depends on the participants, the information exchanged, and the context—specifically, the connection between the content and the price-fixing conspiracy alleged.").  At most, Plaintiff has

alleged that the Dealer Defendants had opportunities to conspire—but a "mere opportunity to conspire does not by itself support an inference that such an illegal combination actually occurred." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc*., 996 F.2d 537, 545 (2d Cir. 1993); *see also IRS I*, 261 F. Supp. at 471 ("[M]ere opportunity to conspire at legitimate meetings does not support an inference that an illegal combination actually occurred").[11]

        e.      <u>Cases in Unrelated Markets</u>.  Plaintiff's references to prior cases and investigations involving other financial products cannot salvage its deficient claims.  (Compl. ¶ 289.) "[E]vidence of [certain Dealer] Defendants' wrongdoing with respect to LIBOR and FX and the existence of regulatory investigations into the precious metals markets do not substantiate [Plaintiff's] antitrust claim[]" with respect to CDS auctions.  *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631, 661 (S.D.N.Y. 2016).  At best, such allegations amount to nothing more than the kind of "if it happened there, it could have happened here" allegations that courts routinely reject.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).

      **C.**      **Plaintiff's Attacks On The CDS Auction Process Fail To State A Sherman Act Claim.**

      Although Plaintiff complains about the rules, adopted more than twelve years ago, that govern the CDS auction process (*e.g.*, Compl. ¶¶ 8-21, 130-136, 175-191, 296, 321), those objections fail to cure the fatal defects in Plaintiff's conspiracy claim.  Plaintiff does not present

---

[11] Plaintiff also asserts that dealers are able to observe each other's prices on Bloomberg terminals (Compl. ¶¶ 255-59), but, as Plaintiff acknowledges, dealers often trade CDS with each other (*id.* ¶¶ 35, 256).  Accordingly, there is nothing unusual or unlawful about dealers reviewing the published prices at which other dealers are willing to trade, particularly when those prices are available to thousands of market participants on Bloomberg.  Moreover, actual CDS trading prices are immediately available to the public on the Depository Trust & Clearing Corporation's website as a result of a federal mandate.  *See id.* ¶ 285; *Repository Reporting OTC Data*, Depository Tr. & Clearing Corp., https://www.dtcc.com/repository-otc-data.

these objections as an independent claim that the auction rules, standing alone, somehow violate the antitrust laws.  To the contrary, the Complaint pleads a single unitary conspiracy to manipulate final auction prices and a single injury in the form of a "supra-competitive auction price."  (*Id.* ¶¶ 174, 191, 292-296, 311, 316-319, 351-355.)

Instead of mounting an independent challenge to the auction rules, Plaintiff appears to suggest that the rules served as a device that facilitated auction manipulation by guaranteeing the Dealer Defendants a central role and access to inside information at auctions.  (*See id.*) These allegations add nothing to Plaintiff's claim because, in the absence of any well-pled allegations that the Dealer Defendants conspired to manipulate auction prices, there was no conspiracy for the auction rules to facilitate.  But even if the Court were to construe Plaintiff's objections to the auction rules as an attempt to assert an independent antitrust claim, that attempt would fail.

1.   *Plaintiff Fails To Adequately Allege Any Agreement To Restrain Trade Related To The CDS Auction Process.*

As Plaintiff alleges, the CDS auction process is a mechanism to arrive at a benchmark reflecting the value of an affected bond or loan underlying a CDS contract so that the contract can be settled.  (*See, e.g.*, *id.* ¶¶ 1, 15, 21-22, 222.)  Plaintiff asserts that various aspects of the auction process, which was developed more than twelve years ago, reflect some "agreement[] to exclude and constrain non-dealer participation."  (*Id.* ¶ 17; *see also* ¶¶ 18-21, 289.)  For example, Plaintiff alleges that, back in 2008 and 2009, dealers[12] (1) "agreed that only Dealers would be permitted to be direct participants in the auctions,"[13] (2)  "agreed to rig the [initial market midpoint] so that

---

[12] Plaintiff does not plead that any BNP Paribas entity was part of the working group that established the auction protocols.  (Compl. ¶ 176 (listing the Dealer Defendants who were members of the working group).)

[13] As discussed above (*supra* Background, Section B), non-dealer defendants were involved in establishing the CDS auction process.

only Dealers would be permitted to submit the initial markets that are used to calculate it," and (3) "agreed that non-dealers could participate in the physical settlement request and limit order phases of the auctions, but only through the Dealers." (*Id.* ¶¶ 18-20 (emphasis omitted); *see also id.* ¶¶ 186-190, 321-324.)  But Plaintiff pleads no facts to support its conclusory assertion that the auction process was designed "to bestow upon each Dealer various inside-information advantages that enable it to reap anticompetitive trading profits." (*Id.* ¶ 21.)

At most, Plaintiff alleges that the Dealer Defendants participated in meetings of the ISDA trade association related to the formulation of the auction process.  (*Id.* ¶ 179.)  This fails to plead any illegal agreement.  *See, e.g.*, *Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *Twombly*, 550 U.S. at 567 n.12 ("belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible).

Stripped of their hyperbole, Plaintiff's allegations about the auction process do nothing more than describe how the auction process arrives at a benchmark price that parties can voluntarily use (or not use) to settle CDS contracts by choosing to trade in CDS using standard form contracts published by ISDA (as opposed to bespoke contracts) and without the modifying standard form contracts published by ISDA to specify some other means of settlement (i.e., physical settlement).  There is nothing unlawful about such a process.  Indeed, although various financial benchmarks have been the subject of litigation, no court has ever held that the mere formulation, publication, or use of a benchmark by a group of industry participants is itself *per se* illegal under the Sherman Act.[14]  It has been blackletter law for almost 100 years that the Sherman

---

[14] *See, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 775 (2d. Cir. 2016) (holding that the alleged *collusive suppression* of LIBOR, an interest rate benchmark, was adequately alleged to be

Act does not prohibit the publication or use of benchmarks or other market information because such activity does not restrain trade. *See, e.g., Maple Flooring Mfrs.' Ass'n* v. *United States*, 268 U.S. 563, 583 (1925) (trade association's dissemination of price information did not "restrain the freedom of action of those who buy and sell"); *Sugar Inst. v. United States*, 297 U.S. 553, 598 (1936) ("[T]he dissemination of information is normally an aid to commerce."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 35 (D.D.C. 2008) (mere publication of a transportation cost index did not show "defendants conspired to restrain trade"). And nothing in the Sherman Act requires that benchmarks be set only through a process that is open to all market participants. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 436 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) (all standards have some exclusionary effect, "and such exclusions are not themselves antitrust violations") (quoting *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008)). Simply put, there is nothing unlawful about an alleged "combination" amongst a select group of institutions to engage in "the circulation of information." *Int'l Healthcare Mgmt. v. Haw. Coalition for Health*, 332 F.3d 600, 607 (9th Cir. 2003) (citing *Maple Flooring*, 268 U.S. at 585).

Plaintiff cannot salvage its claim by asserting that "Dealers" forced non-dealers to enter into CDS contracts that settle by reference to the auction process. (*See, e.g.*, Compl. ¶ 289.) Plaintiff's only purported factual support for this allegation is that standard form contracts published by ISDA that call for settlement through the auction process are widely used. (*See, e.g., id.* ¶ 137.) But Plaintiff does not offer a single non-conclusory allegation that the widespread use of the auction benchmark is the result of collusion, as opposed to a reflection of the fact that market

---

*per se* illegal price fixing and that the "crucial allegation" was that the defendants "*circumvented* the rules around the LIBOR-setting rules" "put in place to prevent collusion" (emphasis added)).

participants value the use of a standardized mechanism endorsed by federal regulators. (*See, e.g.*, *id.* ¶¶ 5-6, 122-125.)   Moreover, the Supreme Court has made clear that competitors do not "become . . . conspirators merely because they gather and disseminate information . . . and make use of it in the management and control of their individual businesses." *Maple Flooring*, 268 U.S. at 584.   Nothing in the Sherman Act prohibits the Dealer Defendants from using a benchmark to settle CDS contracts with counterparties, particularly where those counterparties remain free to negotiate bespoke CDS contracts that do not settle via the auction process. *See, e.g.*, *Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 933 (2d Cir. 1984) (holding that the offering of blanket music licenses did not restrain trade and therefore was "not even amenable to scrutiny under Section 1" because parties remained free to license music in other ways).   For this reason, even if this Court were to view Plaintiff's Complaint as alleging a separate conspiracy to establish the auction structure, those allegations would fail to state a claim under the Sherman Act.

2.   *Plaintiff Fails To Plead That Any Agreement Related To The CDS Auction Process Would Be A* Per Se *Violation.*

Even if this Court were to view the Complaint as alleging an agreement related to the structuring of the CDS auction process (*see, e.g.*, Compl. ¶¶ 8-21, 130-136, 175-191, 296, 321), that agreement would have to be measured under the rule of reason, not the *per se* rule.   The Supreme Court has held that *per se* liability under the Sherman Act is "reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).   Thus, "the rule of reason is the default approach, and there is a presumption in favor of its application." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017).   To rebut this presumption, "[a] plaintiff seeking application of the *per se* rule must present a threshold case that

the challenged activity falls into a category likely to have predominantly anticompetitive effects." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985).

