**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| IN RE: CREDIT DEFAULT SWAPS AUCTIONS LITIGATION | No. 1:21-cv-00606-KG-JHR<br><br>**(ORAL ARGUMENT REQUESTED)** |

**CREDITEX GROUP INC.'S MOTION TO DISMISS THE CLASS ACTION
COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND ................................................................................................3

ARGUMENT .......................................................................................................................6

    I.      PLAINTIFF FAILS TO STATE A SHERMAN ACT CLAIM AGAINST
           CREDITEX ................................................................................................................6

           A.      Plaintiff Pleads No Facts To Suggest That Creditex Participated In
                   Any Conspiracy ...............................................................................................7

           B.      If Plaintiff Is Challenging Creditex's Alleged Participation In The
                   Design Of The Auction Process In 2005, That Claim Is Time-Barred ......11

    II.     PLAINTIFF'S CEA ALLEGATIONS ARE DEFICIENT AS TO CREDITEX ...12

    III.    PLAINTIFF'S UNJUST ENRICHMENT CLAIM AGAINST CREDITEX
           FAILS FOR ADDITIONAL REASONS ................................................................13

    IV.    PLAINTIFF HAS NOT ADEQUATELY ALLEGED PERSONAL
           JURISDICTION OVER CREDITEX .................................................................14

CONCLUSION ....................................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                     **PAGE(S)**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   175 F. Supp. 3d 44 (S.D.N.Y. 2016)..................................................................7

*In re Aluminum Warehousing Antitrust Litig.*,
   2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015) ....................................................10

*In re Amaranth Nat. Gas. Commodities Litig.*,
   730 F.3d 170 (2d. Cir. 2013)..........................................................................13

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   123 F. Supp. 3d 478 (S.D.N.Y. 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018) ...............8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................6

*Bill's Birds Inc. v. Trademarketing Res. Inc.*,
   920 F. Supp. 2d 357 (E.D.N.Y. 2013) ..............................................................10

*Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*,
   137 S. Ct. 1773 (2017)...................................................................................15

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*,
   691 F. App'x 515 (10th Cir. 2017) ....................................................................8

*In re Broiler Chicken Antitrust Litig.*,
   2019 WL 1003111 (N.D. Ill. Feb. 28, 2019) .......................................................8

*CFTC v. R2 Cap. Grp., LLC*,
   2017 WL 4350366 (D. Colo. Aug. 3, 2017) ......................................................12

*Christie's Inc. v. Great Ests. Auction Co.*,
   2004 WL 7338081 (D.N.M. Mar. 15, 2004)......................................................15

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)......................................................................................14

*In re Generics Pharm. Litig.*,
   386 F. Supp. 3d 477 (E.D. Pa. 2019) .................................................................8

*Graham v. Hudgins, Thompson, Ball & Assocs., Inc.*,
   319 F. Supp. 1335 (N.D. Okla. 1970) ..............................................................10

*In re Int. Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017)..........................................................................2, 7

*JP Morgan Trust Co. Nat'l Ass'n v. Mid-America Pipeline Co.*,
   413 F. Supp. 2d 1244 (D. Kan. 2006) ...................................................................7

*Kaw Valley Elec. Coop. Co. v. Kan. Elec. Power Coop., Inc.*,
   872 F.2d 931 (10th Cir. 1989) ............................................................................11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015)..........................................................7

*Llacua v. W. Range Ass'n*,
   930 F.3d 1161 (10th Cir. 2019) .........................................................................2, 8

*Mayor & City Council of Balt. v. Citigroup Inc.*,
   709 F.3d 129 (2d Cir. 2013)..................................................................................8

*Med Flight Air Ambul., Inc. v. MGM Resorts Intl.*,
   2017 WL 5634116 (D.N.M. Nov. 22, 2017), *modified in part*, 2018 WL
   1997292 (D.N.M. Apr. 27, 2018) ........................................................................15

*Medina v. Lorenzo*,
   2004 WL 7337882 (D.N.M. June 16, 2004) .........................................................15

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)..........................................................................................1, 6

*Old Rep. Ins. Co. v. Cont'l Motors, Inc.*,
   877 F.3d 895 (10th Cir. 2017) ............................................................................15

