IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

IN RE CREDIT DEFAULT SWAPS
AUCTIONS LITIGATION                                    Civ. No. 21-0606 KG/DLM

<u>MEMORANDUM OPINION AND ORDER</u>

"Credit default swap (CDS) auction" is Wall Street-speak for, essentially, settling-up an insurance payout when corporate or municipal bond issuers default on those bonds or declare bankruptcy.  The Plaintiffs[1], which the Court collectively refers to as "Plaintiffs," are quasi-state funds that manage state and state-employee asset funds and retirement accounts.  Plaintiffs allege that Defendants impermissibly colluded and conspired to manipulate—or "fix" or "rig"—CDS auctions in an anticompetitive manner, and that this conduct constitutes: 1) a conspiracy to restrain trade in violation of the Sherman Act and the Clayton Act, 2) violations of the Commodity Exchange Act, and 3) unjust enrichment by civil conspiracy in violation of New Mexico law.  *See generally* (Doc. 151).  Defendants now move to dismiss the Amended Complaint for four reasons: 1) the applicable statutes of limitation bar all claims; 2) the Court lacks personal jurisdiction over some Defendants; 3) Plaintiffs lack antitrust standing to assert umbrella claims; and 4) the Amended Complaint fails to state a claim upon which relief can be granted.  (Doc. 157).  For the reasons explained herein, the Court grants in part and denies in part the Motion to Dismiss.

---

[1] This case presents a putative class action.  Plaintiffs have not moved for class certification at this time, so the Court will address only the named Plaintiffs.

I.      *Background*[2]

Plaintiffs and Defendants participate in the CDS and CDS auction market.  Plaintiffs

allege that Defendants have been "rigging" CDS auctions and have "worked together to

manipulate this market for their own financial benefit" and to the detriment of Plaintiffs.  *Id.* at ¶

1.  More specifically, Plaintiffs allege Defendants have "rigged the CDS auction process when

so-called 'credit events' occur." *Id.* at ¶ 3.

A.      The Players

Plaintiffs are the New Mexico State Investment Council (SIC), an institutional investment

firm that manages New Mexico's permanent endowment and investments from twenty-three (23)

state agencies, (Doc. 1) at ¶ 38; the Public Employees Retirement Association of New Mexico

(PERA), a cost-sharing, multiple employer, defined benefit pension fund that manages the

retirement system for New Mexico state, county, and municipal employees, *id.* at ¶ 43; and the

New Mexico Educational Retirement Board (ERB), a pension trust fund that manages the

retirement system for employees of New Mexico school districts and other state educational

institutions, *id.* at ¶ 48.

The Defendants come in ten (10) tranches, which the Court collectively refers to as

"Defendants": 1) Bank of America/Merrill Lynch (BoA), including: Bank of America, N.A., and

BofA Securities, Inc.; 2) Barclays, including Barclays Bank plc and Barclays Capital Inc.; 3)

BNP Paribas, including BNP Paribas S.A. and BNP Paribas Securities Corp.; 4) Citi, including

Citibank N.A., Citigroup Global Markets, Inc., and Citigroup Global Markets Limited; 5) Credit

Suisse, including Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse Capital

LLC, and Credit Suisse International; 6) Deutsche Bank, including Deutsche Bank AG and

---

[2] All facts in this section come from Plaintiffs' First Amended Complaint, (Doc. 1), and are accepted as true for purposes of resolving the Motion to Dismiss.

Deutsche Bank Securities Inc.; 7) Goldman Sachs, including Goldman Sachs & Co. LLC and

Goldman Sachs International; 8) JPMorgan, including J.P. Morgan Chase Bank, N.A. and J.P.

Morgan Securities LLC; 9) Morgan Stanley, including Morgan Stanley & Co., LLC, Morgan

Stanley & Co. International, and Morgan Stanley Capital Services, LLC; and 10) RBS, including

NatWest Markets plc and NatWest Markets Securities, Inc. *Id.* at ¶¶ 53–94. Defendants are

"market makers" or "dealers" of CDS.[3] *Id.* at 3.

Three non-parties play relevant and substantial roles in this story: 1) the International

Swaps and Derivatives Association, Inc. (ISDA); 2) Creditex Group Inc. (CGI, and with its

subsidiaries, "Creditex"); and 3) IHS Markit, Ltd. (Markit). *Id.* at ¶¶ 98–110. ISDA "is a

financial trade association formed in 1985 purporting to represent the interests of derivatives

market participants." *Id.* at ¶ 98. Defendants are members of ISDA and their

employees/representatives sit on the ISDA board of directors. *Id.* at ¶ 99.

Creditex "is an interdealer broker in the credit derivatives market." *Id.* at ¶ 102. An

"interdealer broker" is "an intermediary broker that facilitates trades between Defendants." *Id.* at

¶ 106; *see also id.* at ¶ 142 ("[a]n interdealer broker facilitates trades between dealers").

Defendants "backed Creditex as a 'strategic investment'" and helped it "get off the ground." *Id.*

at ¶ 103. This backing, referred to as a "dealer consortium" or "club" transaction, involved

"various members of the club – Defendants – collectively choos[ing] to support (and not support)

companies that form critical market infrastructure in the financial markets, like trading platforms,

clearinghouses, trade processing businesses, and brokerages." *Id.* Defendants "use these

investments to shape a financial market so that it favors Defendants' collective, incumbent

---

[3] The designations as "market maker" or "dealer" does not mean that Defendants exclusively buy or sell CDS protection. This designation has more to with Defendants' position in the market than the individual positions each Defendant takes with respect to any given reference entity.

interests in that market, such as by preventing the development of a market in a certain way, or by ensuring that any technological innovation in a specific market is controlled by Defendants." *Id.* at ¶ 104. Investment in these businesses "often involve some form of equity in the company, in exchange for the promise of control," such as seats on the board of directors and seats on the "most important committees that make development decisions about how the business will operate and evolve." *Id.* Defendants use these board of directors and committee meetings as "a form for the Defendants' representatives to meet and share their views about overall market structure and how they think it should develop to protect their collective interests." *Id.* Defendants' controlling involvement in Creditex means that Creditex cannot "take business positions contrary to the interests of Defendants." *Id.* at ¶ 106.

Markit was originally incorporated as Markit Ltd. in January 2014 and held an initial public offering (IPO) in June 2014. *Id.* at ¶ 107. Markit Ltd. later merged with IHS, Inc. and became the current iteration of IHS Markit, Ltd, which includes Markit Group Holdings Limited and Markit Group Limited. *Id.* Prior to its IPO, Markit was another strategic investment of Defendants and was owned by sixteen (16) shareholder banks. *Id.* at ¶ 108. "Each dealer was entitled to (and occupied) a seat on Markit's board of directors." *Id.* "As with Creditex, Defendants' control of Markit was rooted in Markit's dependence on the Defendants for the continuation and success of Markit's business, in Defendants' ownership of Markit, and in Defendants' role as Markit's directors." *Id.* at ¶ 109. Markit's operations concern "CDS auctions, CDS pricing/valuation, CDS training, CDS processing, and/or CDS indices." *Id.* at ¶ 107. "Markit is a leading provider of CDS pricing and valuation services (it currently prices approximately 3,800 CDS entities and all major CDS indices) and also provides CDS trade

processing services. Markit also owns, manages, and administers the leading CDS indices, including the CDX and iTraxx indices[.]" *Id.* at ¶ 110.

Defendants, along with ISDA, Creditex, and Markit, "developed the CDS auction protocol, and the related Determinations Committee." *Id.* at ¶ 98; *see also id.* at ¶¶ 141–43. Creditex and Markit have "jointly administered CDS auctions since the auctions' inception in 2005[.]" *Id.* at ¶ 105. "Creditex provides the platform through which CDS auctions are conducted," *id.*, while Markit reviews "CDS auction order submissions and corroborat[es] CDS auction results, including auction final prices," *id.* at ¶ 110.

B.     The Credit Default Swap Basics

"CDS offer participants in financial markets the ability to hedge credit risk by shifting it to other market participants. CDS are contracts that transfer a credit exposure on a specific 'reference entity' (such as a bond issued by a corporation or government) or a 'reference portfolio' (bundles of those instruments)." *Id.* at ¶ 2. The buyer of a CDS, a "protection buyer," "makes a periodic payment to the seller of the CDS," known as a "protection seller," "in exchange for the seller's agreement to make a payment to the buyer if a 'credit event' occurs, such as a reference entity's bankruptcy or default." *Id.* A CDS works a lot like insurance: "the CDS 'protection buyer' makes premium-like payments to the CDS 'protection seller' over the life of the CDS contract and in exchange the 'protection seller' promises to cover the 'protection buyer's' losses if its underlying investment – in this case, corporate and sovereign bonds – fails." *Id.* at ¶ 111. Unlike insurance, however, a "protection buyer can purchase CDS on bonds that it does not actually own. This is known as a 'naked' swap" and allows "investors to speculate on the creditworthiness of a bond issuer." *Id.* at ¶ 114.

A bond failure is called a "credit event," and typically involves the bond issuer's filing for bankruptcy or missing a coupon payment on the bond. *Id.* at ¶ 112. "Deliverable obligations" are those "specific bonds covered by the CDS contract" and the "reference entity" is "the issuer of those bonds." *Id.*

There are, broadly, three types of CDS products relevant to this case: 1) single-name CDS, which insures a protection buyer against the credit risk of a single reference entity; 2) multi-name CDS, which "cover a basket, portfolio, or standardized index of *multiple* reference entities," these usually come in "index CDS," in which a protection buyer "obtain[s] protection on each index constituent in an amount equal to the notional amount of the CDS index transacted divided by the number of 'names' in the index"; and 3) swaptions, or credit default swap options, in which "transactors have the right, prior to or at option expiry, to buy or sell protection, on a single reference entity or index CDS, at a pre-specified strike price." *Id.* at ¶ 115(a)–(c).

Index CDS bear some additional explanation. In an index CDS, the "protection buyer obtains protection on each index constituent in an amount equal to the notional amount of the CDS index transacted divided by the number of 'names' in the index." *Id.* at ¶ 116. "For example, if a particular CDS index is comprised of 100 equally-weighted 'names,' a market participant purchasing $100 million of protection on the index obtains $1 million notional of credit protection on each of the 100 names in the index." *Id.*

The most commonly traded CDS indices are[4]:

(1) the North American Investment Grade CDX index (known as the CDX.NA.IG, composed of 125 equally-weighted North American corporate issuers with investment grade credit ratings); (2) the North American High Yield CDX index (CDX.NA.HY, composed of 100 equally-weighted North American sub-

---

[4] The notion of a "traded CDS index" may be confusing to the reader. These indices are not publicly traded like stocks, but rather are financial products bundled together solely within the credit default swap market. To access a CDS index, a client—that is, an entity other than a large bank like the Defendants—would have to contact a dealer (the Defendants) and engage in a one-on-one transaction.

> investment grade issuers); (3) the CDX Emerging Markets index (CDX.EM, composed of approximately 14-18 emerging markets sovereign debt issuers); (4) the iTraxx Europe index (125 equally-weighted European investment grade issuers); and (5) the iTraxx Crossover index (75 sub-investment grade European issuers).

*Id.* at ¶ 118. Many "CDS indices exist[] in the form of different 'Series,'" such as CDX.NA.IG Series 1 or CDX.NA.IG Series 2, etc. *Id.* at ¶ 120. "New index series are issued bi-annually in March and September of each year, with updated reference portfolios that consider relevant developments during the prior six (6) months." *Id.* "Each series remains unchanged throughout its lifetime, except in the instance … that any of its constituent reference entities experience a credit event. Prior series of an index continue to trade even as and after new series are created, but liquidity is concentrated in the current, 'on the run' series." *Id.*

When a "CDS index constituent experiences a credit event, the index CDS is also settled through the CDS auction process and via reference to the final auction price." *Id.* at ¶ 121. Once the final auction price is determined, the protection seller "becomes obligated to make a credit protection payment that applies (1) the CDS auction final price to (2) the portion of the index CDS notional that the auctioned reference entity represents." *Id.*

CDS are traded "over-the-counter" (OTC), meaning there is "no electronic exchange where trades happen between anonymous counterparties for CDS or bonds." *Id.* at ¶ 129. To conduct a trade in an OTC market, "a client contacts a dealer, requests a quote, and then (if both sides approve) trade at the quoted price." *Id.* A client could also request quotes from multiple dealers and then select between those quotes. *Id.*

Unlike the stock market, or stock exchange, which involves a public ticker tape and allows trade to happen between anonymous counterparties, the OTC CDS market is opaque and "market participants are typically careful to protect [trade] information because disclosing it too

widely could enable other market participants to trade on it." *Id.* at ¶ 130.  Indeed, CDS

transaction information is not publicly available and is only reported to regulators.  *Id.*

Because the CDS market operates outside of public view, information becomes valuable

currency that dealers "use for their own proprietary trading (or 'house') positions." *Id.* at ¶ 131.

Put another way, traders "seek to capitalize on information asymmetries" and to "obtain

commercially sensitive, market-moving information about a particular bond and the CDS

covering that bond." *Id.*

        C.      <u>The Historical Settlement of CDS Contracts</u>

Prior to 2005, CDS were settled directly between the counterparties to the contract, that

is, on a "bilateral basis." *Id.* at ¶ 134.  There were two primary methods of settlement: physical

settlement and cash settlement.  *Id.*

In a physical settlement, the protection buyer would deliver the impaired financial

asset—the bond of the defaulted or bankrupt company—to the protection seller and, in exchange,

would receive the full par value or notional amount in cash.  *Id.* at ¶ 135.

In a cash settlement, "the protection seller pays the protection buyer a sum equal to the

difference between the par value of the deliverable obligation and the value of the deliverable

obligation following a credit event."[5] *Id.* at ¶ 136.  Cash settlements require determining the

post-credit event value of the reference obligation, and most CDS contracts specified the

mechanism for making such a determination.  *Id.* at ¶ 137.  Most commonly, CDS contracts

specified conducting "a dealer poll in which dealers would submit bids and those bids would be

---

[5] For example, "in a $10 million CDS referencing Company X, if the post-default value of Company X bonds was 60% of par value, the protection seller would pay the protection purchaser $4 million – representing 40% principal impairment on the $10 million notional specified in the CDS contract." *Id.* at ¶ 136.

used to calculate the post-credit event value of the underlying bonds" on a given "valuation date." *Id.*

      D.    <u>The Auction Settlement Process of CDS Contracts</u>

Defendants, led by Goldman Sachs, JPMorgan, and Deutsche Bank, introduced auction settlement in 2005 as a third mechanism to settle CDS contracts. *Id.* at ¶¶ 138, 336. The process generally involved "having a committee of market participants decide whether CDS contracts had been triggered, *i.e.*, whether a credit event for a particular set of bonds had occurred." *Id.* at ¶ 139. If the committee decided a credit event had occurred, then they would hold an auction. *Id.* "At the auction, CDS participants would submit bids or offers to buy or sell bonds, with the result of the auction being the announcement of a final price (*e.g.*, 65.5) that would value the bonds and then be used to settle all CDS issued on those bonds." *Id.* Defendants orchestrated the auction process as "a closed, dealer-only club." *Id.* at ¶ 140.

