**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

IN RE CREDIT DEFAULT SWAPS
AUCTIONS LITIGATION                                    No. 1:21-cv-0606 KG/DLM

## <u>MEMORANDUM ORDER AND OPINION</u>

**THIS MATTER** is before the Court on Defendants' Motion to Stay Proceedings. (Doc.
221.) This case's defining trait—and the reason the Court will GRANT the Motion to Stay—is its
complexity. Plaintiff's First Amended Complaint (FAC) alleges antitrust violations spanning over
15 years, and, including the briefing on Defendants' Motion to Dismiss, United States District
Judge Kenneth J. Gonzales had nearly 400 pages of filings to consider in deciding the Motion to
Dismiss. The issue currently before the Court, however, relates to a case originally litigated and
settled in the United States District Court for the Southern District of New York (SDNY).
Defendants request the Court stay the case until the SDNY decides whether a Release that
Defendants obtained pursuant to a settlement precludes any of Plaintiffs' claims in this case.

The complexity of the subject matter and the underlying events in this case has already
generated atypically lengthy briefing, and the parties have not even begun discovery. Moving
forward with discovery while the SDNY decides the motion before it would be slow, at best. At
worst, however, discovery would lead to time and resource intensive motions practice, possibly
resulting in Plaintiffs receiving incomplete information or Defendants turning over material they
ultimately would not have been required to produce. Stated plainly, the Court will grant the Motion
because both the parties and the Court have expended significant energy in ensuring the issues
remain clear in this complex case, and the Court will not risk undoing those efforts by allowing
discovery to become tangled.

I.      **BACKGROUND**

        A. **SDNY Action and Release**

The SDNY Action began with a case filed on May 3, 2013, in the Northern District of Illinois, with other related actions being filed shortly after. *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476 (DLC), 2016 WL 2731524, at *2 (S.D.N.Y. Apr. 26, 2016). "On October 22, the U.S. Judicial Panel on Multidistrict Litigation transferred all related class actions" to the SDNY. *Id.* "On September 4, 2014, the [SDNY] dismissed the complaint's claims under Section 2 of the Sherman Act, but allowed its other claims to proceed[, and t]he parties proceeded to discovery immediately thereafter." *Id.* "Class Counsel obtained over fifty million pages of documents from the defendants and millions more from third parties." *Id.* "During the initial discovery period, Class Counsel also obtained data for millions of [credit default swaps ('CDS')] transactions from the Depository Trust & Clearing Corporation ('DTCC') and engaged experts to analyze this data and build a model capable of calculating damages for Class members." *Id.* The parties began mediation sessions with Daniel Weinstein on January 22, 2015, during ongoing discovery, and spent nine months working with Mr. Weinstein, who devoted over 400 hours of his own time to the matter. *Id.* Ultimately, a settlement was reached, and the SDNY preliminarily approved the settlement on October 29, 2015. *Id.* at *3.

The settlement required Defendants, *inter alia*, to pay a total of $1,864,650,000 into a settlement fund. *Id.* The class for the SDNY Action also agreed to the following Release:

> The Class Plaintiffs and all Settlement Class Members shall release and shall be
> deemed to have released all Released Claims against all the Released Parties. . . .
> "Released Claims" means any and all manner of claims . . . (i) *occurring prior to
> June 30, 2014, that are alleged or that could have been alleged in the Action
> relating in any way to any CDS Transactions or Potential CDS Transactions* ; . . .
> and (ii) occurring prior to the Preliminary Approval Order, relating in any way to
> the litigation or settlement of this Action, including, without limitation, relating in
> any way to any settlement discussions, the negotiation of, and agreement to, this

2

Agreement by the Defendants, or any terms or effect of this Agreement (other than claims to enforce the Agreement).

*Id.* The settlement defined "CDS Transactions" as:

(i) any purchase, sale, trade, assignment, novation, unwind, termination, or other exercise of rights or options with respect to any CDS, whether executed over-the-counter ("OTC") or via inter-dealer brokers, a centralized clearinghouse, a central limit order book ("CLOB"), an exchange, a swap execution facility (SEF), or any other platform or trading facility; or (ii) any decision to withhold a bid or offer on, or to decline to purchase, sell, trade, assign, novate, unwind, terminate or otherwise exercise any rights or options with respect to any CDS.