Assertions that the auction structure excludes non-dealers from the CDS auction process do not meet this burden because there is no precedent for invalidating any similar benchmark process. *See Leegin Creative Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) ("[T]he *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason."). Indeed, alleged agreements related to standard-setting activities similar to the establishment of the auction settlement process are typically reviewed under the rule of reason because standard-setting "may serve[] . . . useful ends, such as protecting consumers from inferior goods" and "increasing compatibility among products that must be interchangeable."[15] *In re German Auto. Mfrs. Antitrust Litig.*, 2020 WL 1542373, at *5 (N.D. Cal. Mar. 31, 2020).

The incorporation of the auction settlement process into standard form contracts published by ISDA furthers these procompetitive objectives.[16] When trading CDS today, parties can manage risk by taking "positions [that are] offsetting" by "obtaining CDS protection from one

---

[15] The Antitrust Division of the United States Department of Justice has recognized that the use of financial benchmarks in contracts "reduces the complexity of financial instruments and facilitates their standardization" in a manner that is procompetitive. *See* DOJ Antitrust Division, Business Review Letter from Asst. Att'y Gen. Makan Delrahim to Abram J. Ellis of Simpson Thacher & Bartlett LLP (Oct. 1, 2020), https://www.justice.gov/atr/page/file/ 1323171/download (finding that the incorporation of standardized benchmark fallbacks into standard form contracts published by ISDA for interest rate derivatives was not an unreasonable restraint of trade).

[16] The New York Federal Reserve Bank applauded the incorporation of the auction protocols into the standard form contract published by ISDA, noting that the auction mechanism provided market participants with more "certainty, transparency, and orderliness of settling CDS transactions following a credit event." *See* Federal Reserve Bank of New York, *supra* note 6.

counterparty, and selling the same CDS protection *on the same terms* to [another] counterparty." (Compl. ¶ 159 (emphasis added).)   This kind of efficient risk management would be nearly impossible in a marketplace dominated by bespoke CDS contracts that settle through diverse means with divergent settlement values.   (*See id.* ¶¶ 5, 7, 122-125, 328 (alleging physical settlement and dealer polls were previously among the means used to settle CDS contracts before adoption of the auction process).)   A standardized means of settlement also protects investors from the market risks and uncertainties that might arise from using physical settlement or some other bespoke process of settlement.[17]   As these obvious procompetitive benefits of the auction process demonstrate, the *per se* rule is inapplicable to any alleged agreement related to the structure of the action process.

> ### 3.   *Plaintiff Fails To Plead The Elements Of A Rule-Of-Reason Claim Regarding The CDS Auction Process.*

To state a claim under the rule of reason, a plaintiff must plead facts establishing a relevant geographic and product market, that the defendants have market power in those markets, and that the anticompetitive effects of the alleged agreement outweigh its procompetitive benefits.   *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018); *see also Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008); *IRS I*, 261 F. Supp. 3d at 467-68.   Plaintiff's objections to the auction structure fail to plead such facts.

---

[17] One of the Complaint's key sources makes clear why physical settlement of CDS contracts became uneconomical as the CDS market grew and more parties became "naked CDS holders" trading CDS without holding underlying bonds.   *See* Erica Paulos, Bruno Sultanum, & Elliot Tobin, "CDS Auctions: An Overview," *Federal Reserve Bank of Richmond: Economic Quarterly*, at 108 (2Q 2019) (cited in Compl. ¶¶ 23, 285, 315).   Physical settlement "exposed both the long and short positions to price fluctuations" and could result in a "rush [by naked CDS holders] to buy the deliverable bonds" that "artificially raised the price."   *Id.*; *see also* Compl. ¶¶ 5-6, 122-25, 130.

The Complaint lacks any factual allegations to support Plaintiff's conclusory assertion that the relevant product market is some global "dealer-to-client credit default swap market." (Compl. ¶¶ 298, 301.)  Plaintiff does not, as it must, define the "dealer-to-client CDS market" by "'the interchangeability of use or the cross-elasticity of demand between the product [in question] and substitutes for it.'" *Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).  Plaintiff also fails to explain why a "dealer-to-client" CDS market is distinct from CDS transactions between other counterparties.  (*See, e.g.*, Compl. ¶ 156.)

Plaintiff's allegations of market power are also deficient.  Plaintiff pleads general statistics about "Dealers" trading CDS in 2019 but says nothing of the other fifteen years covering its claims. (*Id.* ¶ 305.)  The Complaint makes clear that there are "dealers" who are not named in the Complaint but does not explain how their presence in the market impacts any of the anonymized statistics alleged in the Complaint.  (*See, e.g.*, *id.* ¶¶ 232, 283.)

Lastly, Plaintiff makes the conclusory assertion that "[t]he anti-competitive effects of the Dealers' conspiracy outweigh any potential procompetitive benefits that the Dealers can be expected to identify." (*Id.* ¶ 309.)  But if Plaintiff intended to direct that conclusory assertion at the formation of the auction structure itself, it would be no substitute for "non-conclusory allegations as to the pro-competitive benefits and anti-competitive harms of the" auction structure. *In re Int. Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *13 (S.D.N.Y. May 23, 2018).  As explained, the auction rules were adopted at the express urging of federal regulators to promote the stability of the financial system, and while Plaintiff objects to the fact that non-dealers must place their auction bids through dealers, there is an obvious reason for such a requirement: non-dealers cannot be relied upon to deliver the necessary cash or securities to settle their auction

transactions.[18]   And to the extent that Plaintiff tries to embellish its objections to the auction structure with speculation that the structure allows dealers to engage in sharing of confidential client information, front running, and discriminatory settlement practices (*e.g.*, Compl. ¶ 310), Plaintiff pleads no facts to support that speculation or any injury to Plaintiff or the putative class in the absence of an alleged conspiracy to manipulate final auction prices.

## II.   PLAINTIFF LACKS ANTITRUST STANDING.

### A.   Plaintiff Has Not Plausibly Alleged That It Suffered Injury From The Alleged Anticompetitive Conduct.

Plaintiff also fails to plead facts that, if true, would show that it was injured as a result of the Dealer Defendants' alleged misconduct.   To demonstrate an antitrust injury, Plaintiff must plead two elements: (i) "whether the plaintiff has indeed suffered harm, or 'injury-in-fact,'" and (ii) whether any such injury is injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 106 (2d Cir. 2007); *see also Tal*, 453 F.3d at 1253 (Plaintiff must allege an "injury-in-fact" and the injury must be "of the type antitrust laws were intended to prevent and [one that] flows from that which makes defendant's conduct unlawful"). Plaintiff has failed to plead either element of antitrust injury.[19]

---

[18] As Plaintiff recognizes, any auction participant potentially could be matched against any other participant depending on their auction submissions.  (Compl. ¶¶ 148-149.)  Accordingly, auction participants must be able to rely on all other auction participants to deliver the cash or securities they agree to deliver at auction, or, in other words, they must be willing and able to take the risk that their counterparties in an auction transaction will default.  (*Cf. id.* ¶ 300 (describing default risk).)  Plaintiff never alleges—and cannot allege—that auction participants would be willing or able to assume the risk that *non-dealers* would default.  Limiting direct auction participation to dealers solves this problem because, as Plaintiff recognizes, it means that "all client trades resulting from auction activity . . . are settled through [CDS dealers]," all of whom are equipped to trade directly with each other.  (*Id.* ¶ 310(e).)

[19] Indeed, because Plaintiff fails to allege injury-in-fact, Plaintiff fails to allege injury sufficient to support Article III standing.  Plaintiff's wholly speculative and conclusory allegations of injury—

Critically, Plaintiff identifies only one auction—the Argentine Auction—in which it held CDS and through which it was purportedly injured.  (Compl. ¶ 318.)  Public information, of which this Court may take judicial notice, establishes that, under Plaintiff's own theory of the case, the Argentine Auction was not subject to alleged manipulation, and, thus, Plaintiff *could not have been harmed* by its participation in that auction.[20]  Specifically, Plaintiff expressly pleads that "only the Dealer Defendants are alleged to have participated in the conspiracy," and that Plaintiff is not including in its claim "auctions where a non-defendant dealer was the dominant dealer" (Compl. ¶¶ 219, 232), i.e., "the Dealer with the dominant physical settlement request in the auction."  (*Id.* ¶ 197.)  Public information establishes that the dominant dealer in the Argentine Auction was non-defendant HSBC.  (*See* Ex. A, Argentine Rep. Auction Results.)  Accordingly, the Argentine Auction is one of the auctions that Plaintiff has excluded from its dataset and its statistical analyses.  As a result, under its own pleading, Plaintiff could not have been injured by its participation in the Argentine Auction.