*Ontiveros Insulation Co., Inc. v. Sanchez*,
   3 P.3d 695 (N.M. Ct. App. 2000)........................................................................14

*Peay v. BellSouth Med. Assistance Plan*,
   205 F.3d 1206 (10th Cir. 2000) ..........................................................................14

*Tal v. Hogan*,
   453 F.3d 1244 (10th Cir. 2006) ............................................................................8

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ............................................................................8

*United States v. Peoni*,
   100 F.2d 402, 402 (2d Circ. 1938).......................................................................13

*Va. Vermiculite, Ltd. v. Hist. Green Springs, Inc.*,
   307 F.3d 277 (4th Cir. 2002) ..................................................................10

*Walden v. Fiore*,
   571 U.S. 277 (2014)..............................................................................14

*XMission, L.C. v. Fluent LLC*,
   955 F.3d 833 (10th Cir. 2020) ...............................................................15

**STATUTES & RULES**

15 U.S.C. § 15b ....................................................................................12

Fed. R. Civ. P. 12(b)(2)...........................................................................1

Fed. R. Civ. P. 12(b)(6)...........................................................................1

**OTHER AUTHORITIES**

About this Service, CreditFixings.com
   https://creditfixings.com/CreditEventAuctions/static/credit_event_auction/abo
   ut/about.shtml (last visited Nov. 11, 2021)..................................................4

Form of Credit Derivatives Auction Settlement Terms, ISDA (2009),
   https://www.isda.org/a/kS6EE/Auction-Settlement-Terms-CLEAN.doc ...............4

Press Release, Intercontinental Exchange Inc., IntercontinentalExchange
   Completes Acquisition of Creditex Group Inc. (Sept. 2, 2008),
   https://ir.theice.com/press/news-details/2008/IntercontinentalExchange-
   Completes-Acquisition-of-Creditex-Group-Inc/default.aspx ...................................9

Pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Creditex Group Inc. ("Creditex") respectfully moves for an order dismissing with prejudice (as against Creditex) the Class Action Complaint (ECF No. 1) filed by Plaintiff New Mexico State Investment Council for lack of personal jurisdiction and failure to state a claim, consistent with the parties' stipulation approved by the Court on August 23, 2021 (ECF No. 77).

## PRELIMINARY STATEMENT

For the reasons stated in the Dealer Defendants' Motion to Dismiss (the "Dealer Brief"), the Court should dismiss all claims against all defendants, including Creditex.  Creditex joins in the Dealer Brief's arguments and respectfully submits this separate brief to identify further reasons to dismiss Plaintiff's claims against Creditex.

*First*, Plaintiff does not plead that Creditex, one of the two companies hired to administer credit event auctions, participated in any purported antitrust conspiracy.  All Creditex does is (1) operate the technological platform on which the auctions are run and (2) mathematically calculate the auction results.  There is no allegation that Creditex ever performed any of that work improperly or incorrectly, let alone illegally.  To the contrary, this purely ministerial role, by its nature, makes it implausible that Creditex participated in any conspiracy to manipulate auction results.  Indeed, nowhere does the Complaint plausibly explain how or why Creditex's participation in the alleged conspiracy would be necessary or even helpful given Creditex's purely administrative function.  Unsurprisingly, Plaintiff does not plead any facts suggesting that Creditex participated in any alleged conspiracy or otherwise made a "conscious commitment to a common scheme," as required to state a claim.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  In similar circumstances, courts have dismissed the administrator

1

because the plaintiff failed to plausibly allege any participation in a conspiracy.  *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 478 (S.D.N.Y. 2017).

Nor has Plaintiff offered a plausible reason *why* Creditex would want to conspire to manipulate the results of the credit event auctions.  Creditex is not alleged to trade in the underlying financial instruments (credit default swaps) or receive compensation based on the auction results.  Courts routinely dismiss antitrust claims where the plaintiff does not plead any plausible economic motivation for a defendant to conspire.  *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1181 (10th Cir. 2019).