Defendants touted the auction process as a useful standardization tool for the CDS market and, by 2006, the auction settlement process became prevalent. *Id.* at ¶¶ 144, 338–340. "[N]on-dealer market participants [like Plaintiffs]understood that if they did not agree to settle their CDS contracts via reference to the CDS auctions, Defendants would collectively cease trading CDS with them – and because Defendants collectively controlled nearly all CDS liquidity, they had the ability to freeze non-compliant market participants out of the CDS market entirely."[6] *Id.* at ¶ 144 "Because Defendants controlled (and still control) nearly all the CDS liquidity available in the dealer-to-client CDS market, market participants accepted Defendants' terms, agreeing to settle those contracts with reference to the final auction price as determined in the dealer-controlled auction process." *Id.*

---

[6] "CDS liquidity" refers to access to the CDS market. That is, Defendants control access to the CDS market and the protection/diversification it provides on other investments.

In the wake of the 2008 financial crisis and facing regulatory pressure, Defendants formed a dealer-only "working group" that was chaired by ISDA. *Id.* at ¶ 340. The working group was not publicized, did not hold public meetings, was not open to other market participants, and did not involve regulators. *Id.* Defendants Goldman Sachs, JPMorgan, and Deutsche Bank dominated the working group. *Id.* at ¶¶ 336, 344. No non-dealer representatives were part of the working group. *Id.* at ¶ 345. Representatives from these three Defendants "would frequently meet among themselves privately to make the most important decisions about how the CDS auction process would work, who would get to participate, and what the settlement rules would look like." *Id.* at ¶ 344. Upon reaching an agreement among themselves, these representatives would propose rules to the other members of the working group, which would then be rubber stamped. *Id.* The three Defendants' representatives drafted and proposed rules that "were focused on the interests of the 'dealer community,'" without regard to the interests of non-dealer market participants. *Id.*

The dealer-only working group reached five key agreements:

1) "Defendants agreed that *only Defendants* would be permitted to be *direct* participants in the auctions," *id.* at ¶ 349 (emphasis in original);

2) "Defendants reserved for themselves the right to vote on who could be permitted to be a direct participant in the auction," *id.* at ¶ 350;

3) "Defendants agreed that *only* Defendants could submit initial markets," *id.* at ¶ 351 (emphasis in original);

4) "Defendants agreed that non-dealers could participate in the [physical settlement request] and limit order phases of the auctions, *but only through Defendants*," *id.* at ¶ 352 (emphasis in original); and

5) "Defendants agreed to structure the Determinations Committee with ten (10) seats for Defendants and five (5) seats for non-dealers, so that it would always be majority-controlled by Defendants," *id.* at ¶ 353.

These agreements functioned to maintain dealer control of the CDS auction market. *Id.* at ¶ 354.

At the same time, ISDA formed an expressly advisory non-dealer working group comprised of "buy-side" representatives (*e.g.*, hedge funds, corporations, asset managers). *Id.* at ¶ 345. While the dealer-only group presented the auction protocol rules to the non-dealer working group, the dealer group—led by Defendants' representatives—"refused to accept meaningful feedback on the auction rules, ultimately telling the non-dealer working group that their auction proposal was not up for negotiation." *Id.* at ¶ 346.

By 2009, "Defendants agreed to 'hard-wire' the auction process they designed in 2005 into the standardized CDS contracts that virtually every CDS market participant uses to trade CDS." *Id.* at ¶¶ 145, 340. ISDA published rules dictating that CDS contracts must settle vis reference to the CDS final auction price. *Id.* at ¶ 337. Now, virtually all CDS contracts are settled pursuant to that process, known as the "ISDA Credit Derivatives Determinations Committees and Auction Settlement Credit Default Swap Protocol." *Id.* at ¶ 145. While ISDA published these documents as if they were created by a neutral trade association, they were actually created by the Defendants-only working group and authored by Goldman Sachs' representative. *Id.* at ¶¶ 343, 344.

The Determinations Committee generally consists of ten (10) dealer representatives and five (5) non-dealer representatives, such as hedge funds or asset managers. *Id.* at ¶ 147. Then dealer members are selected each year "based on aggregate CDS trading volumes ... assessed by reference to non-public market data reported to the DTCC Trade Information Warehouse. Dealer members are selected in accordance with objective criteria based on their overall trading volume and participation in the CDS markets." *Id.* at ¶ 399 (cleaned up) (quotation omitted). Each dealer typically designates one or two people to serve as its representative on the

Determinations Committee, and the representative is generally the dealer's CDS trader or head of the dealer's credit derivative business. *Id.* at ¶ 147.

If the Determinations Committee decides that an adverse credit event triggered a given reference entity's CDS contracts, the Committee then "makes decisions regarding the rules for each auction, what specific bonds (or 'deliverable obligations') will be up for auction, the date of the auction, and other issues related to the auction's functioning." *Id.* at ¶ 148.

Once the Determinations Committee schedules an auction, only "Participating Bidders" may participate directly in the auction. *Id.* at ¶ 149. The ten (10) dealer members of the Committee "may vote on who gets to participate directly in each auction." *Id.* Notably, no non-dealer has ever participated in an auction. *Id.*

The auction settlement process begins when the Determinations Committee "decides whether CDS contracts referencing a given entity have been triggered by asking whether the entity has experienced an adverse 'credit event.'" *Id.* at ¶ 146. "Triggering credit events include a bond issuer (or 'reference entity') filing for bankruptcy, defaulting on its bonds by failing to make a coupon payment, or (in some cases) restructuring its debt in a way that impairs debt investors." *Id.* The Committee typically schedules the auction approximately thirty (30) days after the credit event determination. *Id.* at ¶ 151.

CDS auctions "produce a single price that values all deliverable obligations (bonds) for purposes of CDS settlement." *Id.* at ¶ 152. "This price determines the settlement value of CDS contracts regardless of whether a CDS market participant is allowed to participant in the auction." *Id.*

Each auction[7] proceeds in two (2) stages: first, a morning session involving calculation of the "net open interest" and the "initial market midpoint," and second, an afternoon session producing a final auction price. *Id.* at ¶ 153.

"The first stage of the auction is completed during a half-hour window prior to 10 a.m. of the auction day." *Id.* at ¶ 154. During this stage, each dealer makes an initial price submission for the auctioned bonds (the "initial market") and also makes an initial quantity submission (the "physical settlement request" or "PSR") indicating the amount of bonds the dealer commits to sell or buy in the auction. *Id.*

"The initial market is a two-way price (bid/offer) that is supposed to represent each dealer's private, independent, good faith view of the price at which it would bid to buy or offer to sell a predetermined amount of bonds (typically, $2 million of bonds)." *Id.* at ¶ 155. Initial markets are published after the auction, but are intended to remain secret during the auction process. *Id.* Initial markets are meant to price the "cheapest-to-deliver" bonds, that is, "the lowest value bond issued by the debt issuer among the bonds specified to be acceptable 'deliverable obligations' in connection with the auction." *Id.* at ¶ 156. Participants price the cheapest-to-deliver bond because dealers will submit "the lowest quality bond they have to deliver on their physical settlement request; the dealer will not want to give up their more valuable and higher-quality bonds which they can perhaps sell at a premium in the bond market." *Id.*

The PSR represents the "quantity of bonds each Defendant commits to buy or sell in the auction." *Id.* at ¶ 158. PSRs are published after the auction but, like initial markets, are intended to remain secret during the auction process. *Id.* Auction rules impose three key limitations on

---

[7] Auctions are run by Markit and Creditex, both of which have offices in the United States, and are mostly conducted in the United States. *Id.* at ¶ 398.

PSR submissions: first, dealers can submit PSRs only to the extent they have actual CDS positions; second, net purchasers of CDS protection can only submit "to sell" PSRs and net sellers of CDS protection can only submit "to buy" PSRs; and third, a dealer's PSR submission cannot exceed the size of their net CDS position, so a net purchaser of $10 million of CDS protection could submit a "to sell" PSR from $0 to $10 million, but no greater. *Id.* at ¶ 160.

Each Defendant's trader forms its initial two-way price, the initial market, "using information that is available to the dealer." *Id.* at ¶ 233. That information is: "(1) the prior day's bond market price of the cheapest-to-deliver bond …, and (2) the dealer's own physical settlement request." *Id.* "Because the Determinations Committee's announcement of a credit event typically occurs a month before the auction, the bond market will have absorbed the relevant information about the bond in the market and reflected it into the price of the bond." *Id.* at ¶ 234.

At the close of the first stage, the auction administrators (Creditex and Markit) use PSR and initial market submissions "to calculate a single quantity figure (the 'net open interest,' or 'NOI') and a single price figure (the 'initial market midpoint,' or 'IMM') to be carried into the auction's second stage." *Id.* at ¶ 162.

The administrators calculate the net open interest by adding up each dealer's PSR submissions. *Id.* at ¶ 163. "The NOI represents the aggregate, excess quantity of supply (or demand) for bonds remaining after the first stage, to be carried into the second stage." *Id.* On the off-chance that the NOI is zero, the auction concludes and the initial market midpoint becomes the auction final price. *Id.* at ¶ 163, n. 87. "The NOI determines the direction of the auction's second stage, *i.e.*, whether the auction is going to be one in which participants … will

be bidding to buy bonds (known as a 'sell' auction), or … will be making offers to sell bonds (known as a 'buy' auction)." *Id.* at ¶ 163.

Administrators also calculate the initial market midpoint, which "synthesizes a single 'average' value from the dealer's initial markets," with several notable exclusions from the calculation. *Id.* at ¶ 166. Calculating the IMM proceeds by:

> (1) listing all dealer bids in descending price order (from highest to lowest); (2) listing all dealer offers in ascending price order (from lowest to highest); (3) discarding any of the resulting bid/offer pairings that "cross" (initial markets "cross" where one dealer's bid to buy is higher than or equal to another dealer's offer to sell, or where a dealer's offer to sell is lower than or equal to another dealer's bid to buy); and (4) then taking the "best half" of the bids and offers and calculating their average (the "best half" are, respectively, the highest half of the remaining bids, and the lowest half of the remaining offers).

*Id.* at ¶ 166 n. 88. The IMM "acts as a ceiling on what the final auction price can be in a 'sell' auction, and as the floor price in a 'buy' auction." *Id.* at ¶ 168. The ceiling is usually IMM plus one (IMM + 1) and the floor is usually IMM minus one (IMM − 1). *Id.*

After calculating the NOI and the IMM, auction administrators publish those numbers at 11:00 a.m., followed by a break of several hours. *Id.* at ¶ 169. The auction resumes the same day. *Id.* at ¶ 170.

During the second stage, "the bonds that constitute the NOI are auctioned off through 'limit orders' prepared and submitted by Defendants." *Id.* In a sell action, participants may only submit limit orders to buy bonds, and in a buy auction, participants may only submit limit orders to sell bonds. *Id.* Limit orders specify a quantity and price for bonds. *Id.* at ¶ 171. The administrators then "collect all the limit orders, sort them (from highest to lowest price in a 'sell' auction, or from lowest to highest in a 'buy' auction), and then match them against the NOI until the NOI is exhausted." *Id.* "Limit orders are private and submitted all at once, so Defendants should not know any other Defendant's limit orders." *Id.* at ¶ 202. "Defendants' initial markets

15

are also carried over into the afternoon and treated as a limit order for $2 million worth of bonds." *Id.* "The price of the limit order that exhausts the NOI becomes the 'final auction price,' subject to the IMM-derived price ceiling or floor." *Id.* at ¶¶ 171, 202.  CDS auctions function to produce a financial benchmark, the final auction price, which is used to cash settle CDS contracts across the entire—global—CDS market.  *Id.* at ¶ 397.

"Across auctions, each dealer has different information, different financial interests, and their price submissions are supposed to be secret." *Id.* at ¶ 226.  With respect to the limit order phase, auction participants have several economically rational data points to rely on in generating limit orders: "(1) the net open interest …, (2) the [IMM] …, (3) each Defendant's knowledge of its own purportedly secret initial market from the morning session, (4) the direction of the auction …, and (5) the quantity for each limit order submitted, to reflect that larger volumes typically mean lower prices." *Id.* at ¶ 228.

For example, a "sell" auction of J.C. Penney bonds occurred on June 9, 2020, in which over 25 limit orders were submitted against $352.117 million in net open interest to sell.  *Id.* at ¶ 172.  The limit orders that exhausted the NOI, highlighted below, set the final auction price:

## Limit Orders

| Dealer | Bid | Size |
|---|---|---|
| Barclays | 2.375* | 50.0 |
| Barclays | 2.375* | 25.0 |
| Barclays | 1.5* | 24.0 |
| Barclays | 1.5* | 12.0 |
| Goldman Sachs | 1.125* | 10.0 |
| Barclays | 1.0* | 30.0 |
| Barclays | 1.0* | 15.0 |
| J.P. Morgan Securities LLC ** | 1.0* | 2.0 |
| BNP Paribas** | 1.0* | 2.0 |
| Goldman Sachs | 0.875* | 10.0 |
| Goldman Sachs | 0.75* | 10.0 |
| Goldman Sachs | 0.625* | 10.0 |
| Goldman Sachs | 0.5* | 20.0 |
| RBC Capital Markets LLC** | 0.5* | 2.0 |
| Bank of America** | 0.5* | 2.0 |
| Goldman Sachs | 0.375* | 20.0 |
| Goldman Sachs | 0.25* | 20.0 |
| Goldman Sachs** | 0.25* | 2.0 |
| Citigroup** | 0.25* | 2.0 |
| Morgan Stanley** | 0.25* | 2.0 |
| Credit Suisse** | 0.25* | 2.0 |
| Deutsche Bank** | 0.25* | 2.0 |
| Goldman Sachs | 0.125^ | 100.0 |
| Citigroup | 0.125^ | 25.0 |
| Barclays | 0.0 | 352.0 |
| Goldman Sachs | 0.0 | 252.0 |
| Barclays** | 0.0 | 2.0 |

*Id.* (highlighting added).  The final auction price was 0.125.  *Id.*

At the end of the auction, the final auction price and all other submissions are published. *Id.* at ¶ 173.  The final auction price factors in to calculating the settlement value for all CDS on the bonds that were the subject of the auction.  *Id.* at ¶ 174.  Protection sellers pay and protection buyers receive the notional value of their CDS multiplied by (1 – final auction price).  *Id.*  In the

17

J.C. Penney example, this means that a buyer of $10 million of protection would receive $9,987,500 on that contract: $10,000,000 x (1 – 0.00125).[8]  *Id.*

Auctions contain some additional relevant parameters and limitations.  First, Defendants are assessed "adjustment amount," or financial penalties, "when their initial markets are deemed to be 'off market' and when dealers 'cross' or 'touch' with another dealer's price."  *Id.* at ¶ 175.  Second, only CDS dealers may participate in the auctions, that is, the auctions are a closed process to anyone other than a CDS dealer.  *Id.* at ¶ 176.  Other market participants who want to submit an initial market, PSR, or limit order must make a request to a dealer, and the dealer determines participation.  *Id.*  Third, one representative from each dealer, usually a trader on the CDS market making desk, participates in each auction.  *Id.* at ¶ 177.

"[T]he final auction price … applies to *all* single-name CDS referencing the reference entity[.]"  *Id.* at ¶ 179.  Similarly, "the CDS auction has exactly the same effect on all *index* CDS where the CDS index at issue has, as one of its constituents, the reference entity that is the subject of the auction."  *Id.* at ¶ 180.  The settlement process with respect to an index CDS does not materially vary from that for a single-name CDS.[9]  *Id.*  With respect to an index CDS, a new version of the index with the defaulted constituent assigned a zero percent weight is issued for trading[10] the day after the auction.  *Id.* at ¶ 181.  The index trades with the impacted entity in the index until the publication of the final auction price.  *Id.*

---

[8] Auction prices are expressed as a percentage, *i.e.*, between 0 and 100.  Therefore, a price of 0.125 is equal to 0.125%, or 0.00125 of par value.