*Id.* "Potential CDS Transactions" are defined as "any CDS Transaction for which an offer or quote was obtained or sought, regardless of whether such transaction was actually entered into or executed with the party from which such offer was obtained or sought." *Id.* Claims that the Release excluded are those (i) by class members not "domiciled or located in the United States at the relevant time"; (ii) based on transactions that "were not in or would not have been in United States commerce"; or (iii) based on transactions that "are or would have been subject only to foreign law." *Id.* Critically, the Release also stipulated that the SDNY retains exclusive jurisdiction for any disputes regarding the Release.[1]

In analyzing the fairness of the settlement, United States District Judge Denise Cote found it was procedurally fair due to the "the skill of Class Counsel and the litigation strategy it employed" and noted that the mediator mirrored that sentiment. *Id.* at *7. Judge Cote also noted that the mediator reported "the settlement negotiations were 'conducted at arm's-length by sophisticated, knowledgeable, and fully-informed counsel who consulted directly with senior

---

[1] The SDNY Action does not quote this portion of the Release. Defendants, however, quote the Release in their Motion to Stay, stating that the parties agreed to "irrevocably submit to the exclusive jurisdiction of the SDNY for any . . . dispute relating to the release provisions herein." (Doc. 221 at 3 (brackets omitted).) Defendants also quoted the Release in the motion to enforce the Release filed in the SDNY in which they argued that the SDNY "retained continuing and exclusive jurisdiction over the parties for the purpose of construing, enforcing, and administering the Settlement Agreement." (Doc. 221-1 at 22 (brackets omitted).) Plaintiffs do not dispute the accuracy of those quotations.

client representatives throughout the process.'" *Id.*

In analyzing the substantive fairness of the settlement, in relevant part, Judge Cote stated the following as to the complexity, expense, and likely duration of the litigation:

> This is highly complex litigation. Antitrust cases are often challenging to investigate and litigate, and this litigation is no exception. It has also been extremely expensive to litigate. The Settlement was preceded by a period of intensive fact discovery, involving the production and examination of many millions of pages of documents. Twenty-seven depositions were conducted and more had been scheduled to occur. Only five months remained in the fact discovery period. The litigation, had it not been resolved through settlement, would have been very expensive to complete and may very well have required a trial of the plaintiffs' claims.

*Id.*

## B. NMD Action

Plaintiffs filed this case on June 30, 2021 (Doc. 1), and filed the FAC on February 4, 2022 (Doc. 151). On April 5, 2022, Defendants filed a Motion to Dismiss the FAC (Doc. 157) and briefing completed on July 12, 2022 (*see* Doc. 167). Judge Gonzales granted in part and denied in part the Motion to Dismiss on June 5, 2023. (Doc. 173.) On August 21, 2023, Defendants filed nearly identical Answers to the FAC. (Docs. 182–91.) Relevant here, Defendants raise the affirmative defense that Plaintiffs' claims are barred by the Release. (*See, e.g.,* Doc. 191 at 101 (Defendant Citi's Answer).) On November 3, 2023, Defendants filed the Motion to Stay in this Court (Doc. 221) and the Motion to Enforce the Release in the SDNY (Doc. 221-1). Briefing completed on the Motion to Stay on December 5, 2023. (*See* Doc. 229.)

As stated above, the FAC, Motion to Dismiss, and accompanying briefing totaled several hundred pages.[2] The Court decided the Motion 11 months later in a 73-page Memorandum Opinion and Order. (Doc. 173.) The Defendants' Answers are approximately 103 pages each. (*See*

---

[2] The FAC was 223 pages (Doc. 151), the Motion to Dismiss was 54 pages (Doc. 157), the Response was 60 pages (Doc. 161), and the Reply was 30 pages (Doc. 166). The total page count, excluding exhibits, was 367 pages.