Other than identifying that it was a credit protection seller in the Argentine Auction, Plaintiff makes only boilerplate claims that it was required to "pay more and/or receive less" when it settled its CDS as a result of the alleged conspiracy.  (Compl. ¶ 317.)  As the Southern District

_____

including that some conduct *must* have harmed Plaintiff (*see* Compl. ¶¶ 164-166)—is regularly deemed insufficient for Article III standing.  *Mitchell v. Bank of N.Y. Mellon*, 835 F. App'x 318, 327 (10th Cir. 2020) (affirming dismissal of federal claims because allegations were "either conclusory or wholly nonexistent" as to dispositive elements of plaintiff's claims); *Infant Swimming Rsch., Inc. v. Faegre & Benson, LLP*, 335 F. App'x 707, 714 (10th Cir. 2009) (affirming dismissal because Plaintiff "failed to demonstrate any injury-in-fact"); *GF Gaming Corp. v. Black Hawk Casino Owners Ass'n*, 326 F. Supp. 2d 1177, 1190 (D. Colo. 2004) (dismissing complaint because "allowing [p]laintiffs to establish standing by merely alleging that consumers are harmed by [d]efendants' conduct, without requiring that they assert more specific facts, would make the standing inquiry meaningless").

[20] The Court may take judicial notice of the publicly available bids and offers.  *See supra* note 3.

of New York recognized less than a month ago, such an allegation is "merely a conclusion and a recitation of the required elements" and insufficient to demonstrate antitrust injury. *Corporate Bonds*, 2021 WL 4952034, at *30 (finding antitrust injury not properly pled where plaintiffs alleged that "[a]s a result of [d]efendants' conspiracy, [p]laintiffs and the Class paid more when buying, and received less when selling, their corporate bonds") (citing *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 428, 430 (S.D.N.Y. 2007)). Indeed, here, there is an even stronger basis for dismissal on standing grounds than in another recent Southern District of New York decision. In *In re SSA Bonds Antitrust Litigation*, 2018 WL 4118979, at *6 (S.D.N.Y. Aug. 28, 2018) ("*SSA Bonds*"), the court dismissed plaintiffs' antitrust claim for lack of standing, even though plaintiffs pleaded specific inter-defendant communications, because plaintiffs did not "allege that any of [those communications] referred to transactions to which they were a party." *Id.* (*citing, e.g.*, *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 416 (S.D.N.Y. 2017)). Here, not only has Plaintiff failed to plead specific inter-defendant communications about any particular auctions, but it has not pleaded that it participated in any auction other than the Argentine Auction. *See Tal*, 453 F.3d at 1253; *Corporate Bonds*, 2021 WL 4952034, at *30 (finding complaint "fails to establish that [p]laintiffs suffered any antitrust injury stemming from the alleged" conduct).

Moreover, Plaintiff alleges that, at times, the Dealer Defendants artificially reduced the final auction price and, at other times, artificially inflated the final auction price. Thus, under Plaintiff's own pleading, Plaintiff could have benefited from the alleged manipulation, depending on its own CDS position going into the auction. The Complaint pleads no basis to determine whether Plaintiff was injured or benefited by any particular CDS auction. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (conspiracies that have "actually tended to benefit" Plaintiff "could not have caused [Plaintiff] to suffer an antitrust injury"); *Harry*

*v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110, 115 (2d Cir. 2018) (the plaintiff did not "establish that they themselves have been harmed by [d]efendants' activities" because "their complaint provides just as much support for the proposition that [Plaintiff] [was] benefited by [defendants' alleged conduct] as they were harmed by it").

In short, Plaintiff has failed to plead an injury, much less establish a direct causal connection between the Dealer Defendants' alleged misconduct and any harm to Plaintiff.[21]  These omissions are fatal to Plaintiff's claims.  *See Tal*, 453 F.3d at 1253; *Corporate Bonds*, 2021 WL 4952034, at *30.

## B.    Plaintiff Is Not An Efficient Enforcer Of The Antitrust Laws With Respect To Transactions With Non-Defendants.

A long line of decisions in financial benchmark cases, among others, have held that plaintiffs are not efficient enforcers with respect to claims arising out of transactions with non-defendants, known as "umbrella claims."[22]  Nonetheless, Plaintiff here impermissibly seeks to assert claims based on *any* CDS that is settled by reference to the ISDA CDS auction protocol, including CDS transactions with non-defendant third parties.  (Compl. ¶ 342.)  The weight of the law is clear that such claims fail the efficient enforcer test, which evaluates (i) the directness of the asserted injury; (ii) the existence of an identifiable class of persons better placed to vindicate the

---

[21] Plaintiff has also failed to allege any harm resulting from the auction structure itself (*supra* Section I.C) and therefore has no independent standing on that basis.  *SSA Bonds*, 2018 WL 4118979, at *6, *7 n.19 ("Unlike government agencies, private [antitrust] plaintiffs do not have the right to bring suit against any person they reasonably suspect has committed a certain sort of wrong. . . .  Plaintiffs can only recover in a civil action if they can establish that *they themselves* have been harmed by defendants' activities." (emphasis in original)).

[22] *See, e.g.*, *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 558-59 (S.D.N.Y. 2017); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *22 (S.D.N.Y. Mar. 28, 2017); *Sullivan v. Barclays PLC*, 2017 WL 685570, at *15 (S.D.N.Y. Feb. 21, 2017); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *15-16 (S.D.N.Y. Dec. 20, 2016).

antitrust laws; (iii) the speculativeness of the alleged injury; and (iv) the difficulty of identifying damages and apportioning damages. *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1186 (D.N.M. 2011); *see also Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406-07 (10th Cir. 1992).

Each of those factors requires dismissal of Plaintiff's umbrella claims, i.e., claims based on CDS transactions with non-defendants. *First*, Plaintiff fails to plead a direct injury with respect to transactions with *non-defendants*, which are one step further removed and "which defendants did not control and of which they were likely not even aware." *Sonterra*, 277 F. Supp. 3d at 560. Moreover, permitting recovery based on umbrella claims would "impose liability that is wildly disproportionate to the defendants' [alleged] gain[s]." *Sullivan*, 2017 WL 685570, at *16; *see also Gelboim*, 823 F.3d at 779 (noting umbrella liability would "vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated"). Thus, Plaintiff's umbrella claims fail the first two efficient enforcer factors.

*Second*, Plaintiff's umbrella claims fail the last two efficient enforcer factors because any determination of injury and calculation of damages for umbrella claims "would be exceptionally complex," if not impossible. *Sonterra*, 277 F. Supp. 3d at 564. The "decision to incorporate [the auction protocol] absent any participation by defendants not only arguably breaks the chain of causation and leads to disproportionate damages, but it also makes it even harder to determine what role, if any, [the auction protocol] played in the ultimate price." *Id.*

III.    **PLAINTIFF FAILS TO PLEAD FACTS SUPPORTING A PLAUSIBLE CLAIM OF MANIPULATION UNDER THE CEA.**[23]

Plaintiff alleges violations of the CEA in connection with credit event auctions.[24]   (*See* Compl. ¶ 4.)   Credit event auctions, however, are used only for the purpose of settling CDS in the wake of credit events pertaining to a particular entity.   But CDS relating to a particular entity— known as "single-name CDS"—are outside the scope of the CEA.[25]   The CEA expressly excludes certain swaps, including "security-based swaps," 7 U.S.C. § 1a(47)(B)(x), from being subject to its provisions.   The SEC and the CFTC have jointly issued rules confirming that "security-based swaps" include single-name CDS.   *See, e.g.*, 17 C.F.R. § 240.3a67-2(a).   The Court should therefore dismiss the CEA claims in their entirety.

----

[23] Because Plaintiff fails to plead facts that plausibly allege a predicate violation of the CEA, Plaintiff's claims for vicarious liability and aiding and abetting in violation of the CEA must also fail.   *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 765 (7th Cir. 2015) (requiring plaintiffs to "demonstrate the components of a manipulation claim against a principal" to establish aiding and abetting under the CEA); *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996) ("In order to recover damages from a secondary party in an action for 'aiding and abetting' liability under the Commodities Exchange Act, a plaintiff must first prove that a primary party committed a commodities violation."); *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 875  (N.D. Ill. 2020) ("Since plaintiffs have not stated an underlying CEA claim against a [defendant], there can be no claim against another [defendant] as an agent."); *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *7, *21 (N.D. Ill. Feb. 9, 2012) (dismissing CEA claims for both principal-agent liability and aiding and abetting because "[p]laintiffs have not plausibly stated a price manipulation claim under the CEA").

[24] Plaintiff's attempt to recover under the CEA fails on its face because Plaintiff purports to bring suit under the felony provision, 7 U.S.C. § 13.   Plaintiff is not the DOJ and cannot bring criminal charges.   This claim should be dismissed outright on that basis alone.