*Second*, Plaintiff does not adequately plead that Creditex is vicariously liable for, or "aided and abetted," the dealers' alleged violations of the Commodity Exchange Act ("CEA"). Apart from the fact that the CEA does not even apply to the products at issue in this action (as explained in the Dealer Brief), there can be no basis for vicarious liability because Creditex is not (and could not be) alleged to control the dealers.  Plaintiff also has not alleged any facts even suggesting that Creditex intended to assist in a CEA violation, and therefore Plaintiff's aiding-and-abetting claim also must be dismissed.  Moreover, both CEA claims against Creditex are insufficient in any event because they rest on the same predicate as the antitrust conspiracy claim—Creditex's purported participation in the dealers' purported conspiracy—for which Plaintiff has not pleaded any factual basis.

*Third*, as to Plaintiff's unjust enrichment claim, it is not even clear that it is asserted against Creditex.  The heading of that cause of action (the fifth claim for relief) purports to set forth a claim for unjust enrichment against "All Defendants."  But the subsequent paragraphs refer only to the "Dealers," and thus on their face do not include Creditex.  In any event, those

paragraphs do not state an unjust enrichment claim against Creditex because Plaintiff does not allege that it provided anything of value to Creditex, or that Creditex unjustly gained at Plaintiff's expense.

*Fourth, and finally*, Plaintiff has not adequately pleaded personal jurisdiction over Creditex. Creditex is alleged to be incorporated in Delaware and to have its principal place of business in New York. The Complaint does not allege that Creditex engaged in conduct in, was registered to do business in, or had any contact with, New Mexico.

### FACTUAL BACKGROUND

The Dealer Brief explains why the market developed an auction process to settle credit default swaps and lays out the mechanics of that process. The background provided here focuses on what Creditex does and does not do in the auction process.

Creditex, along with Markit, are the co-administrators of credit event auctions, though they have differing responsibilities. Compl. ¶ 142. Creditex runs the technological platform on which the auctions are run and mechanically calculates the results. *Id.* ¶¶ 145–49. Markit validates and publishes the results online. *Id.* ¶ 11.

Creditex is not alleged to have any discretionary role in this process. The credit event auction process begins when the Credit Derivatives Determinations Committee (the "Determinations Committee") determines that a credit event, like a default on a bond interest payment or a bankruptcy, has occurred. *Id.* ¶ 138. Creditex is not alleged to be a member of the Determinations Committee (because it is not). *Id.* ¶¶ 140–41 (listing members of Determinations Committee, and not including Creditex). Once the Determinations Committee decides a credit event has occurred, it determines whether an auction is necessary. *Id.* ¶ 138. If, in its judgment,

3

an auction is necessary, it provides notice to the market, including the terms that will govern the auction.  *Id.* ¶¶ 138–39.

These terms, which dictate how the auction will be run, are called the Auction Settlement Terms.  The Auction Settlement Terms are highly detailed and, among other things, set the time of the auction, deadlines for auction submissions, the participant list, bid/offer spreads and minimum denominations, and other "auction-specific" terms, including deliverable obligations. *See id.* ¶ 139.  A "Form of Credit Derivatives Auction Settlement Terms" (which is the template for the Auction Settlement Terms) is available on ISDA's website.[1]  Markit publishes the identity of the auction participants on the creditfixings.com website.[2]

The Determinations Committee provides Creditex with the Auction Settlement Terms. Creditex has no role or input in developing the terms, and Plaintiff does not allege otherwise. Creditex's only role is to input the predetermined variables into the applicable software and set up the platform to run the auction as the Auction Settlement Terms instruct.  Creditex has no discretion in this auction set-up process, but instead just implements the terms (such as the bid/offer spreads and the minimum denominations) that the Determinations Committee has dictated, and Plaintiff does not allege otherwise.  *See id.* ¶¶ 142–49 (explaining the mechanics of the auctions).  Nor does Plaintiff allege that Creditex has any discretion to deviate from the process used to calculate the results of any auction.  *Id.*

---

[1] Form of Credit Derivatives Auction Settlement Terms, ISDA (2009), https://www.isda.org/a/kS6EE/Auction-Settlement-Terms-CLEAN.doc (discussed and cited at Compl ¶¶ 139, 187 n.79).

[2] *See* About this Service, CreditFixings.com https://creditfixings.com/CreditEventAuctions/static/credit_event_auction/about/about.shtml (last visited Nov. 11, 2021) (discussed and cited at Compl ¶ 131 n.81).