[9] For example, if a protection buyer bought $10 million CDS protection on an index containing J.C. Penney bonds, as discussed, weighted as 1% of the notional value, the protection buyer would receive a payout of $99,875.00: (0.01 x $10,000,000) x (1 – 0.00125).

[10] "Trading" in this context does not connote stock trading or even the trading of a tangible asset.  Here, "trading" means the buying and selling of CDS protection, which does not require owning any of the underlying bonds or risks.

There have been over 1,600 instances where a CDS auction has affected any CDS index or series thereof, because a given reference entity can be included in multiple series of the same index and can also be included in multiple indices or sub-indices. *Id.* at ¶ 183. For example, the August 4, 2020 CDS auction for Chesapeake Energy impacted twenty (20) series of the CDX.NA.HY, four (4) series of the CDX.NA.HY.B, and two (2) series of the CDX.NA.HY.BB.[11] *Id.*

E.   The Defendants' Role in the CDS Auction Market

Defendants are the dominant CDS market participants. *Id.* at ¶ 123. They are horizontal competitors, *i.e.*, competitors at the same market level, "who compete as market makers for client business (trades) in the dealer-to-client CDS market." *Id.* Defendants use CDS in three primary ways: first, they try to profit from the "spread" between the prices at which they buy and sell CDS protection; second, they buy and sell CDS to take speculative positions on the creditworthiness of a debt issuer; and third, they use CDS to construct, issue, and trade complex, "structured" credit products, such as synthetic collateralized debt obligations. *Id.* at ¶¶ 124–125.

While each Defendant may have more than one office, or "desk," that trades CDS, each Defendant dealer "participates in the CDS auctions through a single trader," and all of the Defendant's various transactions are "funneled through that single trader, who thus purports to represent the entire bank's 'house' interest on the CDS in the auctions." *Id.* at ¶ 126. Each Defendant's interest in any given CDS is aggregated, or netted, "so that the entire bank's position is generally as a net protection buyer or net protection seller going into the auction." *Id.*

---

[11] CDX.NA.HY.B. and CDX.NA.HY.BB are sub-indices of the CDX.NA.HY consisting only of single-B rated or BB-rated reference entities, respectively. *Id.* at ¶ 183 n. 93.

"Defendants' CDS market-making desks transact CDS with [hedge funds, pension funds, asset managers, governments, businesses, insurance companies, and other market participants as] 'clients' in what is known as the CDS dealer-to-client market." *Id.* at ¶ 393.

Defendants routinely share market information, confidential client information, and pricing information. *Id.* at ¶ 367. Not only does information routinely flow between Defendants, but the flow of information is expected and creates an interdependence between Defendants in the form of trading informational favors. *Id.*

Defendants utilize the Bloomberg terminal for messaging, research, and trading. *Id.* at ¶ 355. That terminal, or system, contains a "back door" through which Defendants are able to access one another's "pricing on CDS and bonds to clients." *Id.* at ¶ 356. As noted above, each Defendant has multiple "desks" involved in the CDS business, including the sell-side desk, which is the "traditional CDS 'dealer' market-making desk that provides liquidity to clients like pension funds and asset managers," and buy-side desks, which are "structured credit and/or correlation trading desks, that are *clients* of *other Defendants'* CDS market-making desks." *Id.* at ¶ 357 (emphasis in original). The Bloomberg terminal treats all of a Defendant's desks as one business, "so a trader on a Defendant's CDS market-making desk can quickly access in real-time all the pricing that a trader on the same Defendant's buy-side structured credit desk was receiving from *other* Defendants." *Id.* (emphasis in original).

In addition to the Bloomberg terminal, Defendants engage in a high degree of interdealer communication regarding CDS auctions. *Id.* at ¶ 363. Traders communicate with one another over email, Bloomberg, WhatsApp, text, and calls, as well as in-person. *Id.* at ¶ 368. Many of these communication methods cannot be audited. *Id.* As discussed above, Defendants dominate the Determinations Committee and use those meetings to share "material, non-public information

about the auctions and the bonds that were the subject of the auctions," including "information about the other Defendants' CDS positions, information about the bonds that will be up for auction, information about secret straw poll results, and other information that Defendants use to the advantage of their trading position in the weeks and days before the auction."[12]  *Id.* at ¶ 365. Moreover, CDS market-making traders "spend their careers migrating from bank to bank," that is, "[t]hey know each other, speak with each other often, and socialize with each other."  *Id.* at ¶ 366.

While it is against each Defendant's policies and code of conduct "to obtain this type of real-time access to competitor pricing, particularly given that Defendants are horizontal competitors in the CDS market-making business," *id.* at ¶ 358, "Defendants have been exploiting this information flow for years," *id.* at ¶ 359.  This instant access to one another's competitive information allows Defendants to "quickly cross-check their own pricing to clients with the pricing of their competitor Defendants in real-time, knowing that each Defendant can do the same thing at the same time with the same information flow."  *Id.*  Defendants have been alerted to this "improper channel for sharing of real-time pricing information," *id.* at ¶ 358, but intentionally leave it wide open "for Defendants' traders to use to improperly share pricing information among themselves," *id.* at ¶ 359.

Defendants tend to be buyers of CDS protection on those bonds that are up for auction. *Id.* at ¶ 360.  Through the Bloomberg terminal and other means, Defendants gain inside information—including who is trading what in the auction, at what price, and in what quantity— and use that information to obtain advantages in the auction or windfall trades.  *Id.* at ¶ 361.

---

[12] More specifically, "Defendants' representatives on the Determinations Committee share this material, non-public information with their CDS market-making desks" and the "market-making desks then use that information to trade ahead of non-dealer clients."  *Id.* at ¶ 376.

"Defendants strategically share client information to win business from clients, to gather intelligence from other market participants, and to generate … trading profits at the expense of their non-dealer clients." *Id.* at ¶ 361(a).

Many traders receive large bonuses when they generate profits for their respective desks, often well into the seven-figures. *Id.* at ¶ 128. In this way, Defendants incentivize "high-risk trading that carries the potential for outsized rewards and outsized losses." *Id.* at ¶ 127. Traders are also incentivized "to deploy information advantageously to generate profits for Defendant's 'house' position." *Id.* at ¶ 132.

At all relevant times, Defendants have occupied at least eight (8) of the ten (10) dealer voting seats on the Determinations Committee. *Id.* at ¶ 150. Specifically, BoA, Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, and JPMorgan "have continuously occupied seats on the Determinations Committee throughout its existence, from 2009 until the present." *Id.* Morgan Stanley occupied a seat from 2009 through April 2017, and RBS had a seat from April 2009 to April 2012. *Id.*

As the dominant market participants, Defendants act as gatekeepers to the auction process. *Id.* at ¶ 176. "Defendants are the only CDS market participants who can exercise direct control over the initial market midpoint, the net open interest, and the final auction price." *Id.*

Part of Defendants' role as gatekeepers includes allocation of deliverable obligations to clients post-auction. *Id.* at ¶ 361(b). "Because they are the exclusive intermediaries between clients and the auction, when Defendants complete a trade for the benefit of a client, Defendants pick off any good bonds for themselves or their friends and substitute lower quality bonds to send off in their place to downstream counterparties." *Id.* Moreover, Defendants "use the information they obtain through their status as the exclusive gatekeepers to the auction to trade

22

ahead of clients who submit limit orders into the auction." *Id.* at ¶ 361(c).  As the sole direct

auction participants, Defendants learn when their non-dealer clients want to submit limit orders

or PSRs, and are able to share that information with their respective market-making desks to

adjust their own PSRs and other market submissions.[13]  *Id.*

F.       The Statistical Analyses[14]

Plaintiffs contend that Defendants have "been secretly colluding, since the auctions'

inception, to skew the CDS auctions in the direction that serves their financial interests[.]"  *Id.* at

¶ 184.  Plaintiffs allege that Defendants manipulate the CDS final auction price and that this

manipulation "directly and necessarily harms two (2) sets of interlinked CDS market

participants."  *Id.* at ¶ 178.  Because the final auction price binds all CDS for that reference

entity, a final auction price manipulated by misconduct necessarily impacts all CDS for that

reference entity.  *Id.* at ¶ 179.  For example, if the auction produces a final price of 60% of par,

then the protection buyers stand to receive a payment equal to 40% of their CDS notional value

and protection sellers must make that payment.  However, if misconduct manipulates the final

auction price to 55% of par value, then protection buyers stand to receive a higher payout and

protection sellers must pay more money.  *Id.*  "In sum, when misconduct pushes auction prices

down, all sellers of single-name CDS protection on that reference entity are harmed; conversely,

when misconduct operates to push auction prices up, all purchasers of single-name CDS

protection on that reference entity are harmed."  *Id.*

---

[13] Clients ask to submit PSRs prior to the auction, meaning that Defendants' market-making desks know about these requests in advance and can adjust their house positions accordingly.  *Id.* at ¶ 362.

[14] The Amended Complaint contains detailed information regarding how Plaintiffs performed statistical analyses, the various variables, and the various outcome values and their meaning.  The Court considered all of this information in ruling on the Motion, then endeavored to minimize hyper technical discussions in this Memorandum Opinion and Order.

Broadly, Plaintiffs aver that econometric analyses "show that Defendants have been consistently engaged in a multiyear bid-rigging and price-fixing scheme to artificially skew the final auction price in whichever direction suits their own financial interests" and that these analyses "demonstrate to a statistically significant degree that Defendants systematically collude across auctions, skewing their initial markets and their limit orders to artificially push the [IMM] and the final auction price in the direction that best serves the financial interest of the Defendant with the greatest financial stake in the auction[.]" *Id.* at ¶ 184. Plaintiffs call this Defendant the "dominant Defendant" or "dominant Defendant Dealer." *Id.* "The power, consistency, and depth of … [the] analyses demonstrate not just that Defendants' pricing is *coordinated*, but that the dominant Defendant's purportedly secret pricing is leaked to the other Defendants so that they can coordinate their own prices to support the dominant Defendant's financial interest and preferred price." *Id.* (emphasis in original).

"The conspiracy works like this: Defendants collusively skew their initial markets and limit orders to push the final auction price in the direction that serve the financial interest of the dominant Defendant." *Id.* at ¶ 185. As Defendants are generally net protection buyers, the "dominant Defendant submits an artificial initial market to (most frequently) skew the final auction price downward[.]" *Id.* "The other Defendants learn the dominant Defendant's purportedly secret initial market and coordinate their pricing in response to help the dominant Defendant artificially skew the final auction price in that direction." *Id.* at ¶ 187. This conduct continues in the afternoon session, where Defendants "again skew their limit orders in the direction that favors the dominant Defendant." *Id.*

The following show the percentage deviation between final auction price and the prior day's cheapest-to-deliver bond price in sell auctions:

24



*Id.* at ¶ 188.  And the same for buy auctions:



*Id.* at ¶ 190.  These skews maximize the benefit to Defendants as either protection buyers (in sell

auctions) or protection sellers (in buy auctions).  *Id.* at ¶¶ 189, 191.

Plaintiffs use the Toys "R" Us CDS auction, held October 11, 2017, as an example of the

conspiracy.  The day before the auction, the relevant bonds were trading in the bond market at

30.750% of par value.  *Id.* at ¶ 192.  The morning of the auction, Defendants submitted their

PSRs as follows:

### Physical Settlement Requests

| Dealer | Bid/Offer | Size |
|--------|-----------|------|
| Bank of America | Offer | 0.475 |
| BNP Paribas | Offer | 8.97 |
| Citigroup | Offer | 0.0 |
| Credit Suisse | Offer | 0.0 |
| Deutsche Bank | Offer | 0.0 |
| Goldman Sachs | Offer | 76.847 |
| J.P. Morgan Securities LLC. | Offer | 0.0 |
| Morgan Stanley | Offer | 0.0 |
| Societe Generale | Offer | 0.0 |
| Barclays | Bid | 5.12 |

**Net Open Interest:** USD 81.172 million to sell

*Id.* at ¶ 193.  The net open interest to sell, primarily from Goldman Sachs, indicates that Defendants purchased a substantial amount of CDS protection on Toys "R" Us bonds.  *Id.* at ¶ 194.  The exception in this case was Barclays, which made a PSR to buy the relevant bonds, indicating that Barclays was a net protection seller on Toys "R" Us bonds.  *Id.* at ¶ 196.

Defendants also submitted their initial markets for the Toys "R" Us auction:



*Id.* at ¶ 198.  Toys "R" Us bonds traded at 30.750% of par value the day before the auction, yet the participating Defendants all submitted initial markets below that value, including Barclays, which had a financial interest in raising the value of those bonds to limit its CDS protection

26

payouts. *Id.* at ¶ 199.  The IMM came out to 30.25% of par value. *Id.* at ¶ 200.  "Skewing the

initial market midpoint is the first step in ensuring/creating an artificial final auction price." *Id.*

at ¶ 201.

For the afternoon session, the NOI of $81.172 million of Toys "R" Us bonds was

auctioned off. *Id.* at ¶ 202.  "Defendants again followed the dominant Defendant's lead (*i.e.*,

Goldman Sachs) and skewed their limit order low – well below the bond price, the [IMM], and

even their own morning initial markets – and successfully skewed the final auction price even

lower, submitting dozens of very low limit orders to buy Toys "R" Us bonds[.]" *Id.* at ¶ 203.

The limit orders went as follows:



TOYS "R" US, INC. AUCTION - LIMIT ORDERS

*Id.*  "The limit orders in the box were 'filled,' *i.e.*, those buyers received bonds in exchange for

their orders." *Id.* at ¶ 204.  The two limit orders that exhausted the NOI, and thus set the final

auction price, were submitted by Goldman Sachs and Barclays to buy bonds at 26% of par value.[15]  *Id.*

"The effect of Defendants' consistent downward skew in price submissions into the auction was that it delivered a final auction price of 26%, a whopping 4.75% points lower than the price of the same bonds trading in the bond market just one day before the auction (30.750%)."  *Id.* at ¶ 205.  This means that a Defendant who purchased $10 million in notional value of protection on Toys "R" Us bonds became entitled to $7.4 million after the auction: $10 million x (1 – 0.26).  At the prevailing bond market rate of 30.75%, that same CDS buyer would have been entitled to only $6.925 million ($10 million x (1-0.3075))—a nearly five hundred thousand dollar ($500,000.00) difference.