Docs. 182–191.) The briefing for the Motion to Stay is a tame 37 pages.[3]

## II.   LEGAL STANDARDS

### A.  Discovery Stays

Courts may stay cases as part of their inherent power to control their docket. *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.") (citation omitted). The use of that power, however, "calls for the exercise of judgment which must weigh competing interest[s] and maintain an even balance." *Brown v. City of Las Cruces Police Dep't*, 347 F. Supp. 3d 792, 803 (D.N.M. May 7, 2018) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)). When deciding whether to grant a stay, courts in this district consider the following: (1) the plaintiff's interests in proceeding with the case and the potential prejudice of a delay; (2) the burden on the defendant of continued litigation; (3) the convenience to the court; (4) the interests of third parties; and (5) the public interest.[4]  *See Silver v. City of Albuquerque*, No. 22-400 MIS/GBW, 2022 WL 9348637, at *1 (D.N.M. Oct. 14, 2022) (citations omitted).

To be sure, stays of proceedings are "generally disfavored[,]" but "when a particular issue may be dispositive, the court may stay discovery concerning other issues until the critical issue is

---

[3] The Motion to Stay is 11 pages (Doc. 221), the Response is 17 pages (Doc. 226), and the Reply is 9 pages (Doc. 228).

[4] The parties do not raise the following standard, but the Court briefly addresses it in an abundance of caution. When deciding whether to grant a stay pending the resolution of *a related proceeding*, the factors a district court must consider overlap with factors 2, 4, and 5 listed in *Silver*. *See, e.g., United Steelworkers of Am. v. Or. Steel Mills, Inc.*, 322 F.3d 1222, 1227 (10th Cir. 2003). An additional factor the court must consider is the movant's likelihood of success in the related proceeding. *Id.* When the moving party has established the first three factors weigh in its favor, however, the analysis of the likelihood of success factor is relaxed. *See F.T.C. v. Mainstream Mktg. Servs., Inc.*, 345 F.3d 850, 852 (10th Cir. 2003). "Under those circumstances, probability of success is demonstrated when the [movant] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Id.* at 852–53 (quotation marks and citation omitted). As the Court will explain below, it will not discuss the applicability or timeliness of the Release, let alone whether Defendants will prevail. Because the other three factors weigh in favor of granting a stay, it is nevertheless sufficient to find that the applicability and timeliness of the Release are indeed central to the merits of this matter and ripe for litigation, which the SDNY will undertake.

resolved." *Id.* at 2 (citation and brackets omitted). The party moving for a stay must make out a clear case of hardship and "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis*, 299 U.S. at 255. One such rare circumstance is antitrust litigation, the effective management of which "requires identifying, clarifying, and narrowing pivotal factual and legal issues as soon as practicable." 32 Moore's Federal Practice 30.1 (2023). Nevertheless, even in antitrust litigation, merits discovery ought to be stayed only if the outcome of a motion will materially affect the scope of that discovery. *See id.* To that end, "[d]efining the issues at an early stage may enable the court to structure the litigation so as to limit the scope and volume of discovery, reduce cost and delay, facilitate the prospects of settlement, and improve the trial." *Id.*

### III.   Discussion

At the outset, the Court will address the central, underlying reason it will grant the Motion to Stay—this Court cannot consider the applicability and timeliness of the Release with respect to Plaintiffs' claims. Defendants argue the Release precludes any claims for CDS Auctions taking place before June 30, 2014, or CDS Auctions taking place after that date but with CDS-related misconduct occurring *before* that date. Defendants also state they have filed a motion with the SDNY arguing as much and request the Court stay this matter until the SDNY decides that motion. Plaintiffs respond saying that the SDNY and NMD Actions are not based on the same factual predicate, so the Release cannot preclude *any* of their claims. Plaintiffs also argue that Defendants failed to timely raise the Release as an affirmative defense. Defendants reply that only the SDNY has jurisdiction to determine whether the two actions are based on the same factual predicate or the Release was timely raised. The Court agrees with Defendants.

To be clear, the Court agrees with Defendants to the extent they argue the SDNY is the

only court that can make any merits determinations regarding the applicability and timeliness of the Release. The Court nevertheless appreciates Plaintiffs' well-reasoned arguments on the issues. There is, however, a subtle distinction between arguing that the Court should disregard the Release because it does not apply or was not timely raised and explaining why *this* Court should make those determinations. Based on the language of the Release, it appears that the SDNY—not this Court—is the only court with the jurisdiction to decide those issues. Proceeding with this matter without knowing whether the Release applies, and how many of Plaintiffs' claims remain, would be cumbersome, to say the least. As explained below, the Court finds all five factors weigh in favor of granting a stay while the SDNY decides the motion to enforce the Release.