[25] Although some types of CDS are within the scope of the CEA, the Complaint relates solely to the CDS that are excluded from the CEA.   Even in situations in which a "CDS index constituent experiences a credit event, that constituent is *removed from the index and settled separately*" as a single-name CDS.   (Compl. ¶ 155 (emphasis added).)   As such, every CDS product ever settled at an auction has been settled as single-name CDS not subject to the CEA.   Credit Event Auction, CreditFixings.com, https://creditfixings.com/CreditEventAuctions/disclaimerHist.jsp.

Even if Plaintiff had set forth any facts concerning a product governed by the CEA, the claim would still fail. Actions that sound in fraud, like allegations of manipulation under the CEA, must meet the heightened pleading standard of Rule 9(b). *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co*., 631 F.3d 436, 447 (7th Cir. 2011); *In re Chi. Bd.*, 435 F. Supp. 3d at 853. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *New Mexico ex rel. Balderas v. Google, LLC*, 489 F. Supp. 3d 1254, 1256 (D.N.M. 2020). Thus, a complaint must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus. Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

Here, the Complaint does not allege facts detailing manipulation of a single, specific trade or series of trades. Instead, Plaintiff simply relabels its vague Sherman Act conspiracy allegations as a manipulation claim under the CEA. It is axiomatic that where Plaintiff's conclusory allegations cannot meet the notice pleading standard applicable to its Sherman Act claim, they most certainly fail under the heightened pleading standard applicable to its CEA claims. *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *6 (D. Minn. Sept. 29, 2020) (finding that because the same flawed Sherman Act conspiracy was also the basis for the CEA claim, "the CEA claim cannot continue"); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 597-98 (S.D.N.Y. 2011) (noting that when the scienter allegations of the CEA claim are based on the same allegations that fail to allege a Sherman Act conspiracy, the CEA claim must fail). The CEA claims are deficient on several additional grounds, set out below.

### A.    Plaintiff Fails To Adequately Plead The Elements Of A Manipulation Claim.

Plaintiff fails to plead with sufficient particularity each of the four required elements of a CEA manipulation claim: that (1) the Dealer Defendants possessed the ability to influence CDS prices, (2) artificial prices existed, (3) the Dealer Defendants caused those artificial prices to exist,

and (4) the Dealer Defendants specifically intended to cause those artificial prices.  *See* 7 U.S.C. § 9; 17 C.F.R. §180.1; *Total Gas*, 244 F. Supp. 3d at 412.  Plaintiff makes only vague, conclusory statements that even touch on these elements.  (Compl. ¶¶ 358-361.)  These statements fall far short of the pleading standard and fail to sustain a claim of manipulation under the CEA.

*First*, Plaintiff fails to adequately plead that the Dealer Defendants possessed the ability to influence prices.  Plaintiff alleges that as direct participants in the CDS auctions, the Dealer Defendants have the ability to influence final CDS prices.  (*Id.* ¶ 358.)  But Plaintiff does not plead facts as to any Dealer Defendant's relative power in the market as compared to other dealers nor how any one Dealer Defendant could have controlled the CDS market with any particular auction submission.  As such, the claim lacks the specific, factual allegations necessary to satisfy the heightened pleading standard.  *See In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *6.

*Second*, Plaintiff fails to adequately plead that artificial prices actually existed.  In determining whether an artificial price existed, courts look to whether the price is affected by a factor that is "not a 'legitimate part of the economic pricing of the commodity.'"  *Id.*  The Complaint purports to rely on economic studies to show a divergence between CDS prices and other bond market prices.  (Compl. ¶¶ 239-254.)  Even assuming Plaintiff is correct that the CDS and bond markets diverge, that divergence amounts only to allegations of "unusual market prices, [that] without more, [are] insufficient to establish artificial prices, as a matter of law."  *In re Rough Rice*, 2012 WL 473091, at *6; *In re DiPlacido*, 2008 WL 4831204, at *87 (C.F.T.C. Nov. 5, 2008) ("[A] statistically unusual high (or low) price will not on that basis alone be deemed artificial.").  And as discussed in Section I.B, Plaintiff fails to plead that the differences are due to anything other than natural market forces.

*Third*, Plaintiff fails to adequately plead that the Dealer Defendants caused any artificial prices. Plaintiff asserts that the dealers had opportunities to collude. (*See, e.g.*, Compl. ¶¶ 275-276, 285-287.) But alleging only that the Dealer Defendants *could have* caused artificial prices is not enough. Indeed, as discussed in Section I.B, the conclusory allegations of collusion do not explain how any "opportunity" to create artificial prices actually translated into artificial prices in the CDS market. These unfounded allegations are "too vague and speculative to be plausible." *In re Chi. Bd.*, 435 F. Supp. 3d at 873.

*Finally*, Plaintiff fails to adequately plead that the Dealer Defendants specifically intended to cause artificial prices. A CEA manipulation claim requires a showing of "specific intent, that is, a showing that 'the accused acted (or failed to act) with the purpose or conscious object' of influencing prices." *In re Rough Rice*, 2012 WL 473091, at \*7 (citing *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1058-59 (N.D. Ill. 1995)). "Mere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA." *Id.* Plaintiff argues that the Dealer Defendants' intent is evidenced by their actions to benefit their own positions. (Compl. ¶ 361.) But presumably every trader in the market, including Plaintiff, acts with intent to benefit their own positions. This conclusory allegation of a motive common to every market actor does not adequately plead specific intent to engage in unlawful manipulation. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539 (S.D.N.Y. 2008) ("Trading, in and of itself, does not constitute market manipulation.") *aff'd*, 730 F.3d 170 (2d Cir. 2013).

## B.     Plaintiff Fails To Adequately Plead Actual Damages As Required By The CEA.

The CEA requires plaintiffs to have suffered "actual damages" in order to bring a claim. 7 U.S.C. § 25(a)(1). To satisfy this requirement, Plaintiff's allegations must be sufficiently particularized to evidence a "net loss" caused by the Dealer Defendants' alleged manipulative

activity. *Braman v. The CME Grp., Inc*., 149 F. Supp. 3d 874, 892 (N.D. Ill. 2015).  A plaintiff must plausibly allege "(1) that she transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated prices were to the plaintiff's detriment."  *In re Chi. Bd.*, 435 F. Supp. 3d at 868 (citing *Total Gas*, 889 F.3d at 112).  Plaintiff alleges no such facts.

Plaintiff fails to plead any actual net loss from even a single, allegedly manipulated CDS auction.  Plaintiff's sole attempt to describe an auction in which it was harmed—the Argentine Auction (Compl. ¶ 318), which, as previously explained, did not even include any Dealer Defendant as the dominant dealer—ends with the conclusory allegation that Plaintiff suffered "greater losses" than it should have but does not allege the requisite net loss.  Similarly vague damages claims are routinely dismissed.  *See, e.g*., *In re Chi. Bd.*, 435 F. Supp. 3d at 868; *Braman,* 149 F. Supp. 3d at 885; *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 241 (S.D.N.Y. 2019).

Moreover, Plaintiff has not alleged that it suffered damages as a result of the supposed manipulation of any other auction.  At best, Plaintiff's analyses could be said to allege a constant state of market artificiality that *may have* caused Plaintiff to "pay more (as a CDS protection seller) and/or receive less (as a CDS protection buyer) on auction settled CDS transactions."  (Compl. ¶ 317.)  But alleging only "that the market was constantly artificial is too ambiguous to show that plaintiffs suffered a loss."  *In re Chi. Bd.*, 435 F. Supp. 3d at 869.  Because Plaintiff does not allege the direction of any given instance of manipulation, let alone how that alleged manipulation affected Plaintiff's own position, it is at least equally possible that Plaintiff actually *benefited* from the Dealer Defendants' bidding behavior.  *Id.* ("By not addressing the direction in which the manipulation occurred, plaintiffs have not established that any manipulation was to the plaintiff's detriment."); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig*., 27 F. Supp. 3d 447,

461 (S.D.N.Y. 2014) (where plaintiffs may have been helped, rather than harmed, on some days by manipulation of the market, "damages are merely 'conceivable'—and thus insufficiently pled"). Painting the market with such a broad brush fails to satisfy the specificity required of the heightened pleading standard, and as such, the CEA claims should be dismissed.

## IV.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.[26]

If the Court dismisses Plaintiff's federal antitrust and CEA claims, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state-law unjust enrichment claim.  *See* 28 U.S.C. § 1367(c).  Regardless, that claim also fails as a matter of law.