The auction itself is run in two stages, pursuant to the Auction Settlement Terms.  In the first stage, the dealers make two submissions:  the "initial market submission" and a "physical settlement request."  *Id.* ¶ 143.  The initial market submission consists of a bid to purchase and offer to sell the bonds in default that are the subject of the auction.  *Id.*  The physical settlement request is the quantity of bonds the dealer commits to buy or sell in the auction.  *Id.*  Creditex automatically uses these two submissions to calculate the "initial market midpoint" (the "IMM") and "net open interest" (the "NOI") to either buy or sell bonds.  To calculate the IMM, Creditex, discards certain outlier bids and then averages the "best half" of the remaining results.[3]  *Id.* ¶ 12.  To calculate the NOI, Creditex adds all of the dealer's physical settlement requests (*i.e.*, Creditex offsets the total requests to sell bonds against the total requests to buy bonds).  *Id.* ¶ 9.  The IMM and the NOI are carried into the second phase of the auction.  In the second phase, dealers place limit orders on their own behalf or on behalf of customers to either buy or sell a particular quantity of bonds, depending on whether the NOI is to buy or sell.  *Id.* ¶ 13.  Unless the requests to buy and the requests to sell exactly offset each other, the limit order that exhausts the NOI sets the final auction price, except that the IMM serves as either a cap or a floor, depending on the direction of the NOI.  *Id.* ¶¶ 13, 19.  If the NOI is zero, the final auction price is the IMM.  *Id.* ¶ 146 n. 71.  Markit validates the results and publishes them.

Plaintiff alleges that, in 2005, Creditex had some role in developing the framework for the auction process.  *Id.* ¶ 133.  Plaintiff does not allege that Creditex:

- trades in credit default swaps;

---

[3] The calculation of the "best half" depends on the direction of the NOI.  If the net open interest is to buy bonds, the IMM is calculated by averaging the highest half of the bids.  Compl. ¶ 12.  If the NOI is to sell bonds, the IMM is calculated by averaging the lowest half of the offers.  *Id.*

- decides whether a credit event occurs;

- determines whether a credit event auction is necessary;

- sets the terms of any auction;

- decides who will participate in any auction;

- exercises any discretion in calculating the IMM or the NOI;

- coordinates with any dealer on its bids or offers;

- receives any advance notice of any dealer's bids or offers;

- manipulates any auction results; or

- receives compensation based on the results of any auction.

As Plaintiff makes clear in the Complaint, Creditex, as one of the two administrators, has a purely ministerial role in these auctions. Plaintiff alleges no facts suggesting that Creditex participated in any conspiracy to manipulate auction results.

## ARGUMENT

## I. PLAINTIFF FAILS TO STATE A SHERMAN ACT CLAIM AGAINST CREDITEX

To state a Sherman Act § 1 claim, Plaintiff must plead enough factual matter to suggest that the defendants entered into an unlawful conspiracy that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For any individual defendant, the plaintiff must plead that the defendant, in its individual capacity, "conscious[ly] commit[ted] [itself] to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Plaintiff has failed to meet its pleading burden to state an antitrust claim against Creditex for several independent reasons.

6

A. **Plaintiff Pleads No Facts To Suggest That Creditex Participated In Any Conspiracy**

The Complaint contains no facts suggesting that Creditex participated in any alleged conspiracy. *See JP Morgan Trust Co. Nat'l Ass'n v. Mid-America Pipeline Co.*, 413 F. Supp. 2d 1244, 1272–73 (D. Kan. 2006) (dismissing antitrust claim against defendant that was not alleged to have engaged in any conspiratorial conduct). The Complaint is completely devoid of any factual allegations that Creditex was a party to any communications by which the purported conspiracy was effectuated, assisted with any alleged manipulation, or joined the conspiracy in any other way. At most, Plaintiff alleges that Creditex operates a platform that serves as a forum for the alleged conspiracy, but that is not sufficient to state a claim under the Sherman Act. To the extent Creditex is alleged to have enabled communications between the dealers, *see* Compl. ¶ 277, those allegations are not pleaded with any factual detail. Nor does Plaintiff allege any facts in support of their conclusory assertions that Creditex made statements regarding the fairness of auctions at the "direction" of dealers. *Id.* ¶ 328. In similar circumstances, courts have dismissed a Sherman Act § 1 claim against an entity that allegedly hosted a forum for the alleged conspiracy to block the emergence of alternative trading platforms. *See In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 485–86 (S.D.N.Y. 2017); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6696407, at *9 (S.D.N.Y. Nov. 3, 2015) (dismissing claims against former LIBOR administrator under whose auspices alleged price-fixing conspiracy was supposedly furthered "because of a combination of lack of personal jurisdiction and failure to state a claim").[4] That Creditex might have had the opportunity to join the alleged