Defendants effectively communicate their intentions in a manner that avoids detection. Defendants' traders "have been careful to adjust their behavior to avoid detection by (for example) shifting to using encrypted messaging services like WhatsApp or Signal instead of Bloomberg chat, which is recorded and has an audit trail."  *Id.* at ¶ 210.  For example, JPMorgan traders and compliance personal used personal devices, instead of work communication devices, "to communicate sensitive business matters, thereby avoiding detection and eliminating any audit trail."  *Id.*

"Using a dataset compiled from over 1,500 individual price submissions made by Defendants across nearly half of all CDS auctions ever held, econometric analyses … show that Defendants have been consistently engaged in a multiyear bid-rigging and price-fixing scheme across all the CDS auctions to artificially skew the final auction price[.]"  *Id.* at ¶ 206.  Plaintiffs

---

[15] It is worth noting that Goldman Sachs submitted an initial market to *sell* bonds and Barclays submitted an initial market to *buy* bonds based on their underlying house positions.  However, in the afternoon portion of the auction, all participants "go the same way" and can submit final auction prices and amounts as they see fit.  The morning prohibition based on the house's net position does not flow to the afternoon session.

employed econometric "screens," or "statistical tools built on economic models that use pricing and other types of data to identify the existence, causes, and scope of manipulative and collusive behaviors." *Id.* at ¶ 207. The same types of screens are "used by federal agencies to detect market manipulation and cartel behavior, by large companies to monitor compliance with antitrust laws, and by litigants as evidence of manipulative and collusive behavior." *Id.*

      i.    *The Conspiracy Regarding Initial Markets*

The econometric analyses show the following results, even after controlling for other variables:

    1) "the farther the dominant Defendant skews its initial market away from the prior day's bond market price, the farther *the other Defendants* skew their initial markets," *id.* at ¶ 214 (emphasis in original);

    2) "it is the dominant Defendant's artificial manipulation that causes the other Defendants to engage in the same manipulation, *i.e.*, the analysis shows strong evidence of *causation*, not *correlation*," *id.* at ¶ 218 (emphasis in original);

    3) "even when analytical focus narrows from Defendants generally to spotlight each individual Defendant's conduct specifically, the results show collusive price manipulation to a statistically significant degree," *id.* at ¶ 221, indeed, "[w]hen the spotlight focuses in turn on *each* Defendant's initial markets in those auctions where it is not the dominant Defendant, the result show that *each* Defendant … acted as a loyal follower of the dominant Defendant and a cartel member, skewing its initial market … in the same direction as the dominant Defendant[,]" *id.* at ¶ 223 (emphasis in original);

    4) "Defendants behave differently than non-Defendants, consistent with the existence of the cartel amongst Defendants," *id.* at ¶ 224; and

    5) "Defendants' manipulative scheme continues into the second stage of the auction in the afternoon," *id.* at ¶ 227.

Plaintiffs also analyzed "*Defendant-specific* CDS auction data and bond pricing data as control variables in a multivariate ordinary least squares ('OLS') regression to construct an economic model that measures the extent to which certain variables predict and explain Defendants' initial markets submitted into the auctions." *Id.* at ¶ 230. Regression analyses "test

whether an observation of correlation is a statement of causation, as well as … isolate the effect

of lawful factors on prices (like publicly available information) from unlawful factors (like

private pricing coordination)." *Id.* at ¶ 231. Moreover, "a multivariate regression incorporates

multiple predicting variables ('control' or 'explanatory' variables) to explain or predict another

variable (the 'dependent' variable)." *Id.* "Multiple regression techniques can help separate out

the effects of competitive market conditions from the effects of a price-fixing conspiracy." *Id.*

Plaintiffs analyzed 723 of the Defendants' initial markets across 88 CDS auctions, or

nearly half of all CDS auctions. *Id.* at ¶ 232. The sampled auctions were held between 2005 and

2020. *Id.* at ¶ 295. Their analyses found that the dominant Defendant's initial market predicts

the non-dominant Defendants' initial markets with a high degree of accuracy and a closely

aligned relationship, after "controlling for other facts like each Defendant's respective physical

settlement request and the prior day's cheapest-to-deliver bond price." *Id.* at ¶ 243. Moreover,

"the dominant Defendant's skew in its initial market away from the prior day's cheapest-to-

deliver bond price (the explanatory variable) predicts the direction and magnitude of the other

Defendants' initial markets (the dependent variable)." *Id.* The analysis suggests that this result

"has a less than one-in-ten thousand probability of occurring by random chance[.]" *Id.* at ¶ 244

(emphasis omitted). The analysis further suggests that Plaintiffs' three (3) variables – bond

price, physical settlement request, and the dominant Defendant's skew away from the bond price

– "explain 99% of the variation in the non-dominant Defendants' initial markets." *Id.* at ¶ 245.

"Because the initial markets are supposed to be secret and unknown to the other

Defendants, Defendants' initial markets should bear no relationship to the dominant Defendant's

initial market." *Id.* at ¶ 251. Moreover, "the information asymmetries that (should) exist

between the Defendants mean that one would expect that their initial markets would be around

the prior day's bond market price, but with some randomness and variation – some higher, some lower, and some about the same." *Id.* The initial markets "should not be ordered, uniform, and consistently skewed in the direction of the dominant Defendant's initial market." *Id.*

To remove the likelihood that the relationship between the explanatory variable (the dominant Defendant's initial market) and the dependent variable (the other Defendants' initial markets) is based on correlation rather than causation, Plaintiffs use a technique called "instrumental variables." *Id.* at ¶ 253. This analysis yielded the same result, to wit, that the dominant Defendant's initial market predicts the other Defendants' initial markets in a way that suggests the other Defendants' were privy to purportedly secret information. *Id.* at ¶¶ 259–262.

Based on these analyses, Plaintiffs claim "that the extent to which the dominant Defendant skews its initial market away from the prior day's cheapest-to-deliver bond price predicts *the other Defendants'* initial markets, even after controlling for the other variables that those Defendants rely on in generating their initial markets," and that this could only happen if the other Defendants improperly knew about the dominant Defendant's initial market. *Id.* at ¶ 246 (emphasis in original). Put another way, the models show "a *per se* bid-rigging and price-fixing conspiracy among horizontal competitors," and "that the dominant Defendant's artificial skew[] in its initial market causes the other Defendants to submit artificially skewed initial markets as well." *Id.* at ¶ 250.

Additional regression analyses focused on specific Defendants "shows that *each* of the Defendants play the role of a loyal member of the cartel." *Id.* at ¶ 265 (emphasis in original). The "analysis shows that when each Defendant is not the dominant Defendant in an auction, it behaves as every other non-dominant Defendant in similar circumstances: it incorporates the dominant Defendant's initial market's skew away from the prior day's price of the cheapest-to-

deliver bond, and then it submits its own artificial initial market that is similarly skewed in that direction." *Id.* at ¶ 267.

In addition to the broad analyses discussed above,[16] Plaintiffs included analyses and allegations specific to each Defendant. *See id.* at ¶¶ 270–311. With respect to each Defendant, when that Defendant was not the dominant Defendant, Plaintiffs' model "detected that the extent to which the dominant Defendant's initial market skewed away from the prior day's cheapest-to-deliver bond market price predicted [the individual Defendant's] initial markets" with a high degree of certainty. *Id.* at ¶ 270 (Goldman Sachs, non-dominant Defendant in 57 sampled auctions), ¶ 275 (Deutsche Bank, non-dominant Defendant in 77 sampled auctions), ¶ 277 (Barclays, non-dominant Defendant in 77 sampled auctions), ¶ 279 (Credit Suisse, non-dominant Defendant in 84 sampled auctions), ¶ 281 (JPMorgan, non-dominant Defendant in 71 sampled auctions), ¶ 283 (BoA, non-dominant Defendant in 86 sampled auctions), ¶ 285 (Citi, non-dominant Defendant in 73 sampled auctions), ¶ 287 (Morgan Stanley, non-dominant Defendant in 84 sampled auctions), ¶ 289 (RBS, non-dominant Defendant in 28 sampled auctions), ¶ 291 (BNP Paribas, non-dominant Defendant in 79 sampled auctions).

Conversely, when each Defendant was the dominant Defendant, the extent to which that Defendant's "initial marked skewed away from the prior day's cheapest-to-deliver bond market price predicted the other Defendants' initial markets." *Id.* at ¶ 297 (Goldman Sachs, dominant Defendant in 30 sampled auctions), ¶ 301 (Deutsche Bank, dominant Defendant in 9 sampled auctions), ¶ 303 (Barclays, dominant Defendant in 9 sampled auctions), ¶ 305 (Credit Suisse, dominant Defendant in 4 sampled auctions), ¶ 307 (JPMorgan, dominant Defendant in 17 sampled auctions), ¶ 309 (Citi, dominant Defendant in 13 sampled auctions); *see also* ¶ 299

---

[16] And discussed in more detail in the Amended Complaint at ¶¶ 206–269.

(analysis shows each Defendant coordinated with Goldman Sachs when Goldman Sachs was the dominant Defendant).

Put in context, the analyses show that each Defendant supported the "manipulative effort" of the dominant Defendant "by submitting their own artificial, skewed initial markets in the same direction[.]" *Id.* at ¶ 294. The conspiracy works because "each Defendant benefits – or wins – in the auction when it is that Defendant's turn to be the dominant Defendant." *Id.* Notably, this analysis holds even when the "dominant Defendant is on the opposite side of the net open interest, *i.e.*, where the dominant Defendant has a large physical settlement to sell and the net open interest is to buy (and vice versa)," and where "the Defendants' [PSRs] are on the opposite side of the dominant Defendant's [PSR.]" *Id.* at ¶ 373.

Plaintiffs also tested their pricing behavior theory against the behavior of non-Defendant dealers like HSBC, UBS, Société Générale, and Nomura in 68 sampled auctions. *Id.* at ¶ 312. "Plaintiffs' analysis found that the Defendants' initial markets were more tightly clustered together than the non-Defendant dealers' initial markets," in a statistically significant manner. *Id.* at ¶ 314.

ii.   *The Conspiracy Regarding Final Auction Prices*

Using a separate model, "Plaintiffs demonstrate, to a statistically significant degree, that the effects of Defendants' collusive manipulation in the morning corrupts the afternoon session of the auction, further pushing the final auction price in the direction that favors" the dominant Defendant's interest.[17] *Id.* at ¶ 319.

Like the models for initial markets, Plaintiffs' econometric evidence "incorporates *Defendant-specific* CDS auction data and bond pricing data as control variables in a multivariate

---

[17] *See* Amended Complaint at ¶¶ 319–335 for additional detail.

OLS regression to construct an economic model that measures the extent to which certain variables predict and explain Defendants' limit orders submitted into the auctions." *Id.* at ¶ 320 (emphasis in original). The NOI and IMM become additional public data points "that would shape an economically rational view of the limit order prices" after the auction administrators publish that information at the end of the morning session. *Id.* at ¶ 321. Put another way, Plaintiffs "test the relationship between *the dominant Defendant's initial market* and *the non-dominant Defendants' limit order prices*," using "five control variables that serve as the data points an economically rational dealer's CDS trader would consider in formulating limit orders[.]" *Id.* at ¶ 322 (emphasis in original). These data points are:

> (1) the Defendant's initial market (from the morning); (2) the Defendant's total limit order quantity at each limit order price, accounting for the direction of the auction (a positive number to buy bonds in a "sell" auction, and a negative number to sell bonds in a "buy auction); (3) the net open interest, scaled by the total amount of outstanding bonds and accounting for the direction of the auction; (4) the direction of the auction, *i.e.*, whether it is a "buy" or "sell" auction; and (5) the initial market midpoint, which is generated from Defendants' initial markets and published after the morning session of the auction.

*Id.* (footnotes omitted). The model incorporates a sixth variable to test the relationship between each non-dominant Defendant's limit order prices and the dominant's Defendant's initial market. *Id.* at ¶ 323.

Notably, only dealers can submit limit orders. *Id.* at ¶ 333. "Non-dealers can request to submit limit orders to a dealer, but the rules of each auction (decided on by Defendants) permit each dealer total discretion in what it can do with a client's request to submit a limit order." *Id.* This means that a "dealer can combine a client's request for a limit order with *its own* limit order or even refuse to accept a request for a client limit order." *Id.* (emphasis in original). While dealers are not required to submit client limit orders, or to submit client limit orders at the price the client requests, "Plaintiffs' investigation has uncovered that the Defendants regularly use client limit

order information to manipulate their own submitted limit orders, using tricks to generate artificial profits from confidential client information." *Id.*

The econometric analyses, using 3,720 limit orders across 115 auctions and representing more than 60% of all CDS auctions, *id.* at ¶ 332, show the following results, even after controlling for other variables:

> 1) "the dominant Defendant's initial market predicts the non-dominant Defendants' limit orders … [and] predicts the direction and magnitude of the other Defendants' limit orders," *id.* at ¶ 326;
>
> 2) "the degree in the dominant Defendant's skew of its initial market away from the [IMM] predicts the *other* Defendants' limit orders with such precision that this result has *a less than one-in-ten thousand probability of occurring by random chance*, … [meaning] the dominant Defendant's initial market *causes* the other Defendants to skew their limit orders in the same direction and to the benefit of the dominant Defendant," *id.* at ¶ 327 (emphasis in original);
>
> 3) "the six variables in Plaintiffs' model explain 94% of the variation in the non-dominant Defendants' limit order prices," *id.* at ¶ 331
>
> 4) "Defendants are routinely and systematically identifying a very specific piece of purportedly secret pricing information—the extent to which the dominant Defendant's initial market deviates from the [IMM] – and coordinating their own limit orders in response to that information, with the effect of artificially skewing the final auction price towards the dominant Defendant's pricing preference," *id.* at ¶ 334; and
>
> 5) "the other Defendants learn the dominant Defendant's purportedly secret initial market and skew their own initial markets and limit orders in response – typically downward, so as to drive the final auction price to an artificially low level," *id.* at ¶ 335.

G.    The Harm to Plaintiffs

Plaintiffs detailed several auctions in which individual Plaintiffs were allegedly harmed by this price-fixing conspiracy.[18]

---

[18] The Amended Complaint contains detailed allegations across multiple auctions in which the Plaintiffs were allegedly harmed. *See id.* at ¶¶ 425–510. The Court does not include all of these allegations or all of the purportedly impacted auctions herein.

SIC purchased protection on the CDX.EM Series 13 from Barclays.[19] *Id.* at ¶ 425. The Argentine Republic suffered a credit event that triggered a CDS auction held on September 3, 2014. *Id.* at ¶ 426. SIC was a net protection buyer on the auction date. *Id.* Barclays was the dominant Defendant for the 2014 Argentine Republic CDS auction and was a net protection seller. *Id.* at ¶ 427. "Defendants' misconduct caused the auction's final price to artificially rise to 31.5% of par," meaning that SIC received credit protection payments of 68.5% of par, "which was artificially suppressed because of Defendants' conspiracy." *Id.* SIC alleges it was harmed "when it received less credit protection compensation as a result of Defendants' conspiracy and was deprived of the ability to transact in a lawful, non-manipulated, competitive market as a result of Defendants' conspiracy." *Id.*

PERA purchased protection on CDX.NA.HY Series 16 from BNP Paribas and Deutsche Bank. *Id.* at ¶ 458. This Series included Dynegy Holdings, LLC as a reference entity. *Id.* at ¶ 459. Dynegy Holdings filed for bankruptcy protection, and the resulting CDS auction occurred on November 29, 2011. *Id.* PERA was net protection buyer on the Dynegy Holdings auction. *Id.* Citigroup, the dominant Defendant in the Dynegy auction, was a net protection seller. *Id.* at ¶ 460. "Defendants' misconduct caused the auction's final price to artificially rise to 71.25% of par," meaning that PERA received credit protection payments of 28.75% of par, "which was artificially suppressed because of Defendants' conspiracy." *Id.*

ERB sold protection on CDX.NA.IG Series 8 to Goldman Sachs.[20] *Id.* at ¶ 482. This Series include the Federal National Mortgage Association (commonly known as "Fannie Mae") as a reference entity. *Id.* at ¶ 483. Fannie Mae suffered a credit default event, which triggered a

---

[19] The CDX.EM is an Emerging Markets CDS index, consisting of approximately fifteen (15) emerging market sovereign reference entities, including the Argentine Republic. *Id.* at ¶¶ 425–426.
[20] The CDX.NA.IG is the North American Investment Grade CDS index, comprised of approximately 125 North American entities with investment grade credit ratings. *Id.* at ¶ 482.

CDS auction held on October 6, 2008. *Id.* ERB was a net protection seller for the Fannie Mae

auction. *Id.* Morgan Stanley was the dominant Defendant and a net protection buyer. *Id.* at ¶

484. "Defendants' misconduct caused the Fannie Mae Senior auction's final price to artificially

fall to 91.51% of par," meaning that ERB made credit protection payments of 8.49% of par,

"which [was] artificially inflated because of Defendants' conspiracy." *Id.*

These "illustrative examples … demonstrate that Defendants' collusive manipulation of

the final auction price has a direct, proximate, and arithmetic effect on the amount of money

Plaintiffs … pay or receive on [their] CDS contracts." *Id.* at ¶ 509.