**A.  Staying this matter will not prejudice Plaintiffs.**

Plaintiffs certainly have an interest in rapidly moving forward, but the Court finds that a stay will not prejudice them. Plaintiffs' claim that a stay will prejudice them centers primarily on the possibility of loss of evidence. (*See* Doc. 226 at 11.) Plaintiffs also indicate that a stay will exacerbate spoliation issues because many of Defendants' employees have used unaudited messaging apps to conduct business, leading to serious fines by regulators. *Id.* Defendants, however, assert that they "have issued litigation holds in this matter and those holds remain in place." (Doc. 221 at 8.)

In *Othart Dairy Farms, LLC v. Dairy Farmers of America, Inc.*, United States Magistrate Judge Stephen M. Vidmar considered a similar situation and determined that "Defendants' litigation holds alleviate the risk of loss of evidence." No. 22-cv-0251 MIS/SMV, 2022 WL 2966615, at *4 (D.N.M. July 27, 2022) (citation omitted). Judge Vidmar noted that "litigants are under a duty to preserve evidence when they know, or should know, that it may be relevant to future litigation." *Id.* (quoting *Schmidt v. Shifflett*, No. CV 18-0663 KBM/LF, 2019 WL 5550067,

at *1 (D.N.M. Oct. 28, 2019)) (brackets omitted). Judge Vidmar further highlighted that if it were to become evident "Defendants' efforts to preserve relevant information were not reasonable or in good faith, Plaintiffs may seek recourse under Rule 37(e) . . . ." *Id.* (citing Fed. R. Civ. P. 37 advisory committee's note to 2006 amendment).

The Court finds the same reasoning applies in this case. Plaintiffs identify no reason the litigation holds would be insufficient, apart from general allegations that evidence may be lost. Additionally, Plaintiffs do not explain how unrelated employee misconduct supports a finding of prejudice. In any event, if such misconduct were to affect this case, Plaintiffs may seek recourse under Rule 37(e). Moreover, even if the Court moved forward with this matter, Defendants would almost certainly object to discovery requests for CDS Auctions and CDS-related misconduct before June 30, 2014. Plaintiffs, in turn, would likely file motions to compel. Only after briefing completed would the Court add the motion to its list of filings under consideration. In other words, even if no stay is issued, it is unlikely Plaintiffs would receive their requested discovery without a sizable delay.

  i.  *The Court will tailor the duration of the stay.*

Plaintiffs do, however, raise a salient point in that Defendants may decide to appeal the SDNY decision and, if they lose before the Second Circuit, file a petition for *certiorari* with the Supreme Court. (Doc. 226 at 11–12.) Their concern is well-taken, and the Court will not grant an indefinite stay. The Court will order the following: The parties shall file a joint status report every 90 days on the status of the SDNY proceedings. Defendants shall file a notice no later than seven days after the SDNY has issued a decision on the motion to enforce the Release notifying the Court of the same. The parties shall file a joint status report no later than 7 days after the filing of notice of appeal or the expiration of the time to appeal discussing whether and to what extent they believe

8

discovery may proceed. At its discretion, the Court may order additional briefing and set a status conference to discuss proceeding with limited discovery or extending the stay. If Defendants intend to file a motion for an extension of time to file a notice of appeal with the SDNY, they are advised to file a notice informing the Court of the same. If Defendants do not file such a notice, the Court will lift the stay 30 days after the SDNY issues its decision and issue an Initial Scheduling Order.

### B.  Absent a stay, Defendants will be unduly burdened.

The SDNY Action is instructive in showing the burden that would be placed on Defendants if the stay is not granted. From September 4, 2014, to July 29, 2015, in just under 11 months, class counsel obtained 50 million pages of documents from Defendants and had conducted 27 out of 46 scheduled depositions. *See In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *2. Beginning on January 22, 2015, the parties began mediation sessions that lasted nine months until the matter was settled. *Id.* at *3–4. Judge Cote also noted that the mediator devoted over 400 hours of his own time to the mediation. *Id.* at *3. Based on the SDNY Action's discovery process and the activity thus far in this matter, it is clear that this case will be as challenging and expensive to investigate and litigate as is typical of an antitrust case. *See id.* at *7; *see also Silver*, 2022 WL 9348637, at *3 ("[T]he burdens attendant to discovery on class action claims exceed the normal burdens of litigation and therefore are particularly salient for purposes of a motion to stay discovery.").