*First*, "[i]f the substance of the claim is already asserted in another claim, then the second claim is duplicative."  *Sw. Re, Inc. v. G.B. Invs. Reinsurance Co.*, 2011 WL 13114921, at *2 (D.N.M. June 17, 2011); *see In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711, at *7 (S.D.N.Y. Aug. 15, 2019) (dismissing "unjust enrichment claims [that] will rise and fall with [state-law antitrust] claims" because, "[t]o the extent that those claims succeed, they are duplicative, and to the extent they are deficient, [the] unjust enrichment claims will not remediate them"); *cf. Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 227 (E.D.N.Y. 2015) (Unjust enrichment "is not a catchall cause of action to be used when others fail."), *aff'd*, 630 F. App'x 61 (2d Cir. 2015).  Here, Plaintiff relies on the same allegations for its unjust enrichment claim as for its defective antitrust claim.  (*See* Compl. ¶ 371 ("This cause of action is against the Dealers for their conspiracy to cartelize the CDS settlement process, and to bid-rig and price-fix the CDS final auction price.").)  Moreover, Plaintiff's failure to adequately plead anything "unjust"—because its

---

[26] Because the Complaint does not specify the applicable substantive law for Plaintiff's unjust enrichment claim, the Dealer Defendants assume for the purposes of this motion that New Mexico substantive law governs.  The Dealer Defendants reserve the right to argue for application of a different governing law in their reply brief or at a later time should the claim proceed.

predicate conspiracy claims fail—also compels dismissal of the unjust enrichment claim.  *See*

*Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 698 (N.M. Ct. App. 2000) (Unjust enrichment

claim requires proof that "allow[ing] [another] to retain [a] benefit *would be unjust*." (emphasis

added)); *IRS I*, 261 F. Supp. 3d at 500 ("[W]ithout a viable underlying claim of illegality, an unjust

enrichment    claim    'must    be    dismissed.'");    *MGB*,    412    F.    Supp.    3d

at 391 (same); *Braman*, 149 F. Supp. 3d at 897 ("Without evidence of a statutory violation, there

can be no evidence that the defendants were enriched.").

     *Second*, Plaintiff's unjust enrichment claim fails to allege that any Dealer Defendant

received any benefit from Plaintiff.  To bring an unjust enrichment claim, a plaintiff must allege

that the defendant "profited *at the expense of the aggrieved party*."  *E.g.*, *Heimann v. Kinder-

Morgan CO2 Co., L.P.*, 144 P.3d 111, 118 (N.M. Ct. App. 2006) (emphasis added).  Here, Plaintiff

has not pleaded that it transacted with *any* individual Dealer Defendant, other than Morgan

Stanley.[27]  Nor does Plaintiff allege any other relationship with these Dealer Defendants.  Although

Plaintiff generically states that it "purchased and sold millions of dollars of CDS, including directly

with Defendants" (*see* Compl. ¶ 317), this type of group pleading is impermissible, *see Robbins*,

519 F.3d at 1250 ("Given the complaint's use of . . . the collective term 'Defendants' . . . but with

no distinction as to what acts are attributable to whom, it is impossible for any of these individuals

to ascertain what particular [unlawful] acts they are alleged to have committed.").  In the absence

---

[27] Even Plaintiff's allegation regarding Morgan Stanley is deficient because it fails to allege what
role Morgan Stanley played in the alleged transactions.  Indeed, Plaintiff does not allege that
Morgan Stanley was its counterparty to any alleged CDS transaction (*see* Compl. ¶ 318 ("SIC, as
a protection seller on CDX.EM Series 31, had to make credit protection payments to *its
counterparty* that were artificially inflated as a result of Defendants' conspiracy" (emphasis
added))), as opposed to Morgan Stanley serving in some other role, such as merely serving as
clearing broker to facilitate the "central[] clear[ing] in the United States through ICE Clear Credit"
(*id.*), which has no relation to the alleged conspiracy.

of plausible allegations that any individual Dealer Defendant(s) benefited at Plaintiff's expense, Plaintiff's unjust enrichment claim must be dismissed. *See Martin v. Comcast Cablevision Corp. of Cal., LLC*, 338 P.3d 107, 110 (N.M. Ct. App. 2014) ("The restitutionary goal is to prevent unjust enrichment of the defendant by making him give up what he wrongfully obtained *from the plaintiff*." (emphasis added)).

*Finally*, in addition to being duplicative of the antitrust claims, Plaintiff's unjust enrichment claim independently fails in light of the fact that private CDS contracts govern the auction process, regardless of whether those contracts were individually negotiated or based on the standard forms published by ISDA.  (Compl. ¶¶ 14, 101, 137); *see Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1116-17 (10th Cir. 2005) (applying New Mexico law). Specifically, "unjust enrichment is not available when the claimant may bring an action for breach of contract.  This limitation applies even if there is no express provision in the contract governing the specific dispute over which a party alleges unjust enrichment; it is enough that the dispute is grounded in the contractual relationship." *Walker v. Emergency Staffing Sols., Inc.*, 2017 WL 3206641, at *4 (D.N.M. Feb. 2, 2017); *see also Anderson Living Tr. v. ConocoPhillips Co., LLC*, 952 F. Supp. 2d 979, 1033 & n.8 (D.N.M. 2013); *Orgill v. Norstan Commc'ns, Inc.*, 2002 WL 35649498, at *3 (D.N.M. Dec. 5, 2002).  Accordingly, Plaintiff's unjust enrichment claim fails.

## V.   PLAINTIFF'S CLAIMS AND DAMAGES ARE LIMITED BY THE STATUTE OF LIMITATIONS.

Plaintiff's claims are barred by the applicable statutes of limitations.  Plaintiff's antitrust claims are subject to a four-year statute of limitations, which runs from the time the alleged antitrust injury occurs regardless of whether the plaintiff was on notice of the claim.  15 U.S.C. § 15b (antitrust); *Kaw Valley Elec. Coop. Co. v. Kan. Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989) (antitrust).  Plaintiff's unjust enrichment and CEA claims are subject to four-year

43

and two-year statutes of limitations, respectively, both of which run from the time Plaintiff was on inquiry notice of its claims.  N.M. STAT. ANN. § 37-1-4 (unjust enrichment); *Sweesy v. Sun Life Assurance Co. of Canada (USA)*, 643 F. App'x 785, 790-91 (10th Cir. 2016) (unjust enrichment); 7 U.S.C. § 25(c) (CEA); *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir.), *cert. denied*, 140 S. Ct. 536 (2019) (CEA).  Plaintiff filed its Complaint on June 30, 2021, and any antitrust[28] or unjust enrichment claims accruing prior to June 30, 2017—including any claims regarding the formation of the auction structure itself more than twelve years ago—are untimely and thus barred by the statute of limitations.  Likewise, the statute of limitations bars Plaintiff from recovering for any CEA claim accruing prior to June 30, 2019.

### A.      Plaintiff Had Notice Of Its Claims.

The facts pleaded in the Complaint demonstrate that Plaintiff was on inquiry notice of its claims long before the statute of limitations began to run.  Although Plaintiff may claim not to have known the full extent of its claims, "[a] plaintiff need not know the full extent of [its] injuries before the statute of limitations begins to run."  *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994).  To the extent that Plaintiff asserts that it did not know of facts underlying its claims, it should have.  Courts deem a plaintiff to be on inquiry notice when it is, or reasonably should have been, aware of "storm warnings," including where media allegations should have put a plaintiff on notice of a potential claim.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005).  The CEA and unjust enrichment limitations period starts once "the plaintiff acquires knowledge of facts, conditions, or circumstances which would cause a

---

[28] Plaintiff's reference to the continuing violations doctrine is also unavailing.  According to Plaintiff, that doctrine provides that "in a conspiracy to violate the antitrust laws each of the Defendants' new and independent overt acts that *injures* the Plaintiff triggers the statute of limitations anew for that act."  (Compl. ¶ 338) (emphasis added).  However, a prerequisite of this doctrine is an assertion of injury, which Plaintiff has failed to do.  *Supra* Section II.

reasonable person to make an inquiry leading to the discovery of the concealed cause of action."
*King v. Est. of Gilbreath*, 2016 WL 7468071, at *6 (D.N.M. Mar. 30, 2016); *see also Levy*, 917
F.3d at 109 ("[W]here the circumstances known to a plaintiff, as alleged in the complaint, were
such as to suggest to a person of ordinary intelligence that she [had a claim], a duty of inquiry may
arise that commences the CEA's two-year limitations period."); *Sweesy*, 643 F. App'x at 790-91
("[T]he time period begins to run when the claimant has knowledge of sufficient facts to constitute
a cause of action.").

   ***Plaintiff was on notice of its auction manipulation allegations***.  Plaintiff's claims based
on allegations of auction manipulation are severely limited because Plaintiff was on inquiry notice
of its antitrust and unjust enrichment claims prior to June 30, 2017 and on notice of its CEA claim
prior to June 30, 2019.  CDS auctions are not held in secret; the dealers' submissions for each
auction are publicly available after the auction.  Plaintiff readily acknowledges that its putative
statistical analysis is predicated on "publicly available CDS auction data and bond pricing data"
(Compl. ¶ 193).  And the economic study on which Plaintiff repeatedly relies (*id.* ¶¶ 23 n.1, 285
n.91, 315 n.105) builds upon theories of bias in CDS auction prices discussed in other articles
between 2009 and 2014, belying any contention that Plaintiff had no notice of its purported claim
prior to the running of the statute of limitations.  Accordingly, Plaintiff's auction manipulation
claims with respect to any auction preceding the relevant statutory period is time-barred.