---

[4] When courts have allowed cases to proceed against entities that allegedly served as a forum for conspiracy, the plaintiffs in those proceedings also alleged affirmative steps those entities took to

conspiracy, or had knowledge of it, is insufficient to state a claim.  *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991) (mere opportunity to conspire insufficient to state a claim); *In re Generics Pharm. Litig.*, 386 F. Supp. 3d 477, 484 (E.D. Pa. 2019) (knowledge of alleged conspiracy insufficient to plead defendant's agreement to join it).

Moreover, Plaintiff does not offer any motive for Creditex to participate in the alleged conspiracy.  Courts regularly dismiss antitrust claims where the alleged conspiracy "does not make economic sense" for the alleged conspirators.  *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1181 (10th Cir. 2019) (dismissing Sherman Act § 1 claim because "the alleged conspiracy does not make economic sense" for defendants); *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (dismissing a bid-rigging claim against a defendant that had no economic interest in the result); *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 519 (10th Cir. 2017) (same as to Sherman Act § 1 claim); *Mayor & City Council of Balt. v. Citigroup Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) (rejecting application of motive as  "plus factor" supporting antitrust liability because plaintiffs' "motive allegations . . . relate almost exclusively to Defendants' joint motivation to conspire to *support* the market"); *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 501 (S.D.N.Y. 2015) (finding the alleged antitrust conspiracy implausible because the object of the conspiracy "was not in Defendants' interests"),

---

further the alleged conspiracy.  *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55–56 (S.D.N.Y. 2016) (denying motion to dismiss Sherman Act claims against interdealer broker that allegedly assisted manipulative conduct in addition to participating in rate-setting process that enabled dealers to further alleged conspiracy); *In re Broiler Chicken Antitrust Litig.*, 2019 WL 1003111, at *2 (N.D. Ill. Feb. 28, 2019) (denying motion to dismiss Sherman Act claims against third party that allegedly published reports that shared information not usually shared with competitors).  No such facts are pleaded here.

*aff'd*, 899 F.3d 87 (2d Cir. 2018).  Here, Plaintiff has neither alleged any economic motivation for Creditex to join a conspiracy to manipulate auction results, nor any motivation for the dealers—that is, the purported co-conspirators—to want to include a non-dealer in the alleged conspiracy.

To be more specific, Plaintiff does not allege that Creditex trades credit default swaps or that it would benefit from skewing the results of a credit event auction.  Nor does Plaintiff allege that Creditex is paid at all based on the auction's outcome.  The only allegation Plaintiff makes that is specific to Creditex is that, *in 2005*, Creditex was the "dominant interdealer broker" for credit default swaps and that some unspecified aspect of its business was dependent on staying in the dealers' favor.[5]  Compl. ¶ 134.  Not only is this allegation expressly limited to a snapshot in time sixteen years before this case was filed, but it also contains no facts to support the speculation that any part of Creditex's business was at all at risk (for example, a threat by the dealers to move their business elsewhere if Creditex did not join the conspiracy).  Nor would the business relationship between Creditex and the dealers in 2005 be sufficient to plead that Creditex participated in the alleged conspiracy.