H.    The Claims

Plaintiffs claim that Defendants' conduct constitutes: 1) a conspiracy to restrain trade in

violation of the Sherman Act and the Clayton Act, 2) violations of the Commodity Exchange

Act, and 3) unjust enrichment by civil conspiracy in violation of New Mexico law. *See generally*

(Doc. 151).

More specifically, Plaintiffs claim that Defendants' conduct "represents concerted action

amongst a group of horizontal competitors to artificially depress (or artificially inflate, in certain

auctions) a benchmark price to benefit the horizontal competitors at the expense of market

participants" and "constitutes an agreement by horizontal competitors (Defendants) to rig their

bids into the CDS auctions so as to fix the final auction price." *Id.* at ¶ 384. This scheme

"directly impacted the dealer-to-client market for credit default swaps, which is a market in

which Defendants participate as market-makers, *i.e.*, as buyers and sellers of CDS, to non-dealer

counterparties such as pension funds, hedge funds, municipalities, asset managers, and

corporations." *Id.* at ¶ 385. As horizontal competitors, Defendants "are expected to compete

against each other when trading their own proprietary books or the assets and investments of

their clients." *Id.* at ¶ 386.  Rather than behaving as horizontal competitors and competing for

client business, "Defendants and their co-conspirators agreed to restrain trade to pursue

collective goals and to manipulate the market by collusion and coordination," which is and was

"inimical to competition and restrained trade in the affected market." *Id.* at ¶ 387.  "[T]her are

no redeeming pro-competitive benefits to the type of benchmark manipulation alleged by

Plaintiffs." *Id.* at ¶ 390.

The impact of Defendants' manipulative pricing "results in artificial final CDS prices

(typically suppressing the final auction price downward) … [which] cause[s] Plaintiffs … to pay

more money to Defendant than they would have under their CDS contracts but for Defendants'

collusive price manipulation." *Id.* at ¶ 409.  "Because the final auction price is the sole variable

that determines the settlement value of CDS contracts, Defendants' demonstrated ability to

manipulate that variable and the settlement value of all CDS contracts market-wide shows the

extent of Defendants' market power in the dealer-to-client CDS market." *Id.* at ¶ 410.

Plaintiffs' assert that "Defendants' information-sharing has all the features indicative of a

naked restraint on competition[.]" *Id.* at ¶ 415.  Plaintiffs base this assertion on the following:

1) "That the Defendants are horizontal competitors sharing price information shows that
   the nature of the information exchange weighs in favor of it being anticompetitive,"
   *id.* at ¶ 415(a);

2) "That the Defendants' information sharing was done privately, without formal
   controls, and in a way designed to avoid detection shows that the nature of the
   information exchange weighs in favor of it being anticompetitive," *id.* at ¶ 415(b);

3) "That the Defendants' information sharing involved real-time price sharing,
   exchanges of future price information, and the incorporation of purportedly private
   price information, shows that the nature of the information exchange weighs in favor
   of it being anticompetitive," *id.* at ¶ 415(c) (internal citations omitted);

4) "That the Defendants' information sharing involves specific price information
   pertaining to specific auctions – as opposed to generalized information sharing of

38

overall market trends or the like – shows that the nature of the information exchange weighs in favor of it being anticompetitive," *id.* at ¶ 415(d);

5) "That the Defendants' information sharing occurred within the context of an auction process that was designed by Defendants, and in which Defendants are the only market participants who have direct access to the auctions, shows that the nature of the information exchange weighs in favor of it being anticompetitive," *id.* at ¶ 415(e);

6) "That the Defendants' information sharing did not involve publicly available information, and instead involved the sharing of each dealer's proprietary view of the price submissions that go into the auction shows that the nature of the information exchange weighs in favor of it being anticompetitive," *id.* at ¶ 415(f);

7) "That the Defendants' information sharing happened, among other places, in Determinations Committee meetings that are private, not open to the public, and that do not have fulsome descriptions of what was discussed at those meetings shows that the nature of the information exchange weighs in favor of it being anticompetitive," *id.* at ¶ 415(g).

Put together, "Defendants' sharing of sensitive current and future pricing information with each other in the lead up to the auction causes Defendants to submit artificial prices in the auctions, typically downward, towards a consensus price that is favored by the [dominant Defendant]." *Id.* at ¶ 416.

Defendants' manipulation "caused Plaintiffs to suffer from a supra-competitive final auction price, the effect of which has been to compel Plaintiffs … to pay out more money (or receive less money) in protection than they would have but for Defendants' conspiracy." *Id.* at ¶ 423.

In Count 1, Plaintiffs seek damages and an injunction against all Defendants for Conspiracy to Restrain Trade in Violation of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 15. *Id.* at ¶¶ 553–559. Plaintiffs allege the conspiracy described herein is a "*per se* violation of Section 1 of the Sherman Act," or, alternatively, that "the conspiracy resulted in substantial anticompetitive effects in the CDS dealer-to-client market." *Id.* at ¶ 556.

In Count 2, Plaintiffs seeks damages against all Defendants for violations of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq. Id.* at ¶¶ 560–568. Plaintiffs contend the Defendants "specifically intended to and did cause unlawful and artificial CDS final auction prices in violation of the CEA … through their use of collusive and manipulative misconduct … to benefit their own proprietary trading positions and make supra-competitive profits at the expense of Plaintiffs[.]" *Id.* at ¶ 561.

In Count 3, Plaintiffs assert Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*, against all Defendants. *Id.* at ¶¶ 569–571. Plaintiffs allege that each "Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of its agents, representatives, and/or other persons acting for them in the scope of their employment." *Id.* at ¶ 570.

In Count 4, Plaintiffs plead Aiding and Abetting in Violation of the Commodity Exchange Act against all Defendants. *Id.* at ¶¶ 572–574. Here, Plaintiffs contend that "Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein … [and] had extensive knowledge of the manipulation, and with such knowledge, willfully intended to materially assist the manipulation by other Defendants[.]" *Id.* at ¶ 573.

And in Count 5, Plaintiffs seek damages against all Defendants for Unjust Enrichment under New Mexico law. *Id.* at ¶¶ 575–583. Specifically, Plaintiffs allege that "Defendants knowingly acted in an unfair, unconscionable, and oppressive manner toward Plaintiffs … through their conspiracy to cartelize the CDS settlement process, and to bid-rig and price-fix the CDS final auction price." *Id.* at ¶ 576. The conspiracy caused Defendants to be "unjustly enriched when Plaintiffs … paid more than they otherwise would have and when Defendants

40

paid Plaintiffs … less than they otherwise would have (absent manipulation and the supra-competitive final auction price)." *Id.* at ¶ 577. To achieve their goal, "Defendants worked in concert and entered into a civil conspiracy and illegal agreement to manipulate final CDS auction prices." *Id.* at ¶ 579. Overt acts in furtherance of the conspiracy include, but are not limited to:

> (i) coordinating and submitting fraudulent submissions into CDS auctions; (ii) acting as a trading bloc and engaging in secret, collusive bid-rigging and price-fixing; (iii) sharing competitively and commercially sensitive information with one another about and around the CDS auctions; (iv) acting against their individual economic self-interest; and (v) intentionally failing to disclose material information that the final CDS auction prices were artificial and manipulated.

*Id.* at ¶ 580.

Finally, Plaintiffs invoke equitable tolling and allege that "Defendants' conduct was inherently self-concealing." *Id.* at ¶ 511. Nonetheless, "Defendants actively concealed their conspiracy to bid-rig CDS auctions and price-fix the final auction price" by:

> (i) knowingly submitting bids, offers, and prices that were false, misleading, or inaccurate because they were manipulated based on impermissible and illegitimate factors, such as the price that would financially benefit Defendants' and dominant Defendants' CDS positions; (ii) relying on non-public forms of communication, including private, unauditable electronic messages and telephone calls; (iii) implicitly representing that the bids, offers, and quotes Defendants supplied in the CDS auction process were the product of honest competition and not fixed by a conspiracy; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust and competitive laws; and (v) fraudulently presenting a variety of pretextual justifications and false narratives about the CDS auctions and the final auction price designed to conceal Defendants' conspiracy.

*Id.* at ¶ 512. The scheme "relied on secrecy for its successful operation and the conduct took place in non-public forums, including private chats and secret meetings." *Id.* at ¶ 514. Defendants further concealed their misconduct by publishing publicly available statements and codes of conduct explicitly prohibiting this type of scheme. *See id.* at ¶ 513(a)–(j).

According to Plaintiffs, "[r]easonable due diligence could not have uncovered" the scheme because:

(i) Defendants' CDS positions and trading strategies are not publicly available; (ii) the CDS auctions process was represented and held out as being fair, efficient, transparent, and competitive based on market factors; (iii) the highly specialized nature of CDS and CDS auctions makes it exceedingly difficult for an ordinary person to assess improprieties and identify collusion; (iv) Defendants did not inform Plaintiffs … that Defendants were conspiring to fix and/or manipulate the final price of CDS auctions; and (v) Plaintiffs … were not parties to Defendants' private communications in which they agreed to fix CDS auctions.

*Id.* at ¶ 535.

II.    *Standards of Review*

    A.    <u>Statutes of Limitation</u>

        i.    *Antitrust*

"[D]amages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued,' plus any additional number of years during which the statute of limitations was tolled." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (quoting 15 U.S.C. § 15b). Generally, an antitrust "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Id.*

The statute of limitations can be tolled by Defendants' fraudulent concealment, which is an "equitable doctrine … read into every federal statute of limitation." *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946). The Tenth Circuit requires plaintiffs to show

(1) the use of fraudulent means by the party who raises the ban of the statute [of limitations]; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action.

*Ballen v. Prudential Bache Securities, Inc.*, 23 F.3d 335, 336–37 (10th Cir. 1994) (quoting *King & King Enters. v. Champlin Petro. Co.*, 657 F.2d 1147, 1154 (10th Cir. 1981)).

ii.   *Commodity Exchange Act*

Claims brought pursuant to the Commodity Exchange Act (CEA) must "be brought not

later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  "Federal courts,

to be sure, generally apply a discovery accrual rule when a statute is silent on the issue …."

*Rotella v. Wood*, 528 U.S. 549, 555 (2000).  "[U]nder the federal discovery rule, claims accrue

and 'the statue of limitations begins to run when the plaintiff knows or has reason to know of the

existence and cause of the injury which is the basis of his action.'"  *Alexander v. Oklahoma*, 382

F.3d 1206, 1215 (10th Cir. 2004) (cleaned up) (quoting *Indus. Constructors Corp. v. U.S. Bur. of

Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994)).  And again, the fraudulent concealment

doctrine is "read into every federal statute of limitation."  *Holmberg*, 327 U.S. at 397.

iii.   *Unjust Enrichment*[21]

Plaintiffs bring an unjust enrichment claim pursuant to New Mexico state law.  New

Mexico employs a four-year statute of limitations on unjust enrichment claims.  NMSA 1978, §

37-1-4.  New Mexico further codified the discovery rule, such that "actions for relief, on the

ground of fraud or mistake, and in actions for injuries to, or conversion of property, the cause of

action shall not be deemed to have accrued until the fraud, mistake, injury or conversion

complained of, shall have been discovered by the party aggrieved."  NMSA 1978, § 37-1-7.

That is, the limitations period begins to run "when the plaintiff acquires knowledge of facts,

conditions, or circumstances which would cause a reasonable person to make an inquiry leading

to the discovery of the concealed cause of action," also known as "inquiry notice."  *Yurcic v. City

of Gallup*, 2013-NMCA-039, ¶ 9.  The question is whether the plaintiff possesses knowledge that

---

[21] Federal courts considering state law claims, whether exercising supplemental jurisdiction in a federal question
case or sitting in diversity, apply the substantive law of the forum state.  *BancOklahoma Mortg. Corp. v. Capital
Title Co., Inc.*, 194 F.3d 1089, 1103 (10th Cir. 1999).

"would, on reasonable diligent investigation, lead to knowledge of" the injury. *Wilde v.*

*Westland Dev. Co.*, 2010-NMCA-085, ¶ 18.

      B.      <u>Personal Jurisdiction</u>

      Plaintiffs bear the burden of establishing personal jurisdiction over all defendants by

presenting evidence—"either uncontested allegations in [their] complaint or evidence in the form

of an affidavit or declaration—that if true would support jurisdiction over the defendant."

*Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 964 (10th Cir. 2022) (internal quotation omitted);

*OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998).  At the

motion to dismiss stage, a plaintiff need only make a *prima facie* showing of personal

jurisdiction.  *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1220 (10th Cir. 2021).  When a court

lacks personal jurisdiction over defendants, it must dismiss the claims against those defendants

without prejudice.  *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1249 (10th Cir.

2004).  For purposes of this analysis, the parties agree that the antitrust and CEA claims render

the United States, as a whole, the applicable forum such that the Court should apply a nationwide

contacts analysis.  *See* (Doc. 157) at 59 n.33; (Doc. 161) at 68.[22]  The parties further agree that

general jurisdiction does not apply.  *See* (Doc. 161) at 68 (arguing for specific jurisdiction over

"Foreign Defendants").[23]

      "Ordinarily, a plaintiff seeking to establish personal jurisdiction over an out-of-state

defendant must show both that the exercise of jurisdiction is sanctioned by the state's long-arm

statute and that it comports with the requirements of due process under the Fourteenth

---

[22] The Court refers to the ECF generated page numbers at the top of each document, rather than the separate pagination used by the parties.

[23] The "Foreign Defendants" are: Barclays Bank PLC, BNP Paribas S.A., Citigroup Global Markets Limited, Credit Suisse AG, Credit Suisse International, Deutsche Bank AG, Goldman Sachs International, Morgan Stanley & Co. International plc, and NatWest Markets Plc.  (Doc. 157) at 14 n.2.

Amendment." *Eighteen Seventy*, 32 F.4th at 965.  The New Mexico Supreme Court has held that New Mexico's long-arm statute "extends the jurisdictional reach of New Mexico courts as far as constitutionally permissible." *Tercero v. Roman Cath. Diocese of Norwich, Conn.*, 2002-NMSC-018, ¶ 6.  Therefore, the jurisdictional analysis collapses into a single due-process inquiry.

"Specific jurisdiction means that a court may exercise jurisdiction over a [foreign] party only if the cause of action relates to the party's contacts with the forum []." *Old Rep. Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017).  "Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum []; and, if so, (b) whether the defendant has presented a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (internal quotation omitted).

The minimum contacts analysis includes two distinct requirements: "(i) that the defendant must have purposefully directed its activities at residents of the forum [], and (ii) that the plaintiff's injuries must arise out of the defendant's forum-related activities." *Id.* (internal quotation omitted) (cleaned up).

C.    Antitrust Standing

Antitrust plaintiffs face a "more rigorous" standing requirement and must demonstrate "antitrust standing," including a showing of "antitrust injury." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2005).  Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  "An injury which is

merely causally linked in some way to an alleged antitrust violation is insufficient." *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408 (10th Cir. 1992) (internal quotation omitted).

A plaintiff seeking damages under Section 4 of the Clayton Act must also "demonstrate that it is an efficient enforcer of the antitrust laws." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1268 (10th Cir. 2006).  Relevant factors in the analysis include: (1) "the directness or indirectness of the asserted injury"; (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) "the speculativeness of the alleged injury"; and (4) "the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 222 n.1 (2d Cir. 2008) (quoting *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290–91 (2d Cir. 2006)).