Plaintiffs argue that the parties can still engage in preparatory work without burdening Defendants because "the first 130 days of the discovery period involve *preparing* for discovery." (Doc. 226 at 12.) That is unpersuasive for two reasons. First, it strains credulity to say that a preparatory stage that lasts over four months would not be burdensome. Such a lengthy preparatory

stage may be typical of antitrust litigation, but it is, nonetheless, extremely time and resource intensive. Moreover, the burden involved in the preparatory stage would be amplified by the inevitable disputes regarding the applicability of the Release on any requested discovery. Second, if Defendants prevail on their motion to enforce the Release, even in part, the scope of discovery will change. As the SDNY Action demonstrates, reducing the scope of this matter even slightly will likely eliminate the need for hundreds of thousands, if not millions, of pages of discovery and hundreds of hours of work.

Plaintiffs also argue that regardless of the outcome of the motion to enforce the Release, Defendants will be obliged to abide by the Tenth Circuit's liberal discovery standards in antitrust cases. (Doc. 226 at 12–14.) Defendants respond that the Release's terms free them "from liability and 'any and all' obligations concerning CDS-related conduct occurring before June 30, 2014," so the scope of discovery would nevertheless be narrowed, even under the Tenth Circuit's liberal standards. (Doc. 228 at 5–6.)  The merits of that argument are for the SDNY to decide, but if the case is not stayed, Defendants would have to address that issue in objecting to discovery requests, even during the preparatory stage.

### C.  Staying this matter benefits the Court, third parties, and the public interest.

The Court "not only has a similar interest [with parties] in moving cases forward, it has a mandate to do so." *See AmeriCom Automation Servs., Inc. v. Metro. Elec. Constr., Inc.*, No. CV 13-0470 MCA/WPL, 2013 WL 12329828, at *2 (D.N.M. July 12, 2013) (citing 28 U.S.C. § 473(a)(2)(B) (directing district courts to set "early, firm trial dates . . . within eighteen months after the filing of the complaint"); D.N.M. LR-Civ. 41.1). To that end, as Plaintiffs argue, courts must abide by "the general rule is that a stay of discovery is not warranted unless the case will likely be concluded as a result of the court's ruling on the pending dispositive motion." *Todd v. Montoya*,

No. CIV 10-0106 JB/RLP, 2011 WL 13286329, at *5 (D.N.M. Jan. 18, 2011) (citation omitted). (*See* Doc. 226 at 8 (quoting *Todd*, 2011 WL 13286329, at *4, 6; *New Mexico ex rel. King v. Bank of Am. Corp.*, CIV NO. 13-478 MV/LFG, 2013 WL 12328915, at *3 (D.N.M. Oct. 223, 2013)).)

Antitrust cases, however, are uniquely large in scale and scope and cannot be managed by general rules that apply to general cases.[5] In *Othart Dairy Farms, LLC*, for example, the plaintiffs alleged the defendants conspired to fix prices of milk in violation of the Sherman Act, and the defendants filed a motion to dismiss the case in its entirety and a motion to stay pending resolution of that motion. 2022 WL 2966615, at *1. Judge Vidmar found that a stay served the interests of "the Court, the public, and third parties" because even a partial dismissal "could substantially narrow the scope of all discovery-related tasks." *Id.* at *5. In other words, even if a motion is only partially dispositive, in an antitrust case, a stay is appropriate if resolution of that motion "is likely to modify the scope of discovery substantially." *Id.*

Considering the possibility that Defendants might prevail even partially on their motion to enforce the Release, the scope of discovery in this matter would be modified drastically. To be sure, the SDNY may decide the Release does not apply, but without the benefit of a ruling, disputes requiring considerable briefing would almost certainly arise before the SDNY issued its ruling. A stay avoids any such needless litigation. Regardless of the outcome, however, waiting for the SDNY to rule on the motion will convenience the Court greatly. Put simply, the SDNY's ruling will provide clarity on the scope of discovery. Without clarity, at best, the Court's decisions on any disputes would align with the SDNY's eventual ruling because they would not conflict with