   ***Plaintiff was on notice of any auction structure claim***.  The Complaint affirmatively
pleads that, more than a decade before its filing, the dealers publicly disclosed their agreed-upon
auction structure, including to their non-dealer clients like Plaintiff:

- By 2006, the auction settlement process "had gained significant adoption for settling
  CDS contracts."  (Compl. ¶ 136.)

- In mid-2008, the Dealer Defendants formed a "Dealer working group" to standardize

the CDS auction process.  (*Id.* ¶¶ 16, 176.)

- Through that working group, the Dealer Defendants allegedly agreed to an auction structure in which (1) a determinations committee composed of both dealers and non-dealer clients would decide whether to conduct an auction, (2) only dealers could participate in the first part of the auction, and (3) non-dealers could participate in the second part of the auction only through dealers.  (*Id.* ¶¶ 16-20, 185-190.)

- Non-dealer clients participated in the formation of the auction structure including when they "pushed back against some of the auction rules" in "several heated phone calls." (*Id.* ¶ 183.)

- In late 2008, the dealers informed Tim Geithner, then chair of the Federal Reserve Bank of New York, that they intended to incorporate the auction process to which they had agreed into standardized CDS contracts. (*Id.* ¶ 15.)

- Since 2009, the agreed-upon auction structure was incorporated into standardized CDS contracts to which non-dealer clients, including Plaintiff and other putative class members, agreed.[29]  (*Id.* ¶ 187 n.79.)

In short, the Complaint pleads facts that manifestly establish both that the Dealer Defendants publicly disclosed the agreed-upon auction structure, and that Plaintiff knew—or with even a modicum of due diligence could have known—all the details of that agreed-upon auction structure more than a decade before Plaintiff filed its Complaint in this action.

In addition, in light of Plaintiff's pleading that non-dealers, like Plaintiff and other putative class members, were members of the determinations committees where confidential information about CDS was allegedly exchanged, (Compl. ¶¶ 32, 190), Plaintiff and other putative class members knew that dealers allegedly collected and shared such information from as early as the earliest determinations committee meetings more than ten years ago.  Plaintiff was therefore on inquiry notice of all of its claims.  *See Levy*, 917 F.3d at 109; *King*, 2016 WL 7468071, at *6.

---

[29] Plaintiff readily acknowledges that its putative statistical analysis is predicated on "publicly available CDS auction data and bond pricing data." (Compl. ¶ 193).

### B.        Plaintiff Does Not Plead Fraudulent Concealment.

Plaintiff cannot avoid this result by invoking the doctrine of fraudulent concealment to toll its claims.  To plead fraudulent concealment, Plaintiff must allege facts that, if true, would show "(1) the use of fraudulent means by [the Dealer Defendants]; (2) successful concealment from [Plaintiff]; and (3) that [Plaintiff] did not know or by the exercise of due diligence could not have known that [it] might have a cause of action."  *Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 336-37 (10th Cir. 1994).  Moreover, fraudulent concealment must be pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.  *Id.* at 337.  Under that enhanced pleading standard, Plaintiff must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  *Koch*, 203 F.3d at 1236.  Plaintiff has not adequately pleaded any facts to support the elements of fraudulent concealment.

Plaintiff has not adequately pleaded facts to support a claim that the Dealer Defendants engaged in "affirmative acts or active deception . . . to conceal the facts giving rise to" Plaintiff's speculation that the dealers manipulated the final price at individual auctions.  *See Indus. Constructors Corp.*, 15 F.3d at 969.  The auction results are published online following the auction and those public auction results formed the dataset for Plaintiff's statistical analyses and, consequently, the basis of Plaintiff's claims.  Those claims are therefore limited by the applicable statute of limitations that began to run after each auction was conducted and its results published.

Likewise, Plaintiff has not pleaded facts that, if true, would establish that the Dealer Defendants fraudulently concealed their alleged agreements with respect to the development and adoption of the current auction structure.  As discussed above and as is clear throughout the Complaint, the auction process was well publicized and incorporated into contracts to which

47

Plaintiff became a party.[30]  (Compl. ¶¶ 4, 15-20, 136, 183, 185-190.)  Accordingly, to the extent

that its claims are predicated on publicly disclosed agreements regarding that auction structure,

those claims are wholly barred by the applicable statutes of limitations.[31]  *Ortiz v. N.M. Dep't of*

*Cultural Affs.*, 2017 WL 6375618, at *7 (D.N.M. Dec. 13, 2017) (defendants did not conceal facts

underlying plaintiffs' cause of auction where those facts were published and "[p]laintiffs could

have easily discovered the information therein at the time it was published"), *report and*

*recommendation adopted*, 2018 WL 637394 (D.N.M. Jan. 31, 2018).

As a whole, the Complaint contains no allegations that, if true, would prove that any Dealer

Defendant committed any affirmative act to conceal its involvement in any aspect of the

development, adoption, and conduct of CDS auctions.   Plaintiff instead asserts only that

"Defendants' conspiracy was self-concealing by its nature." (Compl. ¶ 321.) But "merely stat[ing]

in a conclusory fashion that the [D]efendants' fraud was self-concealing," as Plaintiff does here

(*id.*), is insufficient to plead fraudulent concealment.  *Butala v. Agashiwala*, F. Supp. 314, 320

---

[30] Moreover, the Federal Reserve and other regulators noted in a report released in March 2009 that, in a survey conducted by these global regulators, some buy-side firms had expressed that they desired to participate directly in these auctions, but also noted this view was not universally held, and ultimately concluded that "market participants' support of the International Swaps and Derivatives Association's (ISDA) publication of the auction supplement to its 2003 Credit Derivatives Definitions as well as publication of a 'big bang' protocol will help to reduce uncertainty and make credit event management more operationally efficient."  *See* Senior Supervisors Grp., Observations on Management of Recent Credit Default Swap Credit Events (Mar. 9, 2009), https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2009/SSG_030909.pdf.

[31] The economics article that Plaintiff repeatedly cites in its Complaint (Compl. ¶¶ 23 n.1, 285 n.91, 315 n.105) discusses alleged evidence of bias in the CDS auction process as early as 2010. *See* Erica Paulos, Bruno Sultanum, & Elliot Tobin, "CDS Auctions: An Overview," *Fed. Res. Bank of Richmond: Econ. Q.*, at 110 (2Q 2019) (citing Mikhail Chernov, Alexander S Gorbenko, & Igor Makarov, "CDS Auctions," *Review of Financial Studies* (Mar. 2013); Virginie Coudert & Mathieu Gex, "The Credit Default Swap Market and the Settlement of Large Defaults," *International Economics* (Mar. 2010); Sudip Gupta & Rangarajan Sundaram, "CDS Auctions and Informative Biases in CDS Recovery Rates," Working Paper (Aug. 2012)).

(S.D.N.Y. 1996); *see also JM through Foley v. N.M. Dep't of Health*, 2009 WL 10698495, at *3 (D.N.M. Mar. 5, 2009) ("Bald allegations of concealment are not sufficient to make out a case of fraudulent concealment."); *In re Urethane Antitrust Litig.*, 409 F. Supp. 2d 1275, 1285 (D. Kan. 2006) (dismissing fraudulent concealment allegations for failure to plead "who met or when or where those meetings took place").  Plaintiff therefore cannot recover for any claim based on the auction structure at all and is barred from recovering for alleged auction manipulation that occurred prior to June 30, 2017 for its antitrust and unjust enrichment claims and prior to June 30, 2019 for its CEA claim.

## VI.   PLAINTIFF FAILS TO ESTABLISH PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS.

The Complaint fails to plausibly allege facts establishing personal jurisdiction over any of the Foreign Defendants.[32]  "[W]hen the court's jurisdiction is contested, the plaintiff has the burden of proving jurisdiction exists."  *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). Jurisdiction can be general (all-purpose) or specific (conduct-linked).  *Dental Dynamics, LLC* v. *Jolly Dental Grp., LLC*, 946 F.3d 1223, 1229 n.2 (10th Cir. 2020).  In either event, the inquiry focuses on each defendant's contacts with the forum.  *Walden v. Fiore*, 571 U.S. 277, 282-83 (2014).  That inquiry is defendant-specific.  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984).  And while the court presumes well-pleaded facts are true, the presumption does not extend to conclusory allegations or legal conclusions.  *Wenz*, 55 F.3d at 1505.

Plaintiff fails to establish that the Foreign Defendants are subject to either general or specific jurisdiction.  *First*, Plaintiff fails to show that the Foreign Defendants are subject to general

---

[32] *See supra* note 2.

49

jurisdiction because none of them is "at home" in the United States—let alone New Mexico[33]: they are incorporated and have their principal places of business abroad and do not have the systemic and pervasive contacts in the United States required to render them "at home."  *Second*, the Foreign Defendants are not subject to specific jurisdiction because Plaintiff fails to link any of its allegations to any conduct by Foreign Defendants directed at or occurring in the United States.