Creditex, as described above, does not have any discretion in administering credit event auctions.  Its only alleged role is to run the technological platform on which the auctions take place and to mechanically calculate the results.  It is a service provider.  If the dealers were

---

[5] Since 2005, Creditex's ownership has changed.  Press Release, Intercontinental Exchange Inc., IntercontinentalExchange Completes Acquisition of Creditex Group Inc. (Sept. 2, 2008), https://ir.theice.com/press/news-details/2008/IntercontinentalExchange-Completes-Acquisition-of-Creditex-Group-Inc/default.aspx.  The Court may take judicial notice of this point because it is a matter of public record not subject to reasonable dispute.

conspiring to manipulate the auction process, they would have no need to bring Creditex under the cloak of conspiratorial secrecy, nor would enlisting Creditex's help do them any good. Plaintiff alleges no facts to the contrary.  Courts frequently reject claims that would subject service providers to antitrust liability merely for delivering services to the alleged conspirators in a mechanical, discretionless way.  *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 6472656, at *14–16 (S.D.N.Y. Oct. 23, 2015) (dismissing antitrust claim against a sales agent of the alleged conspirator because the allegations were insufficient to show that he was "a separate economic actor with separate economic interests that diverged" from that of the alleged conspirator); *Bill's Birds Inc. v. Trademarketing Res. Inc.*, 920 F. Supp. 2d 357, 364–65 (E.D.N.Y. 2013) (dismissing antitrust claim against licensing agent and licensor because the agreement between them did not "*bring together economic power that was previously pursuing divergent goals*" and licensing agent was not alleged to have "any decision-making capacity" (emphasis in original)); *Graham v. Hudgins, Thompson, Ball & Assocs., Inc.*, 319 F. Supp. 1335, 1337 (N.D. Okla. 1970) (dismissing complaint against trustee where it had no discretion but to carry out instructions of the settlor); *see also Va. Vermiculite, Ltd. v. Hist. Green Springs, Inc.*, 307 F.3d 277, 282 (4th Cir. 2002) (no antitrust liability for agreement to transfer mineral-rich land from a mining company to a charity because there was no merging of economic power).[6]  In

---

[6] In fact, in many of these cases, the courts held that the service provider was incapable of reaching a conspiratorial agreement with the conspirators within the meaning of Sherman Act § 1 because the service provider and conspirators were not pursuing divergent economic goals. Because the point of Sherman Act § 1 is to police agreements that combine independent centers of economic decision-making, it does not apply to a service provider retained by conspirators. *See Aluminum Warehousing*, 2015 WL 6472656, at *14-16; *Bill's Birds Inc.*, 920 F. Supp. 2d at 365.  Here, Creditex does not compete with the dealers, is not pursuing economic interests that diverge from the dealers', and therefore is incapable of conspiring within the meaning of Sherman Act § 1.  Thus, whether the discretionless nature of Creditex's role means that its

short, Plaintiff has not made any allegation that Creditex ever actually participated in any

conspiracy.  Plaintiff's claim as to Creditex must accordingly be dismissed.

**B.  If Plaintiff Is Challenging Creditex's Alleged Participation In The Design Of The Auction Process In 2005, That Claim Is Time-Barred**

Plaintiff alleges that, in 2005, Creditex "created the auction technology with the Dealers"

and, in conjunction with Markit, ISDA and the dealers, "introduced" the auction settlement

mechanism to the market.  Compl. ¶¶ 131, 134.  Plaintiff also alleges that, at the time, "Creditex

specified that only 'dealers place executable orders on the online platform for obligations of a

particular company that has undergone a credit event,'" but does not say what source is being

quoted or provide any basis to believe that it was Creditex that proposed or requested any

restriction on non-dealers' eligibility to participate (rather than simply, as elsewhere, carrying out

the instructions of the parties that hired Creditex to serve in this role).  *Id.* ¶¶ 131, 133.  Although

it is not clear that Plaintiff is challenging the long-ago design of the auction process (as opposed

to its alleged misuse by dealers) as an antitrust violation, any such claim would be time-barred.

Plaintiff's idea seems to be that the dealer-only limitation allegedly implemented in 2005,

assuming for argument's sake that the Court was to treat it as adequately pleaded against

Creditex, has an anticompetitive effect.  *Id.* ¶¶ 18–20.  As the Tenth Circuit has held, however,

when a plaintiff challenges a group's policy limiting participation in the group, the plaintiff's

claim accrues at the time the plaintiff is first excluded from the group and a new claim does not

accrue for subsequent decisions to exclude it (unless the decision to exclude is not "final").  *Kaw*

---

participation in the conspiracy is implausible or that it is legally incapable of conspiring, the
result is the same: Creditex should be dismissed from this case.