"Unlike constitutional standing, this court's jurisdiction does not turn on antitrust standing." *In re Lorazepam & Clorazepate Antitrust Litig.*, 298 F.3d 98, 107–08 (D.C. Cir. 2002).  "Lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court." *Gerlinger v. Amazon.com Inc., Borders Group, Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008).  Therefore, dismissal for lack of antitrust standing is reviewed under Rule 12(b)(6). *Tal*, 453 F.3d at 1253.

D.    Failure to State a Claim

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Conclusory allegations of liability, without supporting factual content, are insufficient.  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Claims involving fraud or mistake must be pled with particularity.  Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  "Rule 9(b)'s purpose is to afford a defendant fair notice of a plaintiff's claims and the factual grounds supporting those claims." *Clinton v. Security Benefit Life Ins. Co.*, --- F.4th ---, ---, 2023 WL 2657306, at *7 (10th Cir. Mar. 28, 2023) (cleaned up) (internal quotation omitted).  "[A] complaint stating the 'who, what, where, when, and how' of the alleged fraud gives a defendant the requisite level of notice required under Rule 9(b)." *Id.*

i.    *Antitrust*

To succeed on their first claim, Conspiracy to Restrain Trade in Violation of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 15[24], Plaintiffs must prove: (1) a contract, combination, or conspiracy among two or more independent actors; (2) that unreasonably restrains trade; and (3) is in, or substantially affects, interstate commerce. *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992).  The fundamental purpose of the antitrust laws is "the protection of competition, not competitors." *Brown Shoe v. U.S.*, 370 U.S. 294, 430 (1962); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264–65 (2d Cir. 2001).  Thus, the key requirement to successfully state a claim

---

[24] Section 1 of the Sherman Act, 15 U.S.C. § 1, is a criminal statute that private parties may enforce via Section 4 of the Clayton Act, 15 U.S.C. § 15.  *See Singh v. Mem. Med. Ctr., Inc.*, 536 F. Supp. 2d 1244, 1249 (D.N.M. 2008).

under the Sherman Act is the allegation that the asserted violation had an anticompetitive effect; that is, the defendants' actions have injured *competition* and not solely the plaintiff. *NYNEX Corp. v. Discon*, 525 U.S. 128, 135 (1998); *Full Draw Productions v. Easton Sports Inc.*, 182 F.3d 745, 754 (10th Cir. 1999).

Restraint of trade claims come in two forms: (1) *per se* violations of the statute; or (2) other conduct that has the purpose or effect to create an unreasonable restraint of trade. *TV Commc'ns*, 964 F.2d at 1027. Actions are found to be *per se* illegal when their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958). While not an exhaustive list, horizontal or vertical price fixing, tying arrangements, horizontal market divisions, reciprocal dealing arrangements and horizontal group boycotts are among the restraints traditionally found to be *per se* illegal.[25] Most cases do not fall under the *per se* paradigm, and are instead considered using a "rule of reason" analysis. *Diaz v. Farley*, 215 F.3d 1175, 1182 (10th Cir. 2000). The rule of reason requires "the fact finder to weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* (cleaned up) (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 (1977)).

---

[25] Restraints on trade are normally referred to as either horizontal or vertical. Horizontal restraints are those implemented by a competitor at the same market level, while vertical restraints on trade are those that are implemented by a competitor at a different market level.

ii.    *Commodity Exchange Act*

Plaintiffs bring three types of claims under the CEA: 1) unlawful manipulation, in

violation of 7 U.S.C. §§ 9 and 25; principal-agent liability, pursuant to 7 U.S.C. § 2(a)(1)(B); and

aiding and abetting liability, pursuant to 7 U.S.C. § 25(a)(1).

CEA Section 9(a) makes it unlawful for "[a]ny person to manipulate or attempt to

manipulate the price of any commodity in interstate commerce[.]"  7 U.S.C. § 13(a)(2).  To

establish a claim for CEA price manipulation, Plaintiffs must allege "(1) Defendants possessed

an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the

artificial prices; and (4) Defendants specifically intended to cause the artificial price." *Hershey*

*v. Energy Transfer Partners, LP*, 610 F.3d 239, 247 (5th Cir. 2010); *see also In re Amaranth*

*Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (quoting same).  "An artificial

price is a price that 'does not reflect basic forces of supply and demand.'" *Budicak, Inc. v.*

*Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1047 (D. Kan. 2020) (quoting *U.S. Commodity*

*Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012)).

To determine the existence of an artificial price, a court may consider the underlying

commodity's normal market forces, historical prices, supply and demand factors, price spreads,

and the cash market for the commodity at issue. *In re Sumitomo Copper Litig.*, 182 F.R.D. 85,

90 n.6 (S.D.N.Y. 1998).

Section 2(a)(1)(B) of the CEA provides that a principal shall be liable for the acts of its

agents in certain circumstances.  7 U.S.C. § 2(a)(1)(B).  A claim for principal-agent liability

requires that the agent acted in the capacity of an agent when he or she committed the alleged

unlawful acts, and the agent's actions were within the scope of his or her employment.  Put

another way, a principal-agent liability theory allows a Defendant to be held vicariously liable

under Section 2(a)(1)(B) if: (1) its employees were acting as its agents when they took the alleged manipulative actions; and (2) the employees' actions were within the scope of their employment with that Defendant. *Guttman v. Commodity Futures Trading Comm'n*, 197 F.3d 33, 39 (2d Cir. 1999).

Section 22 of the CEA establishes liability for any person "who willfully aids, abets, counsels, induces, or procures the commission of a violation" of the CEA. 7 U.S.C. § 25(a)(1). To succeed on an aiding and abetting theory, Plaintiffs must adequately allege an underlying violation and allege aiding and abetting.

  iii. *Unjust Enrichment*

Unjust enrichment is an equitable claim arising under state common law. To succeed on an unjust enrichment claim, Plaintiffs must show that: "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Sloane v. Rehoboth McKinley Christian Health Care Svcs., Inc.*, 2018-NMCA-048, ¶ 25 (quoting *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, ¶ 11).

III. *Analysis*

  A. <u>Statutes of Limitation</u>

Defendants argue that "Plaintiffs' claims are largely or in some cases entirely barred by the applicable statutes of limitations," and that this conclusion cannot be avoided "by invoking the doctrine of fraudulent concealment to toll the statute of limitations." (Doc. 157) at 51. And even if Plaintiffs could successfully raise fraudulent concealment, Defendants argue, they failed to plead fraudulent concealment with particularity as required by Federal Rule of Civil Procedure 9(b). The Court disagrees.

All of Plaintiffs' claims are subject to a two- or four-year statute of limitations.  *See*

*supra* Section II.A.  "The statute of limitations is an affirmative defense that must be raised by

the defendant."  *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) (citing

*Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018)).  A court may grant a

motion to dismiss based on a statute of limitations defense only "when the complaint itself

admits all the elements of the affirmative defense by alleging the factual basis for those

elements."  *Fernandez*, 883 F.3d at 1299.  These statutes may be equitably tolled by fraudulent

concealment.  *Holmberg v. Armbrecht*, 327 U.S. at 397.  The Court concludes that Plaintiffs'

claims have been equitably tolled and are timely.[26]

> Fraudulent concealment requires the plaintiff to show:
>
> (1) the use of fraudulent means by the party who raises the ban of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action.

*Ballen*, 23 F.3d at 337 (quoting *King & King Enters. v. Champlin Petro. Co.*, 657 F.2d 1147,

1154 (10th Cir. 1981); *see also Mem. Med. Ctr., Inc. v. Tatsch Const., Inc.*, 2000-NMSC-030, ¶

9 (announcing largely the same elements for "equitable estoppel"); *Continental Potash, Inc. v.*

*Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 28 *cert. denied*, 510 U.S. 1116 (1994).  Rule 9(b)

provides that, in alleging fraud or mistake, "a party must state with particularity the

---

[26] Plaintiffs also raise the continuing conspiracy exception, on the theory that the exception "reset[s] the limitations period for all of Plaintiffs' claims[.]"  (Doc. 161) at 60.  Plaintiffs are incorrect.  The continuing conspiracy exception "starts the statutory period running again" with the commission of "each overt act that is part of the violation and that injures the plaintiff."  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1090 (10th Cir. 2006) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).  "But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."  *Id.* (quoting *Klehr*, 521 U.S. at 189).  Because the continuing conspiracy exception would not be fully dispositive of the limitations issue and is not necessary to the Court's disposition of this Motion, the Court declines to further evaluate the exception's applicability.

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind be alleged generally."[27]

Plaintiffs adequately and specifically pled each element of fraudulent concealment.  With respect to the first element, Plaintiffs pled—in detail—a system of covert communication between Defendants and their traders to engage in collusion and price-fixing with respect to all stages of a CDS auction.  *See supra* Sections II.E and II.F; *see also King & King Enters.*, 657 F.2d at 1154 (holding price-fixing is inherently self-concealing).  Plaintiffs also specifically alleged that Defendants successfully concealed the price-fixing scheme and its attendant harms from them and others similarly situated.  *See supra* Section II.G.  Finally, Plaintiffs provided five (5) reasons they could not have uncovered the alleged conspiracy earlier and explained those reasons in Paragraph 535 of the Amended Complaint.  *See id.*  Most notably, Plaintiffs specifically and repeatedly allege that the Defendants concocted a dealer-only working group, which created the auction rules and established the Determinations Committee; that the Defendants dominate the Determinations Committee; and that Defendants engage in off-the-record and unauditable or untraceable communications by which they exchange trade-sensitive and non-public information.  *See id.*  These allegations are sufficient to plead fraudulent concealment (and equitable tolling), with the level of detail required by Rule 9(b), and to establish that Plaintiffs were not on notice—inquire or constructive—of their claims until conducting the detailed investigation described in the Amended Complaint.  Moreover, these are not simple claims that would be obvious on the face of any given auction report or even a series of auction reports: the Defendants repeatedly put out public statements prohibiting this type of conduct while simultaneously engaging in these off-the-record exchanges of privileged

---

[27] The Court notes that it need not—and does not—decide whether the claims at issue are subject to inquiry notice or constructive knowledge, as Defendants failed to satisfy both standards.

information.  *See* (Doc. 151) at ¶ 513(a)–(j); *supra* Section II.G.  Put another way, Plaintiffs

conducted a reasonably diligent investigation, which led to the filing of this case, and could not

have reasonably discovered the injuries any sooner.

For these reasons, the Court finds that Plaintiffs adequately pled sufficient factual matter

to invoke the fraudulent concealment doctrine, and concludes that—at the Motion to Dismiss

stage—the fraudulent concealment doctrine operates to equitably toll the applicable statutes of

limitations, rendering Plaintiffs' claims timely.

B.  Personal Jurisdiction

The parties dispute personal jurisdiction with respect to only the Foreign Defendants.  As

to the Foreign Defendants, the parties agree that this Court lacks general personal jurisdiction.

Therefore, the only question is whether the Court may exercise specific personal jurisdiction

over Barclays Bank plc, BNP Paribas S.A., Citigroup Global Markets Limited, Credit Suisse

AG, Credit Suisse International, Deutsche Bank AG, Goldman Sachs International, Morgan

Stanley & Co. International plc, and NatWest Markets Plc.

Defendants contend that Plaintiffs levy no allegations "to show (1) where any allegedly

manipulated CDS auction occurred, or (2) that any Foreign Defendant manipulated any auction,

let alone in the United States or New Mexico."  (Doc. 157) at 62.  Defendants further argue that

Plaintiffs made no concrete allegations against Barclays Bank plc, Deutsche Bank AG, and

Goldman Sachs International, *id.* at 62 n.37, and do not allege that they entered into any CDS

transaction with Citigroup Global Markets Limited, Credit Suisse International, or NatWest

Markets plc, *id.* at 63 n.38.

In antitrust cases, § 12 of the Clayton Act, 7 U.S.C. § 22, authorizes the exercise of

personal jurisdiction over any foreign corporation in any judicial district, so long as that

corporation has sufficient minimum contacts with the United States writ large. *Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1413 (9th Cir. 1989). Therefore, Plaintiffs need not show that the Foreign Defendants had sufficient ties specific to *this* District. *Id.*

Plaintiffs alleged sufficient facts, accepted as true at this stage of the litigation, to find specific jurisdiction over most, but not all, of the Foreign Defendants. Accordingly, the Court grants in part and denies in part the Motion with respect to personal jurisdiction.

As an initial matter, Plaintiffs claim that the "majority of CDS auctions were held in the United States electronically, including those auctions where Plaintiffs suffered injury to Defendants' collusive and manipulative scheme." (Doc. 151) at ¶ 35; *see also id.* at ¶ 398 ("The auctions are mostly conducted in the United States and run by Markit and Creditex, which both have U.S. offices. Defendants act in furtherance of the conspiracy in the United States and have CDS market making businesses in the United States.").

With respect to Barclays Bank plc, Plaintiffs allege that it maintains a foreign branch in New York, New York, (Doc. 151) at ¶ 60, and wholly owns Barclays Capital Inc., which is a Connecticut corporation, *id.* at ¶ 61, and conducts its "U.S. securities broker-dealer and investment banking operations" through Barclays Capital, *id.*[28] Plaintiffs also allege that SIC purchased protection on CDX.EM Series 13 from Barclays Bank plc on October 6, 2011, and that Barclays Bank plc was the dominant Defendant in the 2014 Argentine Republic CDS auction. *Id.* at ¶¶ 425–27. Though Plaintiffs could have been more explicit in tying their allegations to Barclays Bank plc specifically, Plaintiffs adequately allege that the dominant Defendant in any given auction—including the Argentine Republic auction—impermissibly

---

[28] Defendants accurately note that "a subsidiary's contacts [may] not be imputed to the parent even where they shared some board members and assets [where] there [is] insufficient evidence to rule that the parent controlled the subsidiary." (Doc. 166) at 37 (alterations in original) (quoting *Hernandez v. Chevron U.S.A., Inc.*, F. Supp. 3d 921, 996–67 (D.N.M. 2018)).

communicated confidential, non-public information to the other dealer Defendants in an anticompetitive way that specifically harmed Plaintiffs. *See supra* Sections II.E, II.F and II.G. The Court finds that Plaintiffs adequately alleged that their injuries arise out of Barclays Bank plc's activities directed at CDS auctions in the United States, and, therefore, concludes that it has specific personal jurisdiction over Barclays Bank plc.

Plaintiffs assert that BNP Paribas S.A. operates a foreign branch in New York, New York, (Doc. 151) at ¶ 63, wholly owns BNP Paribas Securities Corp, which is a Delaware corporation, and which "engages in derivatives trading, and clears derivatives on behalf of BNP Paribas," *id.* at ¶ 64. Plaintiffs further allege that PERA sold BNP Paribas S.A. protection on CDX.NA.HY Series 34 on March 27, 2020. *Id.* at ¶ 449. While BNP Paribas S.A. was not the dominant Defendant in the resulting May 6, 2020, auction on Whiting Petroleum Corp. CDS, *id.* at ¶¶ 450–51, Plaintiffs adequately allege that BNP Paribas impermissibly learned confidential, non-public information from the dominant Defendant and adjusted its auction submissions in an anticompetitive manner, to the detriment of Plaintiffs. *Id.* at ¶¶ 291–92; *see also supra* Sections II.E, II.F, and II.G. The Court finds that Plaintiffs adequately alleged that their injuries arise out of BNP Paribas S.A.'s activities directed at CDS auctions in the United States, and, therefore, concludes that it has specific personal jurisdiction over BNP Paribas S.A.