---

[5] Indeed, the cases Plaintiffs cite demonstrate that the metric by which progress is gauged in general cases is decidedly different than in antitrust cases. *See* Doc. 226 at 8. In *Todd*, the court stated that an eight-month delay of discovery was an unduly long period of time. 2011 WL 13286329, at *6. In *New Mexico ex rel. King*, the court set a six-month discovery track and found that a three-month period of inactivity demonstrated the case had stalled. 2013 WL 12328915, at *3. By contrast, the SDNY Action had a 16-month discovery track, and in this case, the parties intend to dedicate four months to the preparatory stage alone.

the reasoning. At worst, however, they would not align, and the parties would need to revisit the issues and possibly file motions to reconsider in order to reconcile the discrepancies, further bloating this matter with unnecessary litigation.[6] For similar reasons, a stay benefits non-parties. With clarity on the scope of discovery, non-parties will know exactly what they are required to produce, and some may not even be required for discovery if their knowledge falls outside the timeframe the SDNY finds the Release covers.

Plaintiffs also argue that a stay is contrary to the public interest because the public has an interest in seeing antitrust laws enforced and Defendants should not be permitted to delay that process. As Judge Cote noted, "there is a 'strong judicial policy in favor of settlements, particularly in the class action context.'" *In re Credit Default Swaps Antitrust Litigation*, 2016 WL 2731524, at *7 (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)). The Tenth Circuit has also recognized the importance of that policy for over 50 years. *See Lowery v. City of Albuquerque*, No. CIV 09-0457 JB/WDS, 2013 WL 1010384, at *29 (N.M.D. Feb. 27, 2013) ("It is well-settled, as a matter of sound policy, that the law should favor the settlement of controversies.") (quoting *Grady v. De Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969)). Accordingly, staying this matter does not represent a delay in enforcing antitrust laws. Instead, it ensures this matter adheres to a judgment in a related proceeding that enforced antitrust laws with incredible speed and diligence. Proceeding in this matter without a stay would be to disregard that effort and undercut both the overarching public interest in settlements and the more specific interests of enforcing antitrust laws and relying on the enforcement of past judgments.

---

[6] For example, this Court might decide that Plaintiffs cannot bring claims based on CDS Auctions occurring after— but based on CDS-related misconduct occurring before—June 30, 2014, but the SDNY might decide such claims *can* be brought, or vice versa. In that situation, it is clear that the Court and the parties would have spent time and resources unnecessarily. The burden on the losing party in this Court, however, would be compounded because they will have spent time and money unsuccessfully litigating an issue that ultimately resolved in their favor.

## IV.     CONCLUSION

The parties in the SDNY Action negotiated a fair settlement, including the Release, which unambiguously requires any disputes related to the Release to be resolved in the SDNY. Accordingly, this Court cannot consider whether and to what extent the Release applies and precludes any number of Plaintiffs' claims or whether the Defendants timely raised the Release as a defense—only the SDNY may do so. Proceeding without clarity on how many claims Plaintiffs may bring will almost certainly lead to disputes involving time and resource intensive litigation, the result of which may nevertheless be altered by the SDNY's eventual ruling. In other words, the parties and the Court would be burdened by proceeding with this matter and further complicate, rather than simplify, the discovery process. Accordingly, the Court finds that every factor weighs in favor of granting the Defendants' Motion to Stay.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Stay (Doc. 221) is **GRANTED** and this matter is **STAYED**.

**IT IS FURTHER ORDERED** that:

(1) The parties file joint status reports every 90 days on the status of the SDNY proceedings;

(2) Defendants shall file a notice **no later than seven days** after the SDNY issues a decision on the motion to enforce the Release informing the Court of the same;

(3) The parties shall file a joint status report **no later than 7 days** after the filing of notice of appeal or the expiration of the time to appeal discussing whether and to what extent they believe discovery may proceed; and

(4) If Defendants intend to file a motion for an extension of time to file a notice of appeal with the SDNY, they are advised to file a notice informing the Court of the same.

**IT IS SO ORDERED.**

_____
DAMIAN L. MARTINEZ
UNITED STATES MAGISTRATE JUDGE