A.      **The Foreign Defendants Are Not Subject To General Jurisdiction.**

The Complaint fails to establish a basis for general jurisdiction over any of the Foreign Defendants because it does not and could not allege that these Foreign Defendants are "at home" in the United States.  In *Daimler AG v. Bauman*, the Supreme Court held that a defendant is subject to general jurisdiction in a forum "only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive as to render [it] essentially at home in the forum State."  571 U.S. 117, 122 (2014); *see also Am. Fid. Assurance Co. v. Bank of N.Y. Mellon*, 810 F.3d 1234, 1241 (10th Cir. 2016).  For a corporation, "the place of incorporation and principal place of business are paradig[m] bases for general jurisdiction."  *Daimler*, 571 U.S. at 137. Otherwise, general jurisdiction will lie only in "exceptional case[s]," where "the corporation's contact with the forum [is] akin to one of those paradigms."  *MVT Servs., LLC v. Terminal Exch. Servs., Inc.*, 2020 WL 6384293, at *4 (D.N.M. May 5, 2020).

Plaintiff admits that all of the Foreign Defendants are incorporated and have their principal places of business outside of the United States (Compl. ¶¶ 62-63, 66, 72, 74-75, 78, 80, 85, 93, 96-97).  *See* Exs. B-L.  Moreover, Plaintiff alleges no facts that would render any of these Foreign Defendants an "exceptional case" under *Daimler*.  *See Daimler*, 571 U.S. at 139 n.19.   To

---

[33] The Dealer Defendants assume *arguendo* that Plaintiff seeks to assert jurisdiction pursuant to the Clayton Act and that the relevant forum state is the United States.  (*See* Compl. ¶ 49.)

constitute an exceptional case, a defendant's contacts with the state must be "so continuous and systematic *as to render them at home in the forum state.*"  *See Am. Fid. Assurance Co.*, 810 F.3d at 1241 (emphasis in original).  This requires the court to compare "a corporation's activities in their entirety, nationwide, and worldwide" with its activities in the forum state; simply conducting business in the forum state is insufficient.  *See Fabara v. GoFit, LLC*, 308 F.R.D. 380, 396, 402 (D.N.M. 2015); *Ramos v. Foam Am., Inc.*, 2018 WL 987243, at *8-9 (D.N.M. Feb. 20, 2018) (finding no general jurisdiction where defendant's sales to New Mexico residents were a small part of defendant's business).  Plaintiff does not and cannot meet this "stringent standard." *Fabara*, 308 F.R.D. at 402; Exs. B-L.[34]

### B.  The Foreign Defendants Are Not Subject To Specific Jurisdiction.

Plaintiff also fails to plead that any Foreign Defendant is subject to specific jurisdiction in the United States.  The Complaint does not allege where any particular CDS auction occurred, although it concedes that auctions occurred abroad.  (Compl. ¶ 49.)  Nor does the Complaint plead the requisite "substantial connection" between any Foreign Defendant or any CDS auction and the forum needed to subject the Foreign Defendants to specific jurisdiction in the United States.

To establish specific jurisdiction, a plaintiff must show that each defendant "purposefully directed its activities at residents of the forum state" and that the plaintiff's injuries "arise out of [the] defendant's forum-related activities." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017).  The Supreme Court has emphasized that "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that

---

[34] "When, however, a defendant presents credible evidence through affidavits or other materials suggesting the lack of personal jurisdiction, the plaintiff must come forward with sufficient evidence to create a genuine dispute of material fact on the issue." *Res. Assocs. Grant Writing & Evaluation Servs., Inc.* v. *Southampton Union Free Sch. Dist.*, 193 F. Supp. 3d 1200, 1220 (D.N.M. 2016).

takes place in the forum State." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1781 (2017). Moreover, a defendant's "suit-related conduct must create a substantial connection with the forum State" that "must arise out of contacts that the defendant *himself* creates with the forum State," and cannot be based on "contacts he makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 284-86 (emphasis in original). The analysis "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290; *Ramos*, 2018 WL 987243, at *7 (plaintiff must demonstrate that "the defendant has 'purposefully directed' activities at residents of the forum state and the litigation 'arise[s] out of or relate[s] to' those activities").[35]

Apart from conclusory allegations—which are not entitled to a presumption of truth, *see Wenz*, 55 F.3d at 1505—Plaintiff fails to allege *any* suit-related conduct by the Foreign Defendants occurring in, directed at, or causing effects in the United States or New Mexico. Plaintiff pleads, for instance, that the Foreign Defendants transacted business in the United States, including by settling CDS that were linked to final CDS auction prices with absent class members. (Compl. ¶ 48.) But the Complaint does not plead facts to show (1) where any allegedly manipulated CDS auction occurred, (2) that Plaintiff transacted with any Foreign Defendant, or (3) that any Foreign Defendant participated in any allegedly manipulated auction.

---

[35] The Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), did not change the purposeful direction standard. *Martinez v. N. Ariz. Univ.*, 2021 WL 3488268, at *6 (D.N.M. Aug. 9, 2021) (applying purposeful direction test). *Ford* instead addressed the separate "relatedness" prong, finding that it too imposed "real limits" and requires plaintiffs to establish a "strong relationship among the defendant, the forum, and the litigation." 141 S. Ct. at 1026, 1028. In doing so, the Court clarified that in the products liability context, if a defendant extensively promoted, sold, and serviced a specific product in a forum, and an alleged defect in "the very" product caused an in-forum injury to a resident plaintiff, "relatedness" exists. *Id.* at 1028. Such a connection among the claim, forum and defendants' conduct does not exist here.

Further, as explained above, Plaintiff merely pleads that "Defendants"—an undifferentiated group—conspired to manipulate some number of unspecified CDS auctions (*id.* ¶¶ 18-27, 168-277) without a single non-conclusory factual allegation that any of the Foreign Defendants agreed to join, participated in, or even knew about the alleged conspiracy. Such pleading is insufficient to establish personal jurisdiction over any Foreign Defendant.[36]

In addition, Plaintiff does not allege, as it must, that the Foreign Defendants acted with the intent of manipulating final CDS auction prices in the United States. Nevertheless, Plaintiff pleads that the Foreign Defendants are subject to jurisdiction because they transacted business in the United States, including by settling CDS that were linked to final CDS auction prices with absent class members. (*Id.* ¶ 48.) But no non-conclusory pleading connects the Foreign Defendants' conduct in the United States with Plaintiff's claimed manipulation.

*First*, Plaintiff does not allege that it entered any CDS transaction with any Foreign Defendant. Plaintiff therefore fails to connect its claims with Foreign Defendants' purported CDS-related activities, much less plead that its claims "aris[e] out of or relat[e] to" such activities.[37] *See*

---

[36] Indeed, the same improper group pleading tactics that provide an independent basis to dismiss the Complaint for failure to state a claim, *see supra* Section I.A, require the dismissal of the Complaint for lack of personal jurisdiction as to the Foreign Defendants. Plaintiff lumps in the Foreign Defendants with twenty other defendants and a hundred Jane Does, and then uses the defined term "Defendants" to refer to this entire group of entities. There are no specific, substantive allegations against any of the Foreign Defendants individually, which fails to satisfy Plaintiff's burden to establish the court's jurisdiction with respect to each claim asserted. *See Keeton*, 465 U.S. at 781 n.13 ("Each defendant's contacts with the forum . . . must be assessed individually."); *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83-84 (2d Cir. 2018) (where a plaintiff "refers to only the grouped entities throughout its complaint, it is impossible to determine whether . . . the [d]efendant . . . belongs in this lawsuit at all").

[37] For the same reason, Plaintiff cannot establish jurisdiction under New Mexico's long-arm statute. N.M. STAT. ANN. § 38-1-16(A)(1) (plaintiff must show the "cause of action aris[es] from the transaction of any business within this state"); *Sugar v. Tackett*, 2020 WL 6508859, at *2 (D.N.M. Nov. 5, 2020) ("New Mexico's long-arm statute . . . is coextensive with constitutional limitations imposed by the Due Process Clause.").

*Bristol-Myers*, 137 S. Ct. at 1780.  Even if certain Foreign Defendants entered CDS transactions with absent class members, this would be insufficient to establish jurisdiction.[38]  *Warren v. MBI Energy Servs., Inc.*, 2020 WL 937420, at *7 (D. Colo. Feb. 25, 2020), *report and recommendation adopted in part*, 2020 WL 5640617 (D. Colo. Sept. 22, 2020) (jurisdiction must be established based on named plaintiffs' claims).[39]

*Second*, Plaintiff does not allege, as it must, that the Foreign Defendants acted with the intent of manipulating CDS auction prices in the United States.[40]  For a court to find specific jurisdiction, the conspiratorial conduct must be "purposefully directed" at the forum.  *See Dental Dynamics*, 946 F.3d at 1229 (stating that "a defendant must have purposefully directed its activities at residents of the forum state").  Other than a conclusory allegation that the manipulation "had the intended effect of causing injury to Plaintiff and Class members" in the United States (Compl.