*Valley Elec. Coop. Co. v. Kan. Elec. Power Coop., Inc.*, 872 F.2d 931, 934–35 (10th Cir. 1989).

Here, Plaintiff admits that it was first excluded from the auctions when the policy was adopted in

2005, Compl. ¶ 133, so any claim from any such purported violation would have expired in

2009, at the end of the four-year limitations period applicable to antitrust claims.  15 U.S.C.

§ 15b.  Nor is there any fact issue as to whether a claim accrued because Plaintiff does not allege

that the Defendants ever actually rejected a request to join an auction.  Compl. ¶¶ 18, 187.  Thus,

even if Plaintiff were to argue that its ambiguous allegations about Creditex's role in 2005

sufficed to state a claim, that claim would be time-barred.[7]

## II.  PLAINTIFF'S CEA ALLEGATIONS ARE DEFICIENT AS TO CREDITEX

Plaintiff does not assert that Creditex directly violated the CEA but asserts that it is

(i) vicariously liable "for the manipulative acts of [its] agents, representatives, and/or other

persons acting for them in the scope of their employment" and (ii) liable for "aiding and

abetting" a CEA violation by the dealers.  Compl. ¶¶ 364–69.  Plaintiff has not pleaded facts

sufficient to support either assertion.

***No Vicarious Liability.***  Creditex cannot be liable on a vicarious liability theory because

no manipulative acts are alleged against any agents, representatives, or employees of Creditex,

and Creditex did not own or control any of the other conspirators.  Rather, as explained above, it

provided an administrative service to the dealers for a fee.  *E.g.*, *CFTC v. R2 Cap. Grp., LLC*,

2017 WL 4350366, at *15 (D. Colo. Aug. 3, 2017) (vicarious liability of CEA violation available

when primary violator "was acting as an agent of and within the scope of his authority" for

---

[7] As explained in the Dealer Brief, Plaintiff's claims are barred by the applicable statute of
limitations for other reasons as well.

defendant "at the time he engaged in the conduct found above to be fraudulent").  In the absence

of such factual allegations, Plaintiff's CEA claims against Creditex must be dismissed.

*No Aiding and Abetting.*  To state a claim for aiding and abetting a CEA violation,

Plaintiff must offer factual allegations suggesting that Creditex had a specific intent to further an

underlying violation of the CEA.  *E.g.*, *In re Amaranth Nat. Gas. Commodities Litig.*, 730 F.3d

170, 181–82 (2d. Cir. 2013) ("[P]roof of a specific unlawful intent to further the underlying

violation is necessary before one can be found liable for aiding and abetting a violation of the

CEA." (citing *United States v. Peoni*, 100 F.2d 402, 402 (2d Circ. 1938) (Hand, J.))).  The

Complaint contains no factual allegations suggesting that Creditex had an unlawful intent to

further any CEA violation because, as described above, Creditex's only role is to set up the

auction and mechanically calculate the results.

### III. PLAINTIFF'S UNJUST ENRICHMENT CLAIM AGAINST CREDITEX FAILS FOR ADDITIONAL REASONS

It is not clear that Plaintiff asserts an unjust enrichment claim against Creditex.  In the

Complaint, the heading above the cause of action for unjust enrichment states that it is asserted

against "All Defendants," yet in each of the subsequent paragraphs, the unjust enrichment

allegations are made only against the "Dealers" and are expressly limited to "each Dealer for

those transactions in which it (or an affiliate) was the counterparty."  Compl. ¶¶ 370–73.  In

short, Plaintiff literally fails to state a claim for unjust enrichment against Creditex.

Even if the Court were to ignore Plaintiff's own words and read the allegations to run

against the "Defendants," rather than against the "Dealers," Plaintiff still would not state an

unjust enrichment claim as to Creditex.  To state an unjust enrichment claim, the plaintiff "must

show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that

allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co., Inc. v. Sanchez*, 3 P.3d 695, 698 (N.M. Ct. App. 2000). But Plaintiff does not allege that it exchanged any funds with Creditex in the course of settling credit default swaps or that it otherwise provided anything of value to Creditex. Under any circumstances, this claim should be dismissed.

## IV. PLAINTIFF HAS NOT ADEQUATELY ALLEGED PERSONAL JURISDICTION OVER CREDITEX

In addition to Plaintiff's failure to plead the merits of its claims, it has not adequately alleged this Court's personal jurisdiction over Creditex. Plaintiff has failed to plead either general or specific personal jurisdiction.

*No General Personal Jurisdiction.* Creditex is not (and could not be) alleged to (1) be incorporated in New Mexico, (2) maintain its primary place of business in New Mexico, or (3) be registered to do business in New Mexico. Compl. ¶ 104. It therefore is not alleged to be "at home" in New Mexico. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

*No Specific Jurisdiction.* A court may exercise "specific jurisdiction" over a defendant if the "defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Here, Plaintiff has not alleged that Creditex engaged in any conduct that had any connection to New Mexico at all. Indeed, the only feature of this case that has anything to do with New Mexico is that Plaintiff resides there. But the personal jurisdiction inquiry only focuses on a defendant's conduct. *Id.*

Even when a federal statute authorizes national service of process, courts must still assess the extent of the defendant's conduct relative to the forum state and the burden on the defendant in litigating there to determine whether jurisdiction passes constitutional muster. *Peay v.*

*BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1210–12 (10th Cir. 2000).[8]  Here, Creditex is

not alleged to have any contacts with New Mexico.  It is not alleged to have its headquarters or

principal place of business in New Mexico.  It is not even alleged to be registered to do business

in the state.  Creditex is not alleged to have solicited Plaintiff to settle a security with respect to

any credit event auction.  In short, nothing about its administrative role is directed at New

Mexico in a way that should subject it to specific jurisdiction.[9]  *E.g.*, *Christie's Inc. v. Great

Ests. Auction Co.*, 2004 WL 7338081, at *4 (D.N.M. Mar. 15, 2004) (auction operator not

subject to personal jurisdiction in New Mexico despite interest in participating in auction from

New Mexico-based residents); *Med Flight Air Ambul., Inc. v. MGM Resorts Intl.*, 2017 WL

5634116, at *9 (D.N.M. Nov. 22, 2017) (no personal jurisdiction over MGM, Nevada-based

gaming and resort company, in New Mexico, when dispute had no nexus with New Mexico),

*modified in part*, 2018 WL 1997292 (D.N.M. Apr. 27, 2018); *Medina v. Lorenzo*, 2004 WL

7337882, at *6 (D.N.M. June 16, 2004) (no personal jurisdiction over Texas corporation that did

not do business in New Mexico, where discovery would not occur in New Mexico).

---

[8] The Supreme Court has since instructed that the "burden" encompasses not only the "practical problems" of litigating in a particular forum (e.g., cost, location of witnesses) but also "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question."  *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017).

[9] Defendants do not create contacts with a forum merely by virtue of maintaining a website or otherwise broadly publishing information that can be accessed by residents of the forum.  *Old Rep. Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895 (10th Cir. 2017).  And unintentionally publishing information accessible in the forum is insufficient, too.  *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 846 (10th Cir. 2020) (plaintiff did not show that defendant *knew* that recipients of disseminated information resided in forum (emphasis in original)).

## **CONCLUSION**

The Court should dismiss Plaintiff's claims against Creditex with prejudice.

Dated: November 15, 2021                    Respectfully submitted,

                                            _/s/ Adam S. Hakki_
                                            Adam S. Hakki (*pro hac vice*)
                                            Jerome S. Fortinsky
                                            SHEARMAN & STERLING LLP
                                            599 Lexington Avenue
                                            New York, NY 10022-6069
                                            Telephone: (212) 848-4000
                                            adam.hakki@shearman.com
                                            jfortinsky@shearman.com

                                            Jeffrey J. Wechsler
                                            MONTGOMERY & ANDREWS, P.A.
                                            325 Paseo de Peralta
                                            Santa Fe, NM 87501
                                            Telephone: (505) 986-2637
                                            jwechsler@montand.com

                                            *Attorneys for Creditex Group Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 15, 2021, a true and correct copy of the foregoing was

filed electronically.  Notice of this filing was sent by operation of the Court's electronic filing

system to all parties indicated on the electronic filing receipt.  Parties may access this filing

through the Court's electronic filing system.

By:  <u>*/s/Adam S. Hakki*</u>
     Adam S. Hakki