Defendant Citigroup Global Markets Limited (CGML) is a corporation organized under the laws of England and Wales, with its principal place of business in London. (Doc. 151) at ¶ 69. CGML is wholly owned by Citigroup and primarily transacts business in Europe, the Middle East, and Africa. *Id.* Plaintiffs bring no other substantive allegations tying CGML to the conduct in this case. Accordingly, the Court concludes that it lacks personal jurisdiction over CGML and, therefore, grants the Motion as to CGML.

Credit Suisse AG is a Swiss corporation operating a foreign branch in New York, New York. *Id.* at ¶ 71. Plaintiffs allege that SIC engaged in CDS transactions directly with Credit Suisse AG. *Id.* at ¶ 42. Taken together with the allegation that dealer-side CDS counterparties impermissibly learned confidential, non-public information from the dominant Defendant and adjusted their auction submissions in an anticompetitive manner, to the detriment of Plaintiffs, *see also supra* Sections II.E, II.F, and II.G, the Court finds that Plaintiffs adequately alleged that their injuries arise out of Credit Suisse AG's activities directed at CDS auctions in the United States, and, therefore, concludes that it has specific personal jurisdiction over Credit Suisse AG.

Credit Suisse International (CS International) is a private unlimited company organized under the laws of England and Wales, with its principal place of business in London. (Doc. 151) at ¶ 75. Credit Suisse Group uses CS International "as one of its primary non-U.S. and/or international derivative dealer entities, and as one of its 'principal booking entities' for Credit Suisse's investment banking business." *Id.* Plaintiffs bring no other substantive allegations tying CS International to the conduct in this case. Accordingly, the Court concludes that it lacks personal jurisdiction over CS International and, therefore, grants the Motion as to CS International.

Deutsche Bank AG is a German corporation that operates a foreign branch in New York, New York. *Id.* at ¶ 77. Deutsche Bank wholly owns Deutsche Bank Securities Inc., which is a Delaware corporation. *Id.* at ¶ 78. Plaintiffs allege that PERA sold protection to Deutsche Bank AG on CDX.NA.HY Series 17, *id.* at ¶¶ 428, 431, 461, and CDX.NA.HY Series 32, *id.* at ¶ 464, and bought protection from Deutsche Bank AG on CDX.NA.HY Series 16, *id.* at ¶ 458. Moreover, Deutsche Bank AG was the dominant Defendant in the 2008 Washington Mutual, Inc. CDS auction and the 2009 CIT Group Inc. CDS auction. *Id.* at ¶¶ 490, 508. Plaintiffs

56

adequately allege that the dominant Defendant in any given auction—including the Washington

Mutual, Inc. and CIT Group Inc. auctions—impermissibly communicated confidential, non-

public information to the other dealer Defendants in an anticompetitive way that specifically

harmed Plaintiffs. *See supra* Sections II.E, II.F and II.G. The Court finds that Plaintiffs

adequately alleged that their injuries arise out of Deutsche Bank AG's activities directed at CDS

auctions in the United States, and, therefore, concludes that it has specific personal jurisdiction

over Deutsche Bank AG.

Goldman Sachs International is a private unlimited company organized under the laws of

England and Wales with a principal place of business in London. (Doc. 151) at ¶ 81. Plaintiffs

allege that Goldman Sachs International was the dominant Defendant in the 2015 Caesars

Entertainment Operating Co., Inc. CDS auction, the 2015 RadioShack Corp. CDS auction, the

2016 Peabody Energy Corp. CDS auction, the 2017 Toys 'R' Us, Inc. CDS auction, and the 2014

Texas Competitive Electric Holding Company LLC CDS auction. *Id.* at ¶¶ 430, 433, 436, 442,

463. Plaintiffs adequately allege that the dominant Defendant in any given auction—including

the Caesars Entertainment, RadioShack, Peabody Energy, Toys 'R' Us, and Texas Competitive

Electric auctions—impermissibly communicated confidential, non-public information to the

other dealer Defendants in an anticompetitive way that specifically harmed Plaintiffs. *See supra*

Sections II.E, II.F and II.G. The Court finds that Plaintiffs adequately alleged that their injuries

arise out of Goldman Sachs International's activities directed at CDS auctions in the United

States, and, therefore, concludes that it has specific personal jurisdiction over Goldman Sachs

International.

Morgan Stanley & Co. International plc (MS International) is a company organized under

the laws of England and Wales with a principal place of business in London. (Doc. 151) at ¶ 89.

Plaintiffs allege that SIC engaged in CDS transactions directly with MS International. *Id.* at ¶ 42. Taken together with the allegation that dealer-side CDS counterparties impermissibly learned confidential, non-public information from the dominant Defendant and adjusted their auction submissions in an anticompetitive manner, to the detriment of Plaintiffs, *see also supra* Sections II.E, II.F, and II.G, the Court finds that Plaintiffs adequately alleged that their injuries arise out of MS International's activities directed at CDS auctions in the United States, and, therefore, concludes that it has specific personal jurisdiction over MS International.

NatWest Markets plc (NatWest Markets), formerly known as The Royal Bank of Scotland plc, is a company organized under the laws of the United Kingdom with a principal place of business in Edinburgh. (Doc. 151) at ¶ 92. NatWest Markets operates as the primary banking subsidiary and primary booking entity for CDS for NatWest Group. *Id.* Plaintiffs bring no other substantive allegations tying NatWest Markets to the conduct in this case. Accordingly, the Court concludes that it lacks personal jurisdiction over NatWest Markets and, therefore, grants the Motion as to NatWest Markets.

Plaintiffs also advance a theory of personal jurisdiction based on a conspiracy.[29] (Doc. 151) at ¶ 35; (Doc. 161) at 72–73. Under this theory, "a defendant can … avail itself of a forum through certain actions taken by a co-conspirator in the forum." *Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 122 (2d Cir. 2021). "Much like an agent who operates on behalf of, and for the benefit of, its principal, a co-conspirator who undertakes action in furtherance of the conspiracy essentially operates on behalf of, and for the benefit of, each member of the conspiracy." *Id.* (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)). "To assert a conspiracy theory of personal jurisdiction, a plaintiff

---

[29] The Court determines that it has personal jurisdiction under a conspiracy theory over all of the Foreign Defendants, except CGML, CS International, and NatWest Markets, based on the allegations discussed *supra*.

must plausibly allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]." *Id.*

Based on the factual allegations discussed above and in Sections II.E, II.F, and II.G, the Court finds that Plaintiffs plausibly allege that a conspiracy existed and that several domestic Defendants' overt acts in furtherance of the conspiracy were committed in the United States and are sufficient to subject co-conspirators to jurisdiction in the United States. The problem comes in the second element: do Plaintiffs plausibly allege that CGML, CS International, and NatWest Markets "participated" in the conspiracy?

The Court concludes that Plaintiffs do not plausibly allege conspiracy-based jurisdiction over CGML, CS International, and NatWest Markets. The allegations related to these three Defendants present insufficient detail to suggest that they "participated" in the conspiracy. Notably absent from the Amended Complaint is any suggestion that these three Defendants engaged in any specific action with respect to the conspiracy, the CDS auctions, or the Plaintiffs. Accordingly, the conspiracy theory of personal jurisdiction does not save the claims against CGML, CS International, or NatWest Markets.

For these reasons, the Motion is granted in part and the claims against CGML, CS International, and NatWest Markets are dismissed for lack of personal jurisdiction.

C. <u>Antitrust Standing</u>

Defendants contend that Plaintiffs lack antitrust standing to assert umbrella claims. (Doc. 157) at 57–59. An "umbrella claim" "refers to the phenomenon that when a group of conspirators sets the price of a product at an artificial[] … level, a price umbrella is created that spreads throughout the market. The umbrella effect occurs because nonconspirator sellers

uninvolved in the anticompetitive conduct correspondingly [alter] prices." *In re Domestic Drywall Antitrust Litigation*, 2019 WL 4918675, at *6 (E.D.Pa. Oct. 3, 2019) (citing Philip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION § 347 (4th ed. 2014)).

Defendants make much of so-called "umbrella" claims and "umbrella standing" with reference to *Schwab Short-Term Bond Market Fund v. Lloyds Banking Grp.*, 22 F.4th 103, 117 (2d Cir. 2021), for the proposition that "plaintiffs are not efficient enforcers with respect to claims arising out of transactions with nondefendants[.]" (Doc. 157) at 57.  Defendants base this argument on Paragraph 544 of the Amended Complaint, (Doc. 157) at 57), which seeks to define the Class as:

> All persons or entities who, during the period of June 1, 2005 through the present ("Class Period"), settled a credit default swap in the United States and its territories by reference to the ISDA credit default swap auction protocol or the auction process that became the ISDA credit default swap auction process.  A "credit default swap" includes the following instruments: single-name CDS, index CDS, and swaptions. Excluded from the Class are Defendants, their officers, directors, management, employees, current subsidiaries, or affiliates, and all federal governmental entities (the "Class").

(Doc. 151) at ¶ 544.  Put another way, Defendants argue that Plaintiffs "seek to assert claims based on *any* CDS that was settled by reference to the ISDA CDS auction protocol, including transactions with nondefendant third parties." (Doc. 157) at 57 (emphasis in original).  This is problematic because "Plaintiffs fail to plead a direct injury with respect to nondefendant transactions, which defendants did not control and of which they were likely not even aware," and because "Plaintiffs' umbrella claims fail the last two efficient enforcer factors[.]" *Id.* at 57–58 (quotation omitted).

The parties do not dispute Plaintiffs' antitrust standing to assert claims against the Defendants, only their standing to assert damages claims based on transactions with non-

Defendants. While Plaintiffs assert that these are not "umbrella" claims, the Court ultimately need not decide that question at this stage.

The relevant question, as noted by Defendants, is the sequence of events leading to the use of the final auction price to settle CDS contracts between non-Defendants and Plaintiffs. *See* (Doc. 166) at 33–34 (citing *Schwab*, 22 F.4th at 117). In *Schwab*, the Second Circuit noted that "[t]here is no allegation that the [Defendants] controlled the market for LIBOR-referencing products, nor any claim that the [Defendants] pressured third parties to adhere to a LIBOR-based index. Instead, third-parties independently decided to peg their bonds' terms to LIBOR." 22 F.4th at 117. Based on this, that court held "the harm that befell [Plaintiffs] is far removed from Defendants' conduct, [so] it cannot be said that Defendants proximately caused the alleged antitrust injury." *Id.*

This case differs from *Schwab* in that Plaintiffs expressly allege Defendants forced market-wide adoption of the CDS auction protocol, (Doc. 151) at ¶¶ 59, 62, 65, 70, 76, 79, 82, 86, 91, 94; used CDS liquidity to force non-dealer clients to accept the auction process as the valuation mechanism for settling CDS contracts, *id.* at ¶¶ 144, 382; and threatened retaliation against non-Defendants should they object to any of the processes, *id.* at ¶ 369. While Defendants may not have a direct financial stake in the individual CDS contracts between Plaintiffs and non-Defendants, the allegations clearly assert that Defendants have a financial incentive to control and manipulate *every* CDS auction, as the primary players, without regard to the individual protection buyers and sellers on any given CDS contract. Put another way, Plaintiffs claim Defendants' market manipulation and cartelized behavior inherently and purposefully infects every CDS auction, and that harm flowing from non-Defendant CDS contracts is a foreseeable and intended consequence of these actions. Defendants, in fact,

benefitted from each of these transactions.  Accordingly, the Court finds that Plaintiffs

adequately pleaded a direct injury with respect to nondefendant transactions.

In this way, the Court agrees with Plaintiffs that these are not "umbrella" claims in that

Plaintiffs do not allege they were injured by non-conspirators who independently decided to

charge artificial prices to keep pace with Defendants.  Because these are direct injuries allegedly

caused by Defendants' anticompetitive conduct, the Court need not address whether Plaintiffs

are efficient enforcers with respect to CDS contracts with non-Defendants.  The Motion to

dismiss is denied on this point.

D.  Failure to State a Claim

i.  *Antitrust*

To state an antitrust claim under Section 1 of the Sherman Act, a complaint must contain

"enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550

U.S. at 556.  A plaintiff may satisfy this requirement by pleading direct or circumstantial

evidence, whereby circumstantial evidence alleges that the defendants engaged in parallel

conduct that suggests a preceding agreement.  *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177,

1179 (10th Cir. 2019).  Circumstantial evidence, or "parallel conduct, absent some additional

type of contextual evidence, is generally insufficient to nudge an antitrust conspiracy allegation

beyond the line from possible to plausible."  *Id.* at 1178.  Parallel conduct allegations must be

accompanied by additional circumstances, or "plus factors," that "raise[] a suggestion of a

preceding agreement, not merely parallel conduct that could just as well be independent action."

*Twombly*, 550 U.S. at 553, 557; *see also Llacua*, 930 F.3d at 1179.  "*Twombly* … made clear

[that] plausible grounds to infer an agreement does not impose a probability requirement at the

pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Llacua*, 930 F.3d at 1179 n.28.

Defendants devote a substantial part of their briefing to challenging whether Plaintiffs stated an antitrust claim. For ease of the parties and the Court, the Court addresses these arguments in the order in which they are presented.

First, Defendants argue Plaintiffs "make no attempt to plead any direct evidence of conspiracy[; n]or do they plead any parallel conduct that raises a plausible inference of conspiracy." (Doc. 157) at 23. In support of this, Defendants contend that Plaintiffs "fail to identify a single 'time, place, or person' involved in the alleged attempts to synchronize auction bids." *Id.* (internal citation omitted). Defendants chastise Plaintiffs for "not identify[ing] a single suspect communication between a single pair of Defendants." *Id.* at 24.

It strains credulity to believe that Plaintiffs could possess intentionally hidden communications at the pleading stage. Nonetheless, Plaintiffs take pains to explain the manner in which Defendants communicate, *see supra* Section II.E; (Doc. 151) at ¶¶ 26, 27, 210, 355, 359, 361, 363, 365–368, 376, 514. Plaintiffs need not identify a specific "suspect communication" at this stage because demanding such stricture would all but nullify the nation's antitrust laws, except in the rare case of a whistleblower action. The Court declines Defendants' invitation to ride the plausibility horse over that logical cliff. *See In re Credit Default Swaps Antitrust Litig.*, No. 13-2476, 2014 WL 4379112, at *1, *4 (S.D.N.Y. Sept. 4, 2014) (sustaining allegations that same Defendants conspired to destroy startups that threatened business as CDS market-makers, without a single suspect communication in pleadings).

Next, Defendants argue that the alleged conspiracy makes no economic sense because no Defendant could be assured it would be the "dominant" participant at any auction ever. (Doc.

157) at 24–25.  As such, reason Defendants, Plaintiffs "posit an economically irrational conspiracy in which most Defendants consistently sacrificed their own interests to benefit a small minority of Defendants, only to receive little or nothing in exchange." *Id.* at 25.

While a reasonable factfinder could, at a later stage of litigation, draw such an inference based on the allegations presented, the Court must draw all reasonable inferences in favor of the Plaintiffs at this stage of litigation.  Accordingly, the Court credits Plaintiffs' allegation that the conspiracy benefitted both dominant and non-dominant Defendants, including when the non-dominant Defendants gain pre-auction knowledge of material, nonpublic information, (Doc. 151) at ¶ 361, which has its own intrinsic value in the CDS and bond markets, *id.* at ¶¶ 129–30. Moreover, Plaintiffs allege that the ongoing conspiracy protected Defendants' status as exclusive gatekeepers over auction participation, which delivered its own benefits to each Defendant in the form of usable—and monetizable—information.  *Id.* at ¶ 361–361(c).

Third, Defendants take umbrage with Plaintiffs' statistical analyses: "Plaintiffs attempt to substitute statistical analyses for the missing facts."  (Doc. 157) at 26.  Defendants argue that Plaintiffs' statistical analyses "lend no support" to their claims for three reasons: 1) "Plaintiffs' statistics are far too aggregated and generalized to support the elaborate conspiracy theory alleged"; 2) "even accepting Plaintiffs' statistics at face value, there is nothing the least bit surprising about Defendants having similar views about the value of auctioned securities"; and 3) Plaintiffs' statistical "causation allegations are mere assertions of law and are plainly incorrect." *Id.*  The Court addresses, and rejects, each challenge in turn.

In arguing that Plaintiffs' statistics are "too aggregated and generalized," Defendants take particular aim at the Toys 'R' Us auction and the Caesars Entertainment auction, and the conclusions Plaintiffs urge from that data.  (Doc. 157) at 28– 9 (citing (Doc. 151) at ¶¶ 198, 200–

02, 430).  Defendants suggest "there is no way to tell from Plaintiffs' aggregated statistics whether the individual bids placed at individual auctions support or contradict the conclusory narrative recited in the FAC." *Id.* at 30.

The Court disagrees.  Plaintiffs explained Defendants' individual and specific pricing in the auctions, rather than drawing inferences from national statistical trends or aggregating the Defendants as a group.  *See* (Doc. 151) at ¶¶ 249–50, 264, 269, 295, 318, 332.  Plaintiffs also addressed individual Defendants, *id.* at ¶¶ 270–74, 297–300 (Goldman Sachs), 275–76, 301–03 (Deutsche Bank), 277–78, 303–04 (Barclays), 279–80, 305–06 (Credit Suisse), 281–82, 307–08 (JPMorgan), 283–84 (BofA), 285–86, 309–11 (Citi), 287–88 (Morgan Stanley), 289–90 (RBS), 291–92 (BNP); identify specific collusive pairings of Defendants, *id.* at ¶¶ 299–300; and draw contrasts between Defendants and non-Defendants, *id.* at ¶¶ 312–18.  These allegations are more than sufficient, at this stage, to support the claimed conspiracy.

Next, Defendants argue that Plaintiffs' statistical analyses "fail to support an inference of conspiracy because they are fully consistent with the results one would expect in the absence of a conspiracy." (Doc. 157) at 30.  Defendants challenge Plaintiffs' interpretation of the regression analyses and their hypothesis that pricing differences should be randomly distributed rather than predicted by the dominant Defendant's initial market.  *Id.* at 30–34.  Contrary to Defendants' assertions, Plaintiffs aver that their statistical analyses control for other pieces of information, public and private, that might explain the skewed auction submissions.  (Doc. 151) at ¶¶ 236–46, 319–35.

At this stage, the Court does not second-guess or theorize about alternative inputs that Plaintiffs used as control variables, nor does the Court draw inferences in favor of Defendants. For example, Defendants argue that they would be aware "if the price of a bond changed

between the prior day and the day of an auction." (Doc. 157) at 32. This may be true, but Plaintiffs—as masters of the Complaint—elected to use the prior day's trading price as the benchmark against which to measure potentially anticompetitive behavior. The Court is not free, at this stage, to question the wisdom of that decision or supplant its own statistical preferences for the econometrics decisions made by Plaintiffs.

For these reasons, and based on the well-pled factual allegations Plaintiffs' submitted, the Court concludes that the allegations are more consistent with an inference of conspiracy than with an inference of unilateral action, and therefore rejects Defendants' argument that the allegations do not support an inference of antitrust conspiracy.

Third, Defendants argue that Plaintiffs' statistics show correlation and not causation, rendering them bereft of probative value. (Doc. 157) at 34. The Amended Complaint alleges that Plaintiffs performed the instrumental variable technique and controlled for relevant variables in the regression analyses, such that the results support causation. (Doc. 151) at ¶¶ 253–54, 257.

The meaning of Plaintiffs' statistical analyses—and whether they were conducted correctly—presents a fact question more appropriate for expert disputes or summary judgment than for a motion to dismiss. Again, the Court is not free, at this stage, to draw inferences in favor of Defendants or to discredit well-pled factual allegations that are not obviously false. Plaintiffs' conclusions based on the statistical analyses are not conclusions of law, but instead are clearly statements based on factual inferences. The Court credits these inferences at this time and rejects Defendants' alternative theory.

Next, Defendants complain that Plaintiffs failed to plead any meaningful "plus factors" from which the Court can infer an anticompetitive agreement. As an initial matter, the Court agrees with Plaintiffs that the statistical allegations, standing alone, allege a plausible antitrust

conspiracy sufficient to deny the Motion as to these claims.  Nonetheless, as detailed in Section

II.D, Plaintiffs allege specific agreements entered into by the Defendants.  *See also* (Doc. 151) at

¶¶ 349–54.  Plaintiffs clearly alleged a common motive, conduct against self-interest, inter-firm

communications, and suspicious auction rules as context for the conspiracy.  *See supra* Section

II.

      For all of these reasons, the Court concludes Plaintiffs adequately alleged an antitrust

conspiracy and, therefore, denies the Motion on this point.

          ii.    *CEA*

      Defendants raise three challenges to the CEA claims: 1) single-name CDS are expressly

excluded from regulation under the CEA; 2) Plaintiffs failed to satisfy the heightened pleading

standard of Rule 9(b); and 3) the CEA claims fail on their merits for having been plead with

insufficient particularity.  The Court addresses, and rejects, each argument in turn.

      Defendants contend that single-name CDS are "security-based swaps" within the purview

of the Securities Exchange Commission and outside the scope of the CEA.  (Doc. 157) at 43

(citing 7 U.S.C. § 1a(47)(B)(x); 17 C.F.R. § 240.3a67-2(a)).  Defendants are correct that single-

name CDS are outside the scope of the CEA.  *See* (Doc. 161) at 47 (citing 7 U.S.C. §§ 1a(42)

and 1a(47)(B)(x)).

      However, this is where the agreement ends.  Defendants then materially misrepresent

Plaintiffs claims and argument: Defendants assert that "as Plaintiffs concede, an index CDS is

nothing more than a 'variet[y] of a single product,' the single-name CDS."  (Doc. 157) at 43

(quoting (Doc. 151) at ¶ 392).  Put another way, Defendants allege that settling an index CDS

references entity in the notional amount following a CDS auction somehow converts the whole

transaction into a single-name CDS.  This is incorrect and not what Plaintiffs allege in the

Amended Complaint.  Plaintiffs actually allege that "single-name and index CDS … are two (2) varieties of a single product ([credit default swap])."  (Doc. 151) at ¶ 392.  This is a material difference: single-name and index CDS are two different types of CDS contracts, they are <u>not</u> all single-name CDS, which are excluded from the CEA.

The CEA expressly regulates and creates a private cause of action for manipulation of "swaps."  7 U.S.C. § 25(a); 7 U.S.C. § 1a(47)(A) (defining swaps).  "Swaps" includes "credit default swap[s]."  7 U.S.C. § 1a(47)(A)(iii)(XV).  Index CDS are credit default swaps.  Accordingly, the Court concludes that the CEA applies to Plaintiffs' claims with respect to index CDS and denies the Motion on this point.

The Tenth Circuit has not had occasion to weigh in on the applicable pleading standard for CEA claims.  A survey across other federal circuits reveals reluctance to squarely answer the question, with many courts assuming without deciding that Rule 9(b) applies, or otherwise avoiding a categorical rule.  *See U.S. Commodity Futures Trading Comm'n v. Enron Corp.*, No. H-03-909, 2004 WL 594752, at *3 (S.D. Tex. Mar. 10, 2004) (holding claims under Section 6(c), 6(d), and 9(a)(2) of the CEA "need not be pled with the factual specificity required by Fed. R. Civ. P. 9(b)"); *Premium Plus Partners, L.P. v. Davis*, No. 04 Civ. 1851 (MRF), 2005 WL 711591, at *15 (N.D. Ill. Mar. 28, 2005) (declining to apply Rule 9(b) pleading standards to CEA manipulation claim); *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (applying Rule 9(b) to CEA manipulation claim); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 554 F. Supp. 2d 523, 531 (S.D.N.Y. 2008) (finding that Rule 9(b) applies "if a particular manipulation claim sounds in fraud," but "need not comply with Rule 9(b)" if the particular claim "does not sound in fraud").

The Court need not decide whether the pleading *must* satisfy Rule 9(b), because it determines that the CEA claims *do* satisfy Rule 9(b).  Plaintiffs adequately "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  (Doc. 157) at 43 (quoting *Koch v. Koch Indus. Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).

Turning to the merits, a CEA claim for price manipulation requires showing that: "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price."  *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1046 (D.Kan. 2020) (quoting *Hershey v. Energy Transfer P'ners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)); *see also* (Doc. 157) at 44 (citing same elements); (Doc. 161) at 47 (same).  Defendants challenge the factual allegations as to each element.  For the reasons explained herein, the Court determines that Plaintiffs pleaded sufficient facts to state a CEA claim against each of the remaining Defendants.

As to the first element, Defendants argue that "Plaintiffs fail to adequately plead that Defendants possessed the ability to influence prices."  (Doc. 157) at 44–45.  The Court disagrees.  Plaintiffs alleged that Defendants: 1) designed the entire auction process to make themselves exclusive gatekeepers and the primary auction participants, (Doc. 151) at ¶¶ 9–10, 336–54, 379; 2) deliberately submitted artificial prices—in the form of initial markets and final bids—directly into the auctions, *id.* at ¶¶ 17, 184–91, 270–93; 3) accounted for more than 80% of all CDS index transactions, *id.* at ¶¶ 3, 117, 395; 4) impermissibly colluded and shared information to skew the CDS auctions, *supra* at Sections II.E and II.F; and 5) held significantly large CDS positions that benefited from manipulated prices, (Doc. 151) at ¶¶ 17–20, 194–97, 205, 297–311.  While

Plaintiffs need not show that Defendants exercised absolute control over the CDS market, *see CFTC v. Enron*, No. H-03-909, 2004 WL 594752, at *5 (S.D. Tex. Mar. 10, 2004), the allegations nonetheless constitute a *prima facie* showing of market power and control. *See also In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 523, 528 (S.D.N.Y. 2008) (finding ability to influence prices where trader executed 70% of the market's transactions).

With respect to whether Plaintiffs adequately allege that an artificial price existed, the Court notes that a price is "artificial" when it "does not reflect basic forces of supply and demand." *Budicak*, 452 F. Supp. 3d at 1047; *see also Ind. Farm Bureau Coop. Ass'n*, CFTC No. 75-14, 1982 WL 30249, at *4 n.2 (Dec. 17, 1982) ("[W]hen a price is [a]ffected by a factor which is not legitimate, the resulting price is necessarily artificial."). Plaintiffs submitted detailed factual allegations regarding initial markets and final auction prices that, at a minimum, allow for the inference that an artificial price actually existed. *See supra* Section II; *see, e.g.*, (Doc. 151) at ¶¶ 133 (chart demonstrating artificial CDS final auction prices), 193-210 (example detailing artificial price with respect to Toys 'R' Us auction); *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1022 (N.D. Ill. 2015) (holding plaintiff need only plead "factual content that allows the court to draw the reasonable inference that the price was artificial" (internal quotation omitted)).

Next, Plaintiffs plausibly allege that Defendants caused the artificial prices. "[S]pecific intent to manipulate prices can be pled through: (1) allegations that show the defendant had both motive and opportunity to commit the [manipulation]; or (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Budicak*, 452 F. Supp. 3d at 1048. As discussed above, Plaintiffs adequately allege that Defendants had "motive and opportunity" to manipulate the CDS auction prices, including through the structure of the

Determinations Committee and Defendants' substantial CDS holdings. *See, e.g.*, (Doc. 151) at

¶¶ 6–10, 17–20, 149–50, 176, 194–97, 205, 348–54, 360–62, 422, 425–510. Taken together,

these well-pleaded facts "constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *See also supra* Sections II.D, II.E, and II.F.

Plaintiffs also sufficiently plead that Defendants specifically intended to cause the

artificial price by their allegations that Defendants, periodically, acted contrary to their own self-

interest by sharing private, confidential information and submitting artificial prices. *See, e.g.*,

(Doc. 151) at ¶¶ 20, 199, 371–74. These allegations extend well beyond simply alleging that

Defendants engage in CDS trading and have an individual profit motive: the allegations suggest

a cartelized cabal acting in concert, rather than individually. This satisfies the fourth element.

Finally, as Defendants note, a Plaintiff must allege that it (1) "transacted in at least one

commodity contract at a price that was lower or higher than it otherwise would have been absent

the defendant's manipulation, and (2) that the manipulated prices were to the plaintiff's

detriment." *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F.

Supp. 3d 845, 868 (N.D. Ill. 2020). Plaintiffs adequately alleged actual damages through the

dozens of examples where Plaintiffs transacted at artificial prices and suffered net losses on their

net CDS positions. *Id.* at ¶¶ 425–510; *see also supra* Section II.G. Even if Plaintiffs were on

both sides of any given auction, the allegations are sufficient to show that each Plaintiff had a net

position on any given auction and suffered harm as a result of the position. *See, e.g.*, (Doc. 151)

at ¶¶ 425–27 (alleging SIC harmed as net protection buyer on Argentine Republic CDS auction),

461–63 (alleging PERA harmed as net protection seller on Texas Competitive Electric Holding

Co. LLC CDS auction), 497–99 (alleging ERB harmed as net protection seller on Abitibi-

Consolidated Inc. CDS auction). While Plaintiffs did not allege a specific dollar amount in damages, they are not required to do so.

As detailed *supra* in Sections II.D, II.E, II.F, and II.G, Plaintiffs adequately elucidated the "who, what, when, and how" of a fraud claim: each Defendant, acting through their corporate statements and representatives, claimed that the CDS auction process was fair and transparent, subject only to market forces; each Defendant submitted artificial initial markets across a broad array of CDS auctions; these representations were repeated on a regular basis from 2005 through the present; and the Plaintiffs suffered economic harm as a result of relying on the false representation that Defendants were operating in good faith in the CDS auction market.

For all of the reasons discussed above, the Court concludes that Plaintiffs alleged sufficient facts to state a claim under the CEA against the Defendants, and, therefore, the Motion is denied on this point.

### iii. *Unjust Enrichment*

Defendants argue that the unjust enrichment claim is duplicative of the antitrust and CEA claims. (Doc. 157) at 48. An unjust enrichment claim under New Mexico law requires a showing that one has been knowingly benefitted at another's expense, in such a manner that allowing one to retain the benefit would be unjust. *Hunt v. N. Carolina Logistics, Inc.*, 193 F. Supp. 3d 1253, 1266 (D.N.M. 2016). The Court notes that available damages under the antitrust/CEA claims differ from those under the unjust enrichment claim, to wit, Plaintiffs seek rescission under unjust enrichment. (Doc. 151) at ¶ 581. It may be true that Plaintiffs must elect remedies at a later date, but at this stage of the litigation, Plaintiffs adequately stated a claim for unjust enrichment and may proceed with that claim as an alternative theory to the federal antitrust and CEA claims.

IV.    *Conclusion*

For the reasons explained herein, the Court grants in part and denies in part the Motion to

Dismiss (Doc. 157).  Defendants CGML, CS International, and NatWest Markets are hereby

dismissed without prejudice for lack of personal jurisdiction, and the Motion is otherwise denied.

IT IS SO ORDERED.

UNITED STATES DISTRICT JUDGE