---

[38] Nor is there any basis to impute any U.S.-based suit-related contacts from one defendant to another, either on an agency or conspiracy theory.  Plaintiff has not invoked any such jurisdictional theory, nor could it seek to do so.  The Complaint is devoid of any of the allegations necessary to make such a theory viable.  *See Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 131 N.M. 772, 785 (N.M. Ct. App. 2001) (conspiracy jurisdiction "rests on principles of agency," which means a plaintiff must demonstrate "the non-resident co-conspirators had sufficient knowledge of and participation in the acts that occurred in the forum state and the resultant effect of those acts was foreseeable").

[39] The exercise of jurisdiction over the Foreign Defendants in this case would also be "inconsistent with traditional notions of fair play and substantial justice."  *Benton v. Cameco Corp*., 375 F.3d 1070, 1078-80 (10th Cir. 2004) (identifying five factors considered when assessing whether the exercise of jurisdiction is reasonable).  Plaintiff sets forth nothing but conclusory allegations that the Foreign Defendants engaged in suit-related conduct in or aimed at the United States.  Plaintiff's Complaint fails to provide this Court any basis by which it could, consistent with due process, assume jurisdiction over the Foreign Defendants.  *See id.* ("[The] exercise of personal jurisdiction over [Foreign Corporation] would offend traditional notions of fair play and substantial justice.").

[40] Three of the Foreign Defendants—Barclays PLC, Credit Suisse Group AG, and NatWest Group Plc—are holding companies that have no business activities at all, much less any involvement in the CDS markets or CDS auctions.  (Compl. ¶¶ 62, 74, 96; Exs. B-L).  Thus, Plaintiff does not and could not identify any suit-related conduct to tie them to Plaintiff's claims.

¶ 49), the Complaint contains no allegations that the Foreign Defendants aimed any alleged misconduct at CDS contracts traded in the United States.

At best, Plaintiff's allegations support a theory that it was foreseeable that some U.S.-based individuals or entities transacting in CDS would be harmed by the alleged misconduct. It is blackletter law that foreseeable harm in the forum cannot by itself support jurisdiction. *See Walden*, 571 U.S. at 289-90; *see also, e.g.*, *Old Republic Ins. Co.*, 877 F.3d at 905 ("Mere foreseeability of causing injury in another state is insufficient to establish purposeful direction."). Courts routinely reject attempts to establish jurisdiction where plaintiffs claim that in-forum transactions with a defendant were supposedly harmed by alleged misconduct outside the United States. *See, e.g.*, *Charles Schwab Corp.*, 883 F.3d at 84 (refusing to exercise jurisdiction based on in-forum sales to plaintiff where the alleged misconduct, LIBOR manipulation, occurred outside the United States); *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 695-97 (S.D.N.Y. 2019) (same for claims based on alleged manipulation of CDOR).

Plaintiff's Complaint against the Foreign Defendants should therefore be dismissed on this independent ground.

## CONCLUSION

For the foregoing reasons, all claims asserted against the Dealer Defendants should be dismissed in their entirety.

Dated: November 15, 2021

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: /s/ Andrew G. Schultz
Andrew G. Schultz
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 765-5900
Facsimile: (505) 768-7395
aschultz@rodey.com

Robert Sperling
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-7941
Fax: (312) 558-5700
RSperling@winston.com

Staci Yablon
Eva W. Cole
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4703
Fax: (212) 294-4700
SYablon@winston.com
EWCole@winston.com

*Attorneys for Defendants The Goldman Sachs Group, Inc., Goldman Sachs & Co. LLC, and Goldman Sachs International*

56

SNELL & WILMER LLP

By: /s/ Gregory J. Marshall
Gregory J. Marshall
201 Third Street N.W. #500
Albuquerque, NM 87102
Telephone: 602-382-6514
Facsimile: 602-382-6070
gmarshall@swlaw.com

Paul S. Mishkin
Sheila R. Adams
Adam G. Mehes
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Fax: (212) 450-4800
paul.mishkin@davispolk.com
sheila.adams@davispolk.com
adam.mehes@davispolk.com

*Attorneys for Defendants Bank of America Corporation,
Bank of America, N.A., and BofA Securities, Inc.*

ATKINSON, BAKER & RODRIGUEZ, P.C.

By: /s/ Douglas A. Baker
Douglas A. Baker
Justin D. Rodriguez
201 Third Street NW, Suite 1850
Albuquerque, NM 87102
Telephone: (505) 764-8111
dbaker@abrfirm.com
jrodriguez@abrfirm.com

Jeffrey T. Scott
Matthew J. Porpora
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
scottj@sullcrom.com
porporam@sullcrom.com
carterjo@sullcrom.com

Renata B. Hesse
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW Suite 700
Washington, DC 20006-5215
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
hesser@sullcrom.com

*Attorneys for Defendants Barclays PLC,*
*Barclays Bank PLC, and Barclays Capital Inc.*

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By:  /s/ Andrew G. Schultz
Andrew G. Schultz
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 765-5900
Facsimile: (505) 768-7395
aschultz@rodey.com

Joshua A. Goldberg
Amy N. Vegari
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
jgoldberg@pbwt.com
avegari@pbwt.com

*Attorneys for Defendants BNP Paribas S.A. and BNP Paribas Securities Corp.*

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: /s/ Eric R. Burris
Eric R. Burris
Debashree Nandy
201 Third St. NW, Suite 1800
Albuquerque, NM 87102
Telephone: (505) 244-0770
Facsimile: (505) 244-9266
eburris@bhfs.com
rnandy@bhfs.com

Jay B. Kasner
Karen Hoffman Lent
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (917) 777-3000
Jay.Kasner@skadden.com
Karen.Lent@skadden.com

*Attorneys for Defendants Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc., and Citigroup Global Markets Ltd.*

BARDACKE ALLISON LLP

By: /s/ Benjamin Allison
Benjamin Allison
141 East Palace Avenue
Santa Fe, NM 87501
Phone: (505) 995-8000
Facsimile: (505) 672-7037
ben@bardackeallison.com

David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
Margaret A. Barone
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
ezatz@cahill.com
jhall@cahill.com
mbarone@cahill.com

*Attorneys for Defendants Credit Suisse Group AG,
Credit Suisse AG, Credit Suisse Securities (USA)
LLC, Credit Suisse Capital LLC, and Credit Suisse
International*

ALLEN LAW FIRM, LLC

By: /s/ Meena H. Allen
Meena H. Allen
6121 Indian School Road NE, Suite 230
Albuquerque, NM 87110
Telephone: (505) 298-9400
Facsimile: (505) 298-7070
mallen@mallen-law.com

John Terzaken
Adrienne V. Baxley
Laurel Fresquez
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC 20001
Telephone: (202) 636-5500
Facsimile: (202) 636-5502
john.terzaken@stblaw.com
adrienne.baxley@stblaw.com
laurel.fresquez@stblaw.com

*Attorneys for Defendants Deutsche Bank AG and Deutsche Bank Securities Inc.*

RODEY,  DICKASON,  SLOAN,  AKIN  &  ROBB,
P.A.

By:  /s/ Andrew G. Schultz
Andrew G. Schultz
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 765-5900
Facsimile: (505) 768-7395
aschultz@rodey.com

Robert D. Wick
Henry Liu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
rwick@cov.com
hliu@cov.com

*Attorneys for Defendants JPMorgan Chase & Co.,
J.P. Morgan Chase Bank, N.A., and J.P. Morgan
Securities LLC*

HOLLAND & HART LLP

By: /s/ John C. Anderson
John C. Anderson
110 N. Guadalupe St., Suite 1
Santa Fe, NM 87507
(505) 954-7290
JCAnderson@hollandhart.com

Michael A. Paskin
Lauren M. Rosenberg
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
mpaskin@cravath.com
lrosenberg@cravath.com

*Attorneys for Defendants Morgan Stanley, Morgan
Stanley & Co. LLC, Morgan Stanley & Co.
International plc, and Morgan Stanley Capital
Services LLC*

RODEY,  DICKASON,  SLOAN,  AKIN  &  ROBB,
P.A.

By:  /s/ Andrew G. Schultz
Andrew G. Schultz
201 Third St. NW, Suite 2200
Albuquerque, NM 87102
Telephone: (505) 768-7205
aschultz@rodey.com

James R. Warnot, Jr.
Patrick C. Ashby
Nicole E. Jerry
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
james.warnot@linklaters.com
patrick.ashby@linklaters.com
nicole.jerry@linklaters.com

Adam S. Lurie
LINKLATERS LLP
601 13th St. NW
Suite 400
Washington, DC 20005
Telephone: (202) 654-9227
adam.lurie@linklaters.com

*Attorneys for Defendants NatWest Group Plc (f/k/a
The Royal Bank of Scotland Group plc), NatWest
Markets Plc (f/k/a The Royal Bank of Scotland plc),
and NatWest Markets Securities Inc. (f/k/a RBS
Securities Inc.